IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

FRANK A. WALLS,

      Petitioner,

v.                                 Case No.: 3:06cv237/MCR

WALTER A. McNEIL, Secretary,
Florida Department of Corrections,[1]
et. al,

      Respondents.

_____/

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

      THIS CAUSE is before the court on a petition for a writ of habeas corpus filed by Frank A. Walls, a Florida death row inmate, pursuant to Title 28, United States Code, Section 2254 (doc. 1). Petitioner has asserted twelve claims for relief. Respondents have filed an answer (doc. 23), and Petitioner has filed a reply (doc. 32). After careful consideration of the issues raised in the pleadings and for the reasons stated below, the petition is denied.

## I.  FACTS & PROCEDURAL HISTORY

      The relevant facts are set out as follows in the Florida Supreme Court's opinion affirming Petitioner's conviction and sentence after a retrial:

> During the early morning hours of July 22, 1987, in Okaloosa County, a neighbor heard loud noises coming from the mobile home of the victims, Edward Alger and Ann Peterson. When Alger failed to report for duty at Eglin Air Force Base, where he worked, his superior officer Sergeant John Calloway went to Alger's home. The body of a nude female was discovered in the front bedroom. Calloway left immediately

---

[1] Walter A. McNeil succeeded James R. McDonough as Secretary for the Department of Corrections and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

to telephone police.

When investigators arrived, they identified the woman as Peterson. She was lying face down on the floor of the front bedroom, shot twice in the head. Alger's nude body was found on the floor of the second bedroom. His feet were tied with a curtain cord and a piece of the same cord was tied to his left wrist. Alger had been shot three times and his throat cut.

A warrant was obtained to search the mobile home where Walls lived with his roommate. The warrant was issued based primarily on information given to the investigators by Walls' former roommate, who lived in the mobile home adjacent to that of the victims. A number of items were seized during the search that were linked to the crime scene. Walls was charged with ten offenses. Some of these charges were dismissed or reduced to lesser offenses following Walls' motion for judgment of acquittal at the conclusion of the trial.

Following his arrest, Walls gave a statement to the investigators detailing his involvement in the murders. In this confession, Walls indicated that he deliberately woke up the two victims by knocking over a fan after entering the house to commit a burglary. Then he forced Alger to lie on the floor and made Peterson tie him up so that his hands were "behind the back, ankles shackled." He next forced Peterson to lie on the floor so he could tie her up in the same manner.

Walls stated the Alger later got loose from his bindings and attacked Walls. During the fight, Walls tackled Alger, forced him to the floor, and "caught [Alger] across the throat with the knife." Alger continued struggling with Walls and succeeded in biting him on the leg. At this point, Walls apparently dropped his knife. Walls then pulled out his gun and shot Alger several times in the head.

Walls returned to Peterson. He found her "laying in there crying and everything, asked–asked me some questions." Walls said he could not understand what she was saying, so he removed her gag. She asked if Alger was all right. Walls said:

> I told her no. I told her what was going on, and I said, I came in here, and I didn't want to hurt none of y'all. I didn't want to hurt you, but he attacked my ass, and things just happened.

Walls then untied Peterson, and "started wrestling around with her."
During this second struggle, he ripped off Peterson's clothing. Walls'
confession stated:

> [Peterson] was like curled up crying like. I don't know, I
> guess I was paranoid and everything. I didn't want no, uh,
> no witnesses.
>
> * * * *
>
> I–all I know is just–all I know I just went out, and I just
> pulled the trigger a couple of times right there behind her
> head.
>
> * * * *
>
> I mean close range, I mean shit, it's got powder burns
> (unintelligible) and everything.

Walls stated that after the first shot, Peterson was "doing all kinds of
screaming." He then forced her face into a pillow and shot her a
second time in the head.

Walls pled not guilty and filed several pretrial motions, including a
motion to determine his competency to stand trial. Five experts
testified, three stating Walls was incompetent and two finding he was
competent. The trial judge agreed with the latter two experts and held
that Walls was competent to stand trial. The jury found Walls guilty of
all charges submitted and later recommended life imprisonment for the
murder of Alger and death for the murder of Peterson. The trial judge
concurred. The conviction later was reversed and a new trial ordered.
*Walls v. State*, 580 So.2d 131 (Fla. 1991).

At the retrial, venue was moved from Okaloosa to Jackson County
because of pretrial publicity. The State's guilt-phase case consisted
primarily of the physical evidence, testimony by investigating officers,
testimony of a pathologist, and Walls' taped confession, which was
played for the jury. Walls chose to present no case in the guilt phase.
The jury later found Walls guilty as charged.

*Walls v. State*, 641 So.2d 381, 384-85 (Fla. 1994)("*Walls II*"), *cert. denied*, *Walls v.
Florida*, 513 U.S. 1130, 115 S. Ct. 943, 130 L. Ed. 2d 887 (1995).

At the conclusion of Petitioner's first trial, the jury found him guilty of all

charges submitted and recommended a life sentence for the murder of Alger and a sentence of death for the murder of Peterson by a vote of seven to five. *Walls v. State*, 580 So.2d 131, 133 (Fla. 1991)("*Walls I*"). On direct appeal Petitioner raised several issues, one of which the Florida Supreme Court concluded entitled Petitioner to a new trial. The court found that a correctional officer's surveillance of Petitioner violated due process when it involved the use of subterfuge to obtain psychiatric information from him while he was incarcerated prior to trial. *See id.* Petitioner's convictions were reversed, and a new trial was held on all issues.

Following a retrial, Petitioner was again convicted on all charges. After the penalty phase of the retrial, the jury recommended the death penalty for the murder of Peterson by a unanimous vote. *Walls II*, 641 So.2d at 386. The trial court followed the jury's recommendation and sentenced Petitioner to death for the murder of Peterson and to life for the murder of Alger. Petitioner could not be sentenced to death for the murder of Alger on retrial because of double jeopardy. Petitioner was also sentenced to five years for burglary of a structure, twenty years for the armed burglary of a dwelling, twenty years each for two counts of kidnaping, and two months for petty theft. *Id.*

The trial court found six aggravating factors which supported imposition of the death penalty: (1) a prior violent felony conviction (the contemporaneous murder of Alger); (2) the murder was committed during a burglary or kidnaping; (3) the murder was committed to avoid lawful arrest; (4) the murder was committed for pecuniary gain; (5) the murder was heinous, atrocious, or cruel ("HAC"); and (6) the murder was cold, calculated, and premeditated ("CCP"). *Id.* The trial court found the following nonstatutory mitigating factors: (1) Petitioner had no significant history of prior criminal activity; (2) his age at the time of the crime (nineteen); (3) he had been classified as emotionally handicapped; (4) he had apparent brain dysfunction and brain damage; (5) he had a low IQ such that he functioned intellectually at about the age of twelve or thirteen; (6) he confessed and cooperated with law enforcement

officers; (7) he had a loving relationship with his parents and a disabled sibling; (8) he was a good worker when employed, and (9) he had exhibited kindness toward weak, crippled, or helpless persons and animals. *Id*. The court concluded that these mitigating factors were of insufficient weight to preclude the death penalty. Petitioner appealed his conviction and sentences, raising nine issues.[2] The Florida Supreme Court found no error and affirmed Petitioner's conviction and sentences. *Walls II*.

Petitioner thereafter filed a motion for postconviction relief under Fla. Rule of Criminal Procedure 3.850 and amended the motion twice. He raised nine claims in his seconded amended motion.[3] The postconviction court denied relief on all claims, and the Florida Supreme Court affirmed. *Walls v. State*, 926 So.2d 1156 (Fla. 2006)(*"Walls III"*). Petitioner filed the instant petition on May 26, 2006. Doc. 1. On July 12, 2006, he moved to hold the case in abeyance in order to exhaust a mental

---

[2]Petitioner raised the following issues on direct appeal of his second conviction and sentence: (1) the trial court should have excused a potential juror for cause or granted the defense an additional peremptory challenge to excuse the juror; (2) the State improperly exercised peremptory challenges to dismiss two black jurors based on their race; (3) the jurors were kept in session for overtaxing hours during trial; (4) the trial court gave the jury erroneous penalty phase instructions on the mitigating factors of mental disturbance, impairment, or duress and on the aggravating factors of HAC and CCP; (5) the trial court refused to provide the jury with a detailed interpretation of emotional disturbance as a mitigating factor; (6) the trial court made errors in its findings on the aggravating factors because HAC and CCP were not proven beyond a reasonable doubt, the evidence did not support the conclusion that the murder occurred during a kidnapping, the commission during a burglary aggravating factor impermissibly doubled the pecuniary gain factor, and the avoid arrest aggravator was improper; (7) the trial court required Petitioner to prove the mitigating factors by a preponderance of the evidence; (8) the trial court improperly rejected expert testimony that Petitioner was suffering from extreme emotional disturbance and substantial impairment; and (9) the death sentence was not proportionate to the crime in this case. *Walls v. State*, 926 So.2d 1156, 1163 (Fla. 2006).

[3]Petitioner raised the following claims: (1) he was denied a fair guilt phase proceeding due to ineffective assistance of counsel, prosecutorial misconduct and trial court error; (2) defense counsel conceded his guilt and eligibility for the death penalty without his consent; (3) he was denied a fair penalty phase proceeding due to ineffective assistance of counsel, prosecutorial misconduct, and trial court error; (4) counsel failed to obtain an adequate mental health evaluation in violation of *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1983); (5) his death sentence is unconstitutional because he is mentally retarded; (6) the trial court did not independently weigh the aggravating and mitigating circumstances; (7) the trial court considered inadmissible victim impact evidence; (8) the jury was improperly instructed on the aggravating factors; and (9) the cumulative effect of these procedural and substantive errors deprived him of a fair trial. *Id*. at 1163-64 n.1.

retardation claim in state court (doc. 11), and this court granted a stay (doc. 12). The trial court denied Petitioner's successive motion for postconviction relief on the mental retardation claim, and the Florida Supreme Court affirmed on October 31, 2008. *Walls v. State*, 3 So.3d 1248 (Fla. 2008)("*Walls IV*"). The petition is now ripe for adjudication.

## II. EVIDENTIARY HEARING

Petitioner requests a plenary evidentiary hearing on the claims presented in his petition.[4] Doc. 1 at 2. Title 28 of the United States Code, Section 2254 provides for an evidentiary hearing in federal habeas claims under very limited circumstances:

> **(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--**
>
> > **(A) the claim relies on--**
> > > **(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or**
> > > **(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and**
> >
> > **(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.**

28 U.S.C. § 2254(e)(2)(2002). Under Section 2254(e) a hearing is not warranted "if such a hearing would not assist in the resolution of [the] claim." *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002) (citation omitted). Stated affirmatively, "'a habeas petitioner is entitled to an evidentiary hearing if he or she alleges facts that, if proved at the hearing, would entitle petitioner to relief.'" *Id.* (quoting *Meeks v. Singletary,* 963 F.2d 316, 319 (11th Cir. 1992)). In the post-AEDPA world, whether

---

[4]Petitioner was granted an evidentiary hearing in state court.

petitioner would be entitled to relief is considered in light of the heavy presumptions in favor of sustaining the state court adjudication. Petitioner has not presented or proffered any evidence to this court which would necessitate an evidentiary hearing on any of the claims he presents. *See Kelley v. Sec.'y for Dep't of Corr.*, 377 F.3d 1317, 1334-37 (11th Cir. 2004)(capital petitioner met none of the requirements contained in 28 U.S.C. § 2254(e)(2), thus district court abused discretion in granting evidentiary hearing). Accordingly, his request for an evidentiary hearing is denied.

### III. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[5] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). The Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds* by *Parker v.*

---

[5]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Head*, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting *Williams*, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If, on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must proceed to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court

case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law may be found reasonable, and not warranting a writ, so long as the State court adjudication results in a "satisfactory conclusion." *Williams*, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum). When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and

§ 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); *Jones*, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U. S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[6]

Within this framework, the court will review Petitioner's claims.

## IV. PETITIONER'S CLAIMS

**Ground I: Ineffective Assistance of Counsel–Guilt Phase**

**A.** <u>Failure to Object to and/or Exclude Evidence Regarding Sexual Battery</u>

Petitioner contends that his trial counsel provided ineffective assistance of counsel in failing to exclude references to a sexual battery on Ann Peterson even though no sexual battery occurred. Specifically he argues that portions of a taped confession should have been redacted in which commission of a possible rape was discussed and that testimony by an evidence custodian concerning a sexual battery kit should have been excluded. Petitioner believes that he was prejudiced by these suggestions of sexual battery which his counsel allowed "to permeate" his trial. Doc. 1 at 47-48.

**1. State Court Proceedings**

---

[6]This harmless error standard is also applicable to cases involving habeas challenges to death sentences. *See Calderon v. Coleman*, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); *Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993); *Hicks v. Head*, 333 F.3d 1280 (11th Cir. 2003).

Petitioner raised this issue in his amended motion for postconviction relief. The postconviction court denied relief, and the Florida Supreme Court affirmed, stating as follows:

At trial, one of the crime scene investigators testified that a sexual battery kit was used to collect blood and saliva samples from Walls in order to determine whether he was a blood contributor on clothing found in his residence.  Walls contends that counsel should have objected to the mention of the sexual battery kit because the jury may have inferred that Walls committed an uncharged sexual battery. However, both the trial transcript and the evidentiary hearing testimony of counsel support the trial court's conclusion that the jury was "well aware of the purpose of the collection of samples from the defendant" and that the exhibits in question had nothing to do with a sexual battery.  The investigator only mentioned the sexual battery kit during two lines of testimony when he was identifying the samples taken from Walls.  The record clearly shows that there was no allegation, nor even an implication, that a sexual battery had been committed on Peterson. Thus, counsel's failure to object to this testimony did not constitute deficient performance and Walls is not entitled to relief on this claim.

Walls also claims that counsel was ineffective for failing to make a motion in limine and failing to object at trial to questions and references to a possible sexual battery against victim Peterson which were contained in Walls' taped confession that was played to the jury at trial.  The lower court found that counsel's decision not to object or file a motion in limine was a well-reasoned tactical decision because the portion of the tape in which Walls was questioned about a potential sexual battery demonstrated his remorse and confusion and supported the defense theory of a "burglary gone bad."  Several times during the tape the investigator asked Walls if he had sex with Peterson.  Each time Walls responded that he did not know.  When the investigator asked Walls if he entered the residence for money or for sex, he responded that he went in to get a few dollars.  He also stated that he had no intent to harm the victims but his plan fell apart when Alger loosened his bonds and attacked him.

During the evidentiary hearing, trial counsel Earl Loveless testified that it was clear to both sides that no sexual battery had occurred and that the State conceded this point.  Loveless also testified that it was a strategic decision not to make objections to this material because it was clear to the jury that no sexual battery had occurred.  Trial counsel

James Sewell explained that he wanted the jury to hear the entire taped statement because it reflected a "sobbing, crying, remorseful, and repentant" defendant.  Sewell also noted that Walls exhibited confusion and emotional distress when he was questioned about a possible sexual battery.  Counsel regarded the tape as useful in proving mitigation and bolstering the defense theory of a "burglary gone bad." Both Loveless and Sewell testified that sexual battery was a "non-issue" and that the jury clearly understood this.

The record clearly supports the trial court's conclusion that counsel made a tactical decision not to redact Walls' taped confession because the tape in its entirety helped prove the defense's theory of the case. Thus, Walls is not entitled to relief on this claim.

*Walls III*, 926 So.2d at 1165-66.

2.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under *Strickland*, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.*, 466 U.S. at 687.  It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof.  *Id.*  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L. Ed.2 d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana, supra,* 350 U.S. at 101, 76 S. Ct. at 164.

*Strickland,* 466 U.S. at 689.

As to the prejudice prong of the *Strickland* standard, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Strickland,* 466 U.S. at 693. The Court has also clarified, however, that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. *Strickland,* 466 U.S. at 693–94. Instead,

[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in *Strickland* for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. *Williams v. Taylor, supra,* 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Strickland,* 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion

only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

3.      **Federal Review of Claim**

The Florida Supreme Court cited *Strickland* as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to Petitioner's claims. *Walls III*, 926 So.2d at 1164-65. The court, therefore, applied the correct legal rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

As an initial matter, it is important to note that Petitioner's lead defense counsel, Chief Assistant Public Defender Earl Loveless, had tried eight to ten capital cases by the time of Petitioner's retrial. Postconviction Record ("PCR") IV at 633. The postconviction court found that Mr. Loveless had been an assistant public defender since 1977 and "possessed the experience and qualifications necessary to represent the defendant as lead counsel and was capable of developing and adhering to a trial strategy based on his years of trial experience." Order on Defendant's Second Amended Motion to Vacate Judgment of Conviction and Sentence ("Postconviction Order"), PCR III at 450. Mr. Loveless had also been involved directly or indirectly in several hundred first degree murder cases in which the death penalty had been sought. PCR IV at 634. Notably, he represented Petitioner in both of his trials, with the first trial resulting in a life sentence for the murder of Ed Alger and a seven to five recommendation for death for the murder of Ann Peterson, just one vote away from a life recommendation. *See* PCR IV at 603 & 634. Because Mr. Loveless was an experienced trial attorney, the presumption that his conduct was reasonable is strong.

*See Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000)("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.") .

The references to a possible sexual battery on Ann Peterson occurred in the taped statement or confession that Petitioner gave to investigators when he was arrested.  This tape was played for the jury during the guilt phase of the trial.  The relevant portions of the tape at issue are as follows:

**INVESTIGATOR VINSON:**

Let me ask you something.  When we found her, she was not tied up, so you had to untie her, right?

**WALLS:**    I had to have, I think, uh, I think–

**VINSON:**    Okay, when–when did you have sex with her?

**WALLS:**    I don't even know if I did that or not.

**VINSON:**    Wait a minute, think about it very, very carefully for me, because, you know, she's a good looking woman.  She's–she's nude, you know.

**WALLS:**    I don't even know if I did that or not.

**VINSON:**    You don't know?

**WALLS:**    It could have been, I don't know.  I just–I was fucking–I was scared shitless.

**VINSON:**    All right, if you had had sex with her, would it have been an anal sex, or would it have been vaginal sex?

**WALLS:**    I don't get into no anal sex.

**VINSON:**    You're not into anal sex?  So it'd be vaginal sex?

WALLS:       More than likely.  I don't–I don't think I done it,
             I don't know.

                              * * * *

WALLS:       I don't know what made me go in there and do
             things like that.  I mean, shit.

VINSON:      Frank, did you go in there to–for money, or did
             you go in there for sex?

WALLS:       I just went in there to get some few
             (unintelligible) or something, you know.

VINSON:      A few dollars?

WALLS:       To get something, I mean I'm flat broke.  I'm
             practically living on my own, on the street, and,
             well, I finally got the place with John.

                              * * * *

VINSON:      I want you to think about something.  I
             want–and it's very important.  Did you have sex
             with that girl?

WALLS:       What girl?

VINSON:      Ann, the one that was–you had tied up on the
             floor.

WALLS:       I can't tell you, I don't know.

Trial Record ("T.") IV at 675-76; 681-82; 683.  The transcript of the tape is twenty-two

pages long, and these are the only references to a possible sexual battery.  Throughout

the confession Petitioner describes the scene of the murders as chaotic; he says he

went "beserk," "nuts," "crazy," and "I don't know where I was, I don't know what I was

doing;" there were many details he could not remember.  *Id.* at 673.

        Mr. Loveless testified at the evidentiary hearing that he did not attempt to have

portions of the taped statement dealing with a possible sexual battery redacted

because:

> I simply felt that it was better to give the impression to the jury that we weren't trying to hide anything and that everything was going to come out, and that Frank, during his discussions, was being truthful, was being as honest as he could, and that it would become clear during the trial to the jury that regardless of those questions, there was no evidence a sexual battery or a rape either was attempted or actually completed.

* * * *

> One of the things in dealing with a case of this nature is that you have to at least try to get the jury a little bit on your side if you can, and the only way you have, I think, as a defense attorney of doing that is to try to convince the jury that you are being honest with them, and that you are being as straightforward with them as you possibly can, and that you're not trying to play games with them, to keep things out, to keep them from seeing things, and that's one of the issues that's always going on in a trial like that.

PCR IV at 611 & 619. Mr. Loveless testified that in his memory the "overall tone" of the tape was one of denial of the allegations of sexual battery, and in his experience and observation he did not believe that the jury really considered these allegations an issue. *Id.* at 617 & 620.

James Sewell, who was then chief assistant public defender in Okaloosa County and co-counsel on the retrial of this case, testified in the evidentiary hearing that he had tried five to seven capital cases by the time of Petitioner's trial and had taken one case through the penalty phase. *Id.* at 682-83. Mr. Sewell was responsible for the penalty phase of the trial, and he testified that the taped statement was an important part of the defense's strategy because it was a way for the jury to hear Petitioner's state of mind and his confusion because they were not going to call Petitioner as a witness at trial. *Id.* at 689. Mr. Sewell explained that the statement was:

> . . . a huge part of our strategy as far as the guilt/innocence and the penalty phase, because the statement was–the remorse reflected in the statement, the fact that our theory was that this was not a planned crime, one that Frank, you know, intended to commit, and that it was a burglary gone awry, and that's how we were going to try the case, that once the

fight occurred between he and Mr. Alger that it became a life and death situation as was testified to earlier. Frank was bitten, enraged, and that because of his mental health deficits and other factors throughout his life, that he was not in a position to control, you know, his actions at that point in time. It was not an insanity defense, but it was going towards the intent to commit the crimes charged. The sexual battery aspect of it was not even, in my mind's eye, was not an issue because there was no question that he did not commit a sexual battery upon the lady.

*Id.* at 684-85. Mr. Sewell felt that because Petitioner began to cry when the questions about a possible sexual battery arose and became uncertain as to what happened, his emotional distress at that point was indicative of remorse, an important mitigation factor. *Id.* at 686-87. He believed that the statement reflected Petitioner's mental state, and he did not believe that the sexual battery statements were anything that the jury would consider. *Id.* at 689.

The remaining reference to a possible sexual battery on Ms. Peterson is the testimony of Jules Borio, an investigator and evidence custodian with the Okaloosa County Sheriff's Department. He mentioned a sexual battery kit while describing numerous photographs and exhibits:

Q. [by Mr. Grinsted for the State]:

I'm going a little out of order here. Let's go to DD, State's Composite Exhibit DD-1, 2, 3, 4 and 5. What are DD-1, 2 and 3? I'm sorry, Jules, that would be your Exhibit 141. What are they?

A. [Borio]:

This is going to be a sexual battery kit, palm and fingerprints. It was turned over to me by Investigator Don Vinson on the 21st of August, 1987. It went to the laboratory on 21 August 1987 and returned back to me on the 2nd of October, 1987.

Q. That would be fingerprints, blood samples, saliva sample?

A. It's a sexual battery kit. That would include all them items.

T. III at 407. When asked at the evidentiary hearing why he did not object to this

reference to a sexual battery kit, Mr. Loveless stated that he generally allows investigators to testify about what was done in a particular case "unless there is something that's so egregious that you need to keep it out." PCR IV at 617-18.

The postconviction court made the following findings with regard to this claim:

As to the claim that defense counsel was deficient in failing to object to Jules Borio's testimony regarding a sexual battery kit used for the purpose of excluding the defendant as a contributor of blood on pieces of evidence, the trial transcript clearly demonstrates that it was made clear to the jury and the jury was well aware that pieces from the kit were used to take samples from the defendant to exclude him as a blood contributor on evidence; thus, the jury was aware of the purpose of the kit and they could not have inferred from the testimony that the defendant had committed an uncharged battery. (Footnote omitted). As counsel testified during the evidentiary hearing, the jury was well aware of the purpose of the collection of samples from the defendant; thus, the failure to object to Jules Borio's testimony did not constitute deficient performance by defendant's trial counsel.

Likewise, trial counsel's failure to object to the defendant's taped statement or file a motion *in limine* concerning the statement was not deficient performance. The Court is satisfied that Mr. Loveless and Mr. Sewell chose not to move for a pre-trial motion *in limine* or object at trial to the questions regarding a possible sexual battery for tactical reasons. Mr. Loveless and Mr. Sewell testified that they had developed a trial strategy which was to save the defendant's life. The taped confession of the defendant demonstrated their theory of defense, which was that the defendant did not break into the trailer for the purpose of killing the victims instead it was a "burglary gone bad." (Footnote omitted) During the confession, the defendant's confusion over whether or not a sexual battery had occurred, when it was made clear to the jury that a sexual battery had not in fact occurred, and the defendant's emotional distress demonstrated the defense's theory. As Mr. Sewell testified, the sexual battery questions posed during the defendant's confession were not an issue because there was never a question or an issue as to whether a rape occurred. Also, Mr. Sewell testified that the confession made by the defendant was a large part of the guilt and penalty phase strategy. The portion of the statement wherein the defendant is questioned regarding a potential sexual battery demonstrates that the defendant became confused, upset, emotional and remorseful. Mr. Sewell testified that he believed that the statement in its entirety showed remorse, confusion, and bolstered the defense theory that

this was a "burglary gone awry." Furthermore, both Mr. Loveless and Mr. Sewell testified that their defense was very limited due to the confession and physical evidence; thus, their only choice was to try to save the defendant's life through showing that the murders were not cold, calculated and planned. The taped statement of the defendant was played for the jury and during cross examination by Mr. Loveless testimony was elicited that the defendant was teary eyed and upset during the statement. (Footnote omitted). The decision to not object was not deficient performance but in fact a well reasoned tactical decision based on their years of experience. As to the decision not to file a motion *in limine*, as discussed above Mr. Loveless and Mr. Sewell both stated that they believed that the statement in its entirety helped prove the defense theory of the case; thus, they did not file the motion. The defendant is now alleging that a letter from the Office of the State Attorney dated July 1, 1988 should have made Mr. Loveless aware of rape being an issue in the trial and Mr. Loveless should have reacted to the letter by filing a motion *in limine* to keep out all references to a possible sexual battery on Ann Peterson. However, a sexual battery charge was never filed against the defendant and it was not an issue in this trial. In fact, the letter itself referred to redacting inadmissible questions concerning the Gygi murder and an old rape investigation. The Court is satisfied that not reacting to this letter received by Mr. Loveless did not constitute ineffective assistance of counsel. Again, the defendant's trial counsel developed and adhered to a well reasoned trial strategy and dealt with the statement made by the defendant in a manner consistent with their strategy. The defendant has failed to establish ineffective assistance of counsel.

Postconviction Order, PCR III at 451-53.

A review of the record supports the courts' conclusion that Petitioner did not demonstrate deficit performance by his trial counsel. Given Petitioner's taped statement/confession and other physical evidence, defense counsel determined their best defense would be to show that the murders occurred during the course of a burglary gone awry. They believed that the tape supported their theory; therefore, they did not seek to redact portions of the tape referencing the possible sexual battery on Ms. Peterson. Petitioner has not demonstrated that this defense strategy was unreasonable or was a strategy that no competent counsel would use. Additionally, Petitioner was not charged with a sexual battery; thus, it is not reasonable to assume that the jury would consider the references in the tape as evidence that such a crime

occurred. As to Mr. Borio's brief testimony with regard to the sexual battery kit, testimony by several witnesses at trial explained why the kit was used. *See* testimony of Lonnie Ginsberg, FDLE forensic serologist, T. IV at 622-623 & 629-630; testimony of Dr. Edmund Kielman, T. IV at 578; testimony of Don Vinson, T. III at 486; and testimony of Larry Donaldson, T. III at 495.

Evaluating the reasonableness of counsels' performance from their perspective at the time, the court finds Petitioner's counsels' performance was reasonable. This conclusion is further supported by the fact that during the first trial, the jury recommended life for the murder of Mr. Alger and death for the murder of Ms. Peterson by a recommendation of seven to five. Defense counsel was reasonable in employing the same strategy in the retrial. Since Petitioner has failed to meet the first prong of *Strickland*, the second prong of the analysis, whether Petitioner was prejudiced, need not be addressed. *See Strickland*, 466 U.S. at 697.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**B.**     <u>**Failure to Object to Prosecutor's Guilt Phase Closing Argument**</u>

Petitioner contends that the prosecutor's closing remarks regarding his lack of remorse "exhude venom and clearly cross the line into improper inflammatory comments." Doc. 1 at 54. He also contends that the prosecutor's implication that a neighbor who testified about what she heard during the killings would have been

harmed had she gone over to the trailer to investigate is "demagogic demonization at its worst."  *Id*. at 55.  Petitioner claims that his counsel's failure to object to these two remarks constitutes ineffective assistance of counsel.

1.    **State Court Proceedings**

Petitioner raised this issue in his amended motion for postconviction relief.  The postconviction court denied relief, and the Florida Supreme Court affirmed, holding:

> The trial court ruled that the prosecutor's lack of remorse comment was not an improper comment but an invited response based on defense counsel's closing argument.  As to the prosecutor's comments about the witness, the court concluded that defense counsel made a tactical decision to maintain a "low-key" defense and not object too frequently.  However, the court concluded if counsel was deficient in this regard, Walls failed to establish prejudice from counsel's failure to object.

> During closing argument, defense counsel argued that Walls' sobbing and tearful statements on the taped confession showed that he did not premeditate the murders and was sorry for what had happened.  In response, the prosecutor commented that Walls only expressed concern for himself and how his life had been ruined and never stated that he was sorry for the victims.  The prosecutor argued that Walls could have stopped the incident after he injured Alger, but instead went on to kill both victims.  This record supports the trial court's conclusion that the prosecutor's comment was an invited response and did not constitute an improper comment.  A prosecutor's comments are not improper where they fall into a category of an "invited response" by the preceding argument of defense counsel concerning the same subject.  (Citations omitted).  Thus, we agree with the trial court that Walls is not entitled to relief on this claim.

> Walls also argues that defense counsel was ineffective for failing to object to the prosecutor's closing argument in which he implied that had Amy Touchton become an eyewitness by going over to the trailer during the incident Walls would have killed her.  During closing argument, the prosecutor noted that Walls had stated that he "didn't want any witnesses" when asked about Peterson's murder during his taped statement.  The prosecutor then reminded the jury to "think about Amy Touchton, remember Amy Touchton.  She said she almost went over there and knocked on the door.  Maybe she would have been a witness.  Frank wasn't going to have any witnesses."  Walls' counsel offered no objection

to this comment. When trial counsel Loveless was asked about this statement at the evidentiary hearing, he had no independent memory of the argument but offered a number of reasons why he would not have objected to the statement, including the context in which it was said, what he might have said to trigger the comment, how innocuous or important he felt the comment was, and whether he had previously objected to anything else in the prosecutor's argument.

Much of the defense's closing argument at trial focused on the discrepancy between Walls' taped statement in which he stated that Peterson's screams caused him to fire the second fatal shot into her head and Touchton's testimony that she did not hear any female screams or a female voice at all. Defense counsel argued that Touchton's testimony that she heard three gunshots followed by a man's voice saying "no, no, no" indicated that Walls was not a cold-blooded killer and the "no, no, no" was Walls expressing his remorse about shooting Alger.

We agree with Walls that the prosecutor's speculative comment about what Walls might have done to Touchton was improper. However, even if counsel's failure to object to this comment was deficient performance, Walls cannot show how he was prejudiced by this one comment. In order to require a new trial based on improper prosecutorial comments, the prosecutor's comments must:

> either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.

*Spencer v. State*, 645 So.2d 377, 383 (Fla. 1994). The improper comment in this case does not approach this level. *See, e.g., Brooks v. State*, 762 So.2d 879 (Fla. 2000) (finding that a new penalty phase proceeding before a new jury was required based on the prosecutor's closing argument that included dehumanizing comments about the defendants, a statement that the jury should show the defendants the same mercy they showed the victim, a "prosecutorial expertise" argument that cloaked the State's case with legitimacy as a bona-fide death penalty prosecution, a misstatement of the law regarding the weight given merged aggravators, an argument that the jury had a sworn duty to come back with a determination of death, a denigration of the mitigation evidence offered by the defendants and personal attacks on the defense counsel). Thus, we agree with the trial

**court that Walls has not met the *Strickland* prejudice prong on this claim and is not entitled to relief.**

*Walls III*, 926 So.2d at 1166-67.

 2. **Clearly Established Supreme Court Law**

 The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

 3. **Federal Review of Claim**

 In order to properly evaluate this claim, the closing arguments of both the prosecutor and defense counsel must be reviewed in their entirety. During his closing argument, Mr. Loveless emphasized that the murders committed by Petitioner were not premeditated and that the taped confession made that clear. T. V at 725. With regard to a witness, Amy Touchton, testifying that she heard a man say "no, no, no," Mr. Loveless argued that the man was Petitioner expressing remorse after he shot Mr. Alger, not Mr. Alger pleading for his life. He said:

> Just ask yourself what kind of a person says that? Is that the cold-blooded killer I'm sure Mr. Williams will tell you he is? Is that the person that you hear on that tape? I've never heard a person described as teary-eyed before. I have never heard a person sound teary-eyed who was audibly sobbing on the tape, but you listen to it, and you'll see. Is that a person who is pausing to reflect on his actions to premeditate a second murder, or is that a person who is going beserk in a house as Frank has described himself.

*Id*. at 727. Mr. Loveless also told the jury to consider that Petitioner "has never denied his guilt" and that his story "came pouring out" as soon as he was picked up by police. *Id*.

 The prosecutor, Charles Williams, responded in his closing argument that Petitioner only began confessing to the crime when he knew he had been caught:

> Remember and I know you remember it, Pete Jones' testimony, the first officer on the scene, saw Frank Walls that same day when the bodies were found, and what he said to him was not, I can't wait to tell you what happened here because I'm so sorry. What he said to him was, "I hope you catch that son of a bitch" and kept going. And, you know, that's something about his statement that sticks in my mind more than anything

else, and I'm a fairly gentle person, but it gets you indignant to think about the only thing Frank Walls talks about in his statement was, "This ruined my whole life." Yeah, this ruined Frank Walls' whole life. Did you hear him say anything about Ann Peterson or Ed Alger? I've been thinking about it. I'm asking you to be indignant.

*Id.* at 730-31. Mr. Williams also maintained that the State had proved beyond a reasonable doubt that Petitioner had committed first degree murder from the facts presented and inferences that could be drawn from the facts:

There's no question that Frank Walls broke into that trailer with a gun and a knife. I mean, what is there to argue about? But you wonder why someone who's just out–who says he's just out for the money goes to a place where there are three vehicles parked in the yard at two o'clock in the morning, a trailer, a house trailer, and he's going in there to steal something knowing or at least he must realize that there were people inside. He must realize it, but he didn't want any witnesses. He killed Ed Alger but one slip with the knife didn't do the job so he had to shoot him three times. At that particular moment this person is being painted to you by Mr. Loveless, why didn't he run out of that place, call the ambulance, call somebody and say, you know, this has gotten out of hand. I just came in here to steal something. I didn't want to hurt anybody, help this person. They may be dying. That didn't happen. No, he went to the next bedroom where that young girl is lying there, bound hands and feet, and shot her twice and killed her because he didn't want any witnesses. Ladies and gentlemen, that's reflection enough for first degree murder. That's all it takes. How much time does it take a person to know that they want to kill the witnesses, to take those steps, to go from one room to the other and not try to help the person who's been shot, not try to say, run, just can't wait to tell everyone what happened because they're so sorry? He didn't do that, and he didn't do it after he killed Ann Peterson? What did he do? What did he do? This makes me indignant, too. He takes the money and goes to Kay's Body Shop and he spends money on drinks and dancing girls. That's your caring, giving person that Mr. Loveless is describing. This man is guilty of first degree murder. He did not care about those victims. He did what he had to do, and he never once said he was sorry about them.

*Id.* at 733-34.

A review of the closing arguments reasonably supports the state court's conclusion that the prosecutor's remarks with regard to Petitioner's lack of remorse

were made in response to defense counsel's statements that Petitioner was not cold-blooded and did not plan to commit these murders. Mr. Loveless used Petitioner's taped statement to support their defense theory, and Mr. Williams used the statement to support an opposite interpretation of Petitioner's actions. The prosecutor's argument must be evaluated in light of the defense argument that preceded it. The state court determined that statements made by Mr. Williams were an invited response based on statements in defense counsel's preceding closing argument. Because Florida courts recognize that a prosecutor's remarks are not improper when they were invited by the preceding argument of defense counsel, Petitioner has not demonstrated deficient performance. *See Barwick v. State*, 660 So.2d 685, 694 (Fla. 1995); *Sorey v. State*, 463 So.2d 1225 (Fla. 3d D.C.A. 1985). [7]

While Mr. Loveless did not have an independent recollection of the prosecutor's comments on Petitioner's lack of remorse, he testified that "I object to anything I think is appropriate and is worthy of an objection," but that there are a number of reasons not to object during the opposing party's closing statement including "the context in which [the comment] occurred . . . , what I had said to possibly trigger that, how innocuous it was or how important I felt it was, whether I had previously objected to anything else." PCR IV at 623 & 624. Mr. Loveless, who had adopted a "low-key" defense strategy, made a tactical decision not to object to the comments at issue, and because these comments were a fair response to previous argument, Petitioner has not demonstrated that Mr. Loveless's performance "fell below an objective standard of reasonableness" considering all of the circumstances. *See Strickland*, 466 U.S. at 687.

As to the statement at issue concerning Amy Touchton, Mr. Williams commented:

---

[7]While generally considered in cases of prosecutorial misconduct, "the idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Darden v. Wainwright*, 477 U.S. 168, 182, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)(quoting *United States v. Young*, 470 U.S. 1, 13, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)). In *Darden*, the Court recognized that a defendant's due process right to a fair trial is not infringed by a prosecutor's comments that are "undesirable or even universally condemned;" instead, the comment must have"infected the trial with such unfairness that the conviction constitutes a denial of due process." *Id.* at 181. The comments must be viewed in the context of the entire trial.

And one of those things he said in that statement besides the one that I just told you about that this has ruined my whole life, is the statement he made about Ann Peterson. "I just didn't want no witnesses." All right. Let's assume he was telling the truth there. I don't know whether he was or not, but what he did–he admits he did in his statement. You got to believe that he might be the kind of person to say, "No, I don't want any witnesses. I'm going to kill them." Just think about Amy Touchton, remember Amy Touchton. She said she almost went over there and knocked on the door. Maybe she would have been a witness. Frank wasn't going to have any witnesses.

T. V at 731-32.

The state court found that this statement was improper; however, it found that Petitioner had not been prejudiced by this one comment. The court found the comment did not rise to the level of prejudice under *Strickland* because it did not materially contribute to the conviction, fundamentally taint the trial or so inflame the jury that it was influenced to reach a more severe verdict than it would otherwise have. *Walls III,* 926 So.2d at 1167. Given the overwhelming evidence of Petitioner's guilt, including his taped confession admitting to the murders, Petitioner has not demonstrated that there is a reasonable probability that, had the challenged comment not been made, the jury would not have recommended death and the trial court would not have imposed it. *See Mills v. Singletary*, 63 F.3d 999, 1029 (11th Cir.1995). *See also Strickland*, 466 U.S. at 693-94. Therefore, Petitioner has not established prejudice under the *Strickland* standard.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly

established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

C. **Concession of Guilt**

Petitioner contends he received ineffective assistance of counsel when his trial counsel conceded both his guilt and death-eligibility in his opening statement. He claims that his own testimony during the evidentiary hearing demonstrates he was not informed of the defense strategy and did not consent to any strategy which included a concession of his guilt. Petitioner states he believed he was pleading an insanity defense. Doc. 1 at 57-58.

1. **State Court Proceedings**

Petitioner raised this issue in his amended motion for postconviction relief. The postconviction court denied relief, and the Florida Supreme Court affirmed, holding as follows:

> Walls alleges that trial counsel conceded his guilt to felony murder and conceded the existence of the aggravating circumstance of a murder committed during the course of a felony without his consent. The trial court found that counsel discussed these concessions as trial strategy with Walls and that Walls specifically agreed to this strategy. Thus, the court concluded, trial counsel did not render ineffective assistance of counsel in making these concessions. We find competent, substantial evidence to support these findings.
>
> At the evidentiary hearing, both of Walls' attorneys testified that they discussed the trial strategy of conceding guilt to felony murder with Walls on numerous occasions and that Walls both understood and specifically agreed to this strategy. Walls testified that he never agreed to concede guilt or to concede any of the aggravating factors, that he did not understand counsels' trial strategy, and that he did not discuss strategy with counsel. However, upon questioning by the judge, Walls described his understanding of the trial strategy as a "robbery gone awry" argument, that is, he entered the victims' trailer with the intent to steal from them but without any intent to kill them. Thus, Walls description of what he thought the trial strategy would be is exactly the trial strategy presented by his counsel.
>
> Moreover, even if Walls' testimony had been in direct conflict with the

testimony of his attorneys, we would still recognize the trial court's superior vantage point in assessing the credibility of witnesses. *See Chandler v. State*, 848 So.2d 1031, 1041 n.11 (Fla. 2003)(affirming denial of postconviction relief on a similar claim of conceding guilt where court found trial counsel's testimony to be more credible than that of the defendant, who "waffled" on whether he agreed to the strategy in his testimony); *see also Stephens v. State*, 748 So.2d 1028, 1034 (Fla. 1999) (recognizing trial court's superior vantage point in assessing credibility of witnesses). Thus, we affirm the trial court's denial of postconviction relief on this claim.

*Walls III*, 926 So.2d at 1167-68.

2.      **Clearly Established Supreme Court Law**

The standard for evaluating claims of ineffective assistance of counsel are set forth *supra*.

3.      **Federal Review of Claim**

Mr. Loveless testified during the evidentiary hearing that he used the same strategy, a burglary gone awry, in both Petitioner's first and second trials because it was the only strategy available in his opinion. PCR IV at 605. Mr. Loveless stated he discussed the strategy with Petitioner numerous times and believed that Petitioner understood.[8] According to Mr. Loveless, he does not normally discuss his opening statements with his clients, and he had no memory of doing so with Petitioner in this case. *Id.* at 608-09. With regard to conceding Petitioner's guilt, he testified that "I didn't perceive a defense that would have Frank being acquitted," so Mr. Loveless conceded Petitioner's guilt to the burglary and felony murder.[9] *Id.* at 625-26. Mr. Loveless said that the nature of the crime meant that he conceded the murder during the commission

---

[8]When asked by Petitioner's postconviction counsel on what basis he held this belief, Mr. Loveless responded, "Well, just experience. Over years of having to talk to people and speaking to him and his responses, his cooperation, his assistance, just his general demeanor, that the great majority of the time, yes, he did understand." PCR IV at 606.

[9]He said that "[f]rankly, I didn't see a way other than an insanity defense in this particular case given the evidence that was going to come in, including Frank's statement, that we would ever be able to dispute the felony murder," and that he "absolutely" informed Petitioner of this before both trials. *Id.* at 626.

of a burglary aggravator and he may have conceded the prior violent felony aggravator due to Mr. Alger's contemporaneous murder.  *Id.* at 627.  Mr. Loveless, however, did not concede that Petitioner was guilty of premeditated murder.  *Id.* at 646.

James Sewell testified that he, his office's chief investigator, and Mr. Loveless had numerous conversations with Petitioner, and that one of them met with Petitioner at least once a week during the year between his being returned to Okaloosa County until his retrial.  *Id.* at 692-93.   According to Mr. Sewell, Petitioner was involved in making decisions in his case and that his "experience with Frank was that, you know, he knew, he was certainly oriented as to time, place and person to use a psychological term, and he was very much involved in his case.  We discussed the strategies that we were going to use, the witnesses we were going to call."  *Id.* at 693.  With regard to conceding the issue of guilt, Mr. Sewell stated:

> We had to deal with what happened inside the trailer when he was inside the trailer.  He understood that we were going to have to concede that, you know, he was in the trailer and that the events occurred, but that he did not enter with the intent to kill anybody, and that that was as a result of the events that went out of control.

*Id.* at 696-97.  *See also id.* at 706.

The postconviction court found that:

> Mr. Loveless testified that there was no question in his mind that the defendant understood and agreed with the trial strategy.  Mr. Sewell testified that he met with the defendant at least once a week during preparations for the retrial and the strategy of admitting the burglary was discussed and agreed to by the defendant.  The Court is satisfied that defense counsel discussed the strategy with the defendant and the defendant agreed to this strategy.

Postconviction Order, PCR III at 455.

Petitioner testified during the evidentiary hearing that to the best of his knowledge he did not agree to any strategy which conceded his guilt.  PCR IV at 715.  However, he agreed the first trial was basically like the second trial and that he told his attorneys several times, ". . . I did not go and commit this crime with that intent.  I went beserk, I went crazy, things just happened, you know.  Whether I was insane at the time

or whatever, this is what–the defense I think I'm going on." *Id.* at 720.  *See id.* at 721.

With regard to the Petitioner's testimony, the postconviction court found:

> Although the defendant testified at the evidentiary hearing that he never agreed to the trial strategy, the Court does not find this testimony by the defendant to be credible.  The defendant testified that there had not been a change in strategy from the first trial to the retrial.  Further, the defendant testified at the evidentiary hearing that he thought that his trial counsel would argue that he had no intent to commit the murders.  This is exactly the trial strategy they utilized.  The Court is also satisfied that the defendant fully understood the discussions with his attorneys and was competent to agree to the defense strategy.  The defendant was competent to stand trial; thus, he was competent to agree to and consent to concede his guilt.  Thus, the defendant fully consented to the defense strategy and his trial counsel did not render ineffective assistance of counsel by conceding felony murder and the burglary aggravator.

Postconviction Order, PCR III at 455-56.

Under the first prong of the *Strickland* analysis, Petitioner must show that no competent counsel would have taken the action that his counsel took.  Based on the state court record, this court cannot conclude that counsels' performance was not "reasonable considering all the circumstances" or that counsel committed "serious derelictions" of their duty.  *Stano v. Dugger*, 921 F.2d 1125, 1150-51 (11th Cir. 1991). A review of Mr. Loveless' opening and closing statements demonstrates that he was emphasizing to the jury that he did not believe that the State had or could meet its burden of proof as to first degree murder in this case, particularly as to the element of premeditation.  Mr. Loveless, however, had to confront the facts as they existed and, in particular, deal with the statements Petitioner made to the investigators which were entered into evidence as well as with the physical evidence admitted in the case.  Petitioner had admitted he entered the trailer with the intent to rob its occupants and killed Mr. Alger and Ms.  Peterson when he went "beserk."  Mr. Loveless stated in his opening:

> Well, one thing attorneys have to do throughout a proceeding like this, and Mr. Williams, I think, will agree with me, we have to make every effort to be completely honest with you, because you are judging us as we go along.

We've got to tell it like it is.  That's what he tries to do, and that's what I try to do.  Basically, from what he told you and what you heard from the judge, there's a couple of burglaries, two counts of kidnapping, a count of petty theft and two counts of murder.  We're not going to deny most of the facts in this particular case, never will.   You'll see throughout the proceedings from what I do, from what Mr. Williams or Mr. Grinstead does, that most of the facts that come in will be undisputed, but there's going to be some that are, very key. . . .You're going to find out that Frank Walls broke into that trailer and two people died as a result of that.  We had talked about it during jury selection as to the types of charges that we have here.  Frank is charged in one count with premeditated or felony murder of Ann Peterson.  He's also charged with just the felony murder of Ed Alger.  That's because the evidence is going to show clearly that Frank went into that trailer, never having any intent to harm anyone.

\* \* \* \*

He had no intent to do anything, and he'll tell you that on his statement.  It doesn't mean he's not guilty of breaking in there.  It doesn't mean he didn't do something that is as bad as anything I'm sure most of you have heard, it doesn't mean that at all.

\* \* \* \*

Frank went back into the back bedroom, and he and Ed Alger got into a life and death struggle, and as a result, because of the circumstances, Mr. Alger lost.  Then, from the State's own evidence, you're going to see that Frank Walls did not cooly and calculatedly, if I can get that out, go back to the other bedroom and execute Ann Peterson.  Frank Walls lost it.  State's own evidence is going to show that.  Frank Walls was completely out of control, and as a result Ann Peterson was killed, too.  We're not asking you to forgive him or anything like that.  That's not the point here.  What we're asking you to do is convict him of what he did.

T. III at 370-72.  In his closing Mr. Loveless noted that the single issue in the case was the issue of premeditation as to the murder of Ann Peterson.  He then argued the evidence in favor of Petitioner.  *See* T. V at 723-727.  He stated, "Frank Walls has never denied his guilt either.  From the first time he was picked up, it came pouring out, so fast that the first officer didn't even have time to get a tape recorder. [Premeditation]'s the issue, and that's the ultimate one." *Id.* at 727.

A review of the record, and specifically Mr. Loveless' comments in opening and

closing, demonstrates that he did not concede Petitioner's guilt to first degree murder. The United States Supreme Court addressed this issue in *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed.2d 565 (2004). In *Nixon*, defense counsel in a capital case made a strategic decision to concede the defendant's commission of murder at the guilt phase of the trial and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant's life. Defense counsel stated in his opening statement that, "In this case, there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie Bickner's death . . . [T]hat fact will be proved to your satisfaction beyond any doubt." *Id.*, 543 U.S. at 182-83. Given the overwhelming evidence of guilt in the case, Nixon's defense attorney felt that if he denied that Nixon had kidnaped and murdered the victim, his ability to persuade the jury to spare Nixon's life would be compromised. The Florida Supreme Court presumed deficient performance and prejudice because it found that the defendant had not expressly consented to the strategy, even though the strategy had been discussed with the defendant. In overturning the decision of the state supreme court, the Court explained:

> The [state supreme court] distinguished between a guilty plea and a concession of guilt: A guilty plea is an event of signal significance in a criminal proceeding. By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers. While a guilty plea may be tactically advantageous for the defendant, the plea is not simply a strategic choice; it is 'itself a conviction' and the high stakes for the defendant require 'the utmost solicitude'. . . . Accordingly, counsel lacks authority to consent to a guilty plea on a client's behalf . . . . Despite Corin's concession, Nixon retained the rights accorded a defendant in a criminal trial. The State was obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with which Nixon was charged. . . . Further, the defense reserved the right to cross-examine witnesses for the prosecution and could endeavor, as Corin did, to exclude prejudicial evidence. In addition, in the event of errors in the trial or jury instructions, a concession of guilt would not hinder the defendant's right to appeal.

*Id.* at 560-61 (internal citations omitted). The Court recognized that defense counsel

must consider both the guilt phase and the penalty phase in determining trial strategy, and ultimately concluded that even when the defendant is unresponsive when informed of a possible strategy, no tenable claim of ineffective assistance of counsel will exist if the strategy otherwise satisfies the *Strickland* standard. *Id.* at 563. *See also Atwater v. Crosby*, 451 F.3d 799, 808-809 (11th Cir. 2006).

In the instant case, defense counsel did not concede Petitioner's guilt to first degree murder, nor did his comments amount to the entry of a guilty plea to that charge. The State was required to present competent, admissible evidence establishing the essential elements of first degree murder; defense counsel vigorously cross-examined the State's witnesses; defense counsel made strategic motions before, during and after the trial; defense counsel made meaningful objections to the admissibility of testimony; and defense counsel presented a cogent defense theory in the opening and closing statements of the guilt phase of the trial. In light of the vigorous defense mounted by Petitioner's counsel, it would be unreasonable to conclude that the statements complained of by Petitioner or the strategy in general were in effect a concession of guilt of first degree murder. Defense counsel's crafting of a "burglary gone awry" theory of defense was plainly not an unreasonable strategy in light of all of the facts and circumstances surrounding the case. The state court's factual findings are supported by the record and must be given deference by this Court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this Court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is

not entitled to habeas relief on this ground.[10]

## D.    Failure to Object to Improper Penalty Phase Comments

Petitioner alleges that his trial counsel was ineffective in failing to object to a number of comments and argument made by the prosecutor in closing argument during the penalty phase of the trial, including a future dangerousness argument, a comment that Petitioner did not attend church, a statement that the jury must find the prior violent felony aggravator in light of the double murder, a characterization of Petitioner's bipolar disorder as a "mood swing," and an argument that Petitioner should be executed because he lacked the will to be a good person and because of his mental illness.  Doc. 1 at 59-60.  Petitioner argues these comments dehumanized him before the jury.

### 1.    State Court Proceedings

Petitioner raised this issue in his amended motion for postconviction relief.  The postconviction court denied relief, and the Florida Supreme Court affirmed, explaining:

> The trial court found that the "future dangerousness," "mood swing," and "lacked the will to be a good person" comments were actually the prosecutor's recounting of the penalty phase testimony by defense expert psychiatrist Dr. Eugene Valentine.  Dr. Valentine had characterized bipolar disorder as involving mood swings between depression and mania.  Dr. Valentine had also stated that medication for bipolar disorder would not solve Walls' problems unless he had "the will and desire to conform to society's ways, and to be productive, and to be a good person, to have values and live by them."   Additionally, Dr. Valentine had testified that Walls had a history of threatening people, including threatening hospital staff and Dr. Valentine during his treatment.  Dr. Valentine explained that "this was in character when [Walls] felt his wants, needs, and desires were not being gratified and somebody was frustrating his wants, needs, and desires, he would resort to threatening."  In Dr. Valentine's estimate, Walls' "wants, needs, and desires exceeded his willingness to conform to society's rules and regulations."   The prosecutor's comments on these points were not improper argument, but a summary of this testimony by the defendant's own expert.  Thus, Walls is not entitled to relief on these claims.

---

[10]Because Petitioner has failed to establish deficient performance, this court will not address the prejudice prong of *Strickland.*

Walls also alleges that trial counsel was ineffective for not objecting to the prosecutor's comments on the mitigating evidence that had been presented by the defense. During closing argument, the prosecutor summarized the mitigating evidence that had been presented to the jury and argued that the jury did not find out about Walls at the time of the crime, including "what kind of values Frank had, what was his idea of right and wrong, did he go to church, was he the kind of person to stand up for what's right and put aside what was wrong, who were his friends, where did he go at night." Walls contends that these comments by the prosecutor constituted nonstatutory aggravating factors. We do not agree. The prosecution cited these examples to make the point that the mitigating evidence presented by the defense left gaps in the picture of Walls' life and who he was at the time of the crime. Thus, we agree with the trial court that the comments were not improper and counsel was not ineffective for failing to object to them.

Finally, Walls claims that trial counsel was ineffective for failing to object to the prosecutor's argument that the jury would have to find the prior violent felony aggravator because this was a double murder. However, trial counsel did in fact object to the prosecutor's statement of the law regarding the jury's obligation in finding the aggravating factors. In response, the trial court directed the prosecutor to inform the jury that while they could consider this as an aggravating factor, they were under no obligation to do so. The prosecutor complied. Thus, trial counsel cannot be deemed ineffective for objecting to a misstatement of the law that was corrected in response to counsel's objection. Walls is not entitled to relief on this claim.

*Walls III*, 926 So.2d at 1168-69.

2.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel are set forth *supra*. Additionally, a prosecutor's comments during a closing argument are evaluated to determine whether the comments so unfairly affected the trial as to deny the defendant due process, *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S. Ct. 2464, 2474-71, 91 L. Ed. 2d 144 (1986), when considered "in the context of the entire trial in light of any curative instructions." *United States v. Abraham,* 386 F.3d 1033, 1036 (11th Cir.2004) (per curiam) (quotation marks and citation omitted). Due process is denied "when there is a reasonable probability," or "a probability sufficient to undermine

confidence in the outcome," that, but for the improper remarks, "the outcome of the proceeding would have been different." *United States v. Eyster,* 948 F.2d 1196, 1206-07 (11th Cir.1991) (citations omitted). The prosecutor's comments must both (1) be improper and (2) prejudicially affect the substantial rights of the defendant. *United States v. Thompson,* 422 F.3d 1285, 1297 (11th Cir.2005).

    3.    Federal Review of Claim

    In his closing argument, the prosecutor reviewed with the jury the testimony presented by defense expert, Dr. Eugene Valentine, who diagnosed Petitioner with a bipolar disorder, and stated:

> . . . the medication is not what it takes to overcome a problem you have with bipolar, that's mood swings. We all have mood swings. Some people have them a little bit more than others, and they give that a name and they call it bipolar, but it said the medication wouldn't necessarily solve any problems anyway, it's just a tool. That's the word he used , I think. Again, my recollection is he said it was a tool, and you've got to have the will and the desire to conform to society's ways, and to be productive, and to be a good person, to have values and live by them, then that tool of lithium can help, but you've got to have that first. He said another thing that stuck in my mind when he was talking about his evaluation of Frank Walls. He said his wants, needs and desires exceeded his willingness to conform to society's rules and regulations, and that's Frank Walls.

T. VI at 989. Mr. Loveless testified at the evidentiary hearing that he did not consider the comments about Petitioner's wants and needs exceeding his ability to conform to society's rules as a comment on Petitioner's future dangerousness; if he had, he would have objected. PCR IV at 655. Dr. Valentine, a child, adolescent and adult psychiatrist, testified for the defense in the penalty phase and diagnosed Petitioner as having bipolar disorder, mixed type, and conduct disorder. T. V at 826. Dr. Valentine explained that:

> [c]onduct disorder is a behavioral disorder. It's a disorder in which people do not respect the ordinary society's morals and values. They know right from wrong, but they feel that their wants, desires, and needs supersedes what society expects so they'll do things impulsively at the whim of the moment without consideration of the effect that it has upon other people. They're known to steal things. They're known to destroy property. They will threaten people physical harm. . . . In general they practice impulsive

and immature social judgment. They don't think things through, or if they do, they don't care about the consequences.

*Id.* at 828. Dr. Valentine also testified that he prescribed lithium carbonate to treat the kinds of disorders Petitioner had because:

> . . . it stabilizes mood swings. People's moods, as I said, are up and down with the bipolar disorder between the depressed and the manic. Instead of going up and down like this, it kind of smooths things out and people feel that their moods are more stable, that they're [sic] less frequent mood swings. It also has an effect on mood-caused aggression. People are in a certain mood and they become aggressive as a result of that. This medication helps them to think of the consequences before they decide to react, and that gives them a feeling–a sense of internal control that they have thought of the consequences. It doesn't do the thinking for them, but it gets their thinker operating rather than them reacting impulsively to the pressures of the moment, so in that respect it reduces the aggression, also.

*Id.* at 829. A review of Dr. Valentine's testimony reflects that the prosecutor's comments in closing were based on his recollection of the doctor's testimony; the comments were not improper argument regarding Petitioner's future dangerousness.

The prosecutor also commented that the jury should put sympathy aside and consider only the real mitigation presented by the defense. He said that defense witnesses testified about when Petitioner was a baby, but did not discuss him as a grown man:

> Obviously, this is difficult for his parents, to be here, to see him–just to know what's going on and to come here and testify, tell us what he was like when he was young and so forth. That's basically it. That's pretty much the mitigation. We didn't hear a lot of things, at least not–what kind of values Frank had, what was his idea of right and wrong, did he go to church, was he the kind of person to stand up for what's right and put aside what was wrong, who were his friends, where did he go at night? Nobody knows those things. At least if they did, they didn't come in here and testify about it. We didn't really find out about Frank Walls in July of 1987 when he committed this offense. We didn't find out that, and that's the mitigation.

T VI at 991. Mr. Loveless testified that he did not object to these comments because "[i]t appeared to be simply a comment on the mitigation and on the testimony that had

occurred." PCR IV at 656.

When reviewing the aggravating factors, the prosecutor recited the first one for the jury to consider as follows:

> ". . .number 1, Frank Walls committed this offense after he had committed the offense of the murder of Ed Alger, and this is—there's no question about this, not in your mind. You've already rendered your verdict. You know that. This is a double murder. That means it is permissible for you to find that this is an aggravating factor in this case. You will, you have to, because you found that he killed Ed Alger first. He didn't kill Ann Peterson first.

T VI at 992. Mr. Loveless testified he did not view this comment as an incorrect statement of the law or facts and thus he did not consider the comment objectionable. PCR IV at 657. The record reflects Mr. Loveless objected once during the prosecutor's closing argument when he began to list the aggravators in the case. Mr. Loveless objected to the prosecutor's statement that these factors may be considered as aggravating, either to be accepted or rejected. The trial court clarified that the State should indicate that these were simply aggravators that the jury may consider. *See* T VI at 993. Mr. Loveless also testified that sometimes he does not object to statements that may be objectionable if the statement can be referred to later. PCR IV at 653.

The postconviction court found that in each of the instances complained of by Petitioner, defense counsel was not ineffective in failing to object, and the record clearly supported his stated reasons for not doing so. *See* Postconviction Order, PCR III at 456-58. The court found that defense counsel's performance was neither deficient or prejudicial. A review of the prosecutor's closing argument supports the state courts' determination. Viewed in its entirety and in the context of all of the evidence presented at trial, *see Abraham*, 386 F.3d at 1036, the court finds the closing did not demonize or dehumanize Petitioner. The prosecutor's comments can be considered fair comment on the evidence, or lack thereof, presented at trial. The record does not support Petitioner's argument that his trial counsel's failure to object to these comments constitutes an error no competent counsel would have made, or that there is a reasonable probability that "but for" counsel's failure to object, the result of the trial

would have been different. Because Petitioner has failed to meet the first prong of *Strickland*, the second prong of the analysis, whether Petitioner was prejudiced, need not be addressed. *See Strickland*, 466 U.S. at 697.

The state court's factual findings are supported by the record and must be given deference by this Court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

E.     Cumulative Effect of Claims of Ineffective Assistance of Counsel

Petitioner contends that all of the grounds cited *supra*, when considered cumulatively, demonstrate that Petitioner did not receive a fair trial. Respondents maintain that a claim of cumulative ineffectiveness is not cognizable in federal habeas, as no United States Supreme Court decision reflects a cumulative error analysis in the habeas context. Doc. 23 at 48-49.

1.     State Court Proceedings

Petitioner did not raise a claim of cumulative error in state court.

2.     Clearly Established Supreme Court Law

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. §2254(b)(1),[11] thereby giving the State the "'opportunity to pass upon and correct'

---

[11]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
          (A)  the applicant has exhausted the remedies available in the courts of the State;

alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In *Picard v. Connor*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has explained that a general appeal to a constitutional guarantee as broad as due process is insufficient to present the "substance" of the federal claim to a state court. In *Anderson v. Harless*, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed.2d 39 (1979)).

---

or
      (B) (i)  there is an absence of available State corrective process; or
         (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The sole cite to federal authority by the habeas petitioner was a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7 (internal quotation marks omitted). The court of appeals affirmed the district court's decision granting relief based on a constitutional argument that was never presented to or considered by the state court and that was not the same federal claim advanced in the state court decision cited by the petitioner. The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law ordinarily will be sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the *cited* case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court again readdressed the "fair presentation" requirement in *Duncan v. Henry*, 513 U.S. 364. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the habeas petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[12] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 513 U.S. at 365-66. Recently, the Supreme Court again focused on the requirement of "fair presentation," recognizing that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."

---

[12]The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

*Baldwin v. Reese*, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The *Baldwin* Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* With regard to this statement, the Eleventh Circuit stated in *McNair v. Campbell*:

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"*McNair [v. Campbell*], 315 F. Supp.2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'" (Cite omitted).[13]

*McNair v. Campbell*, 416 F.3d 1291, 1302-03 (11th Cir. 2005).

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848. This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See Coleman v. Thompson*, 501 U.S. 722, 734-35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims

---

[13]In his initial brief before the Court of Criminal Appeals, the petitioner in *McNair* cited one federal case in a string citation containing other state cases and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed.2d 812 (1991). However, a petitioner may obtain federal review of his claim if the state procedural rule is applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S. Ct. 850, 858, 112 L. Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower*, 7 F.3d at 210. To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

_Id._

### 3.    Federal Review of Claim

Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review. *See Coleman v. Thompson, supra*. Additionally, Petitioner has made none of the requisite showing to excuse his default. Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848.

Setting aside for a moment  the procedural bar to this claim, the court notes that the Supreme Court has not recognized the cumulative error doctrine in the context of an ineffective assistance of counsel claim. While the Eleventh Circuit Court of Appeals appears to have recognized a claim regarding the cumulative effects of "incidents" during an entire trial in deciding whether a petitioner's trial was fundamentally unfair, Petitioner in this case has not established any individual harmful errors which can be aggregated to determine a cumulative effect. *See Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004); *U.S. v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal.").[14]   *See also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) ("Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant.'")(citation omitted); *U.S. v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) (". . . a cumulative-error analysis should evaluate only the effect of matters determined to

---

[14]The Eleventh Circuit recently noted "the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel." *Forrest v. Fla. Dept. of Corr.*, 2009 WL 2568185 at 4 (11th Cir., Aug. 21, 2009). The court cautioned that the Supreme Court has held that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 5 (quoting *United States v. Cronic,* 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

be error, not the  cumulative effect of non-errors.").

As previously discussed, none of the alleged errors of trial counsel, considered alone, satisfy the threshold standard of ineffective assistance of counsel.  Therefore, there are no errors to accumulate.  Petitioner was not denied effective assistance of counsel, and he has not demonstrated that his trial was fundamentally unfair.  *See Bronstein v. Wainwright*, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted)).  Therefore, this claim is also rejected.

**Ground II:    The Postconviction Court Erroneously Denied An Evidentiary Hearing on Meritorious Claims**

Petitioner contends that the postconviction court improperly failed to grant him an evidentiary hearing on the following ineffective assistance of counsel claims: (1) failure to retain an expert on the effects of Ritalin; (2) failure to investigate and present lay testimony regarding his life; (3) failure to utilize an expert pharmacologist; (4) failure to perform adequate medical testing, including having a PET scan conducted; and (5) failure to move for a life sentence, to object, to move for a mistrial, or otherwise present the testimony of doctors who testified at his first trial but, who, because of prosecutorial misconduct, were not called during the second trial.   Doc. 1 at 70- 78.  Petitioner alleges that had an evidentiary hearing been conducted on these claims, he would have been entitled to postconviction relief.  Respondents assert that this ground is not cognizable in federal habeas.

**1.    State Court Proceedings**

Petitioner raised this issue in his amended motion for postconviction relief.  The postconviction court denied relief, and the Florida Supreme Court affirmed:

> As a general proposition a defendant is entitled to an evidentiary hearing on a motion for postconviction relief unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient.  The defendant bears the burden of establishing a prima facie case based upon a legally valid claim.  Mere conclusory allegations are not sufficient to meet

this burden. However, in cases where there has been no evidentiary hearing, the Court must accept the factual allegations made by the defendant to the extent that they are not refuted by the record. This Court must examine each claim to determine if it is legally sufficient, and, if so, determine whether or not the claim is refuted by the record.

* * * *

Walls claims that trial counsel was ineffective for failing to present expert testimony at trial regarding the effects of Ritalin on his actions and his mental health. After the *Huff* hearing, the trial court gave Walls the opportunity to present additional evidence from a medical professional who had examined Walls and could testify that Ritalin had some effect on him at the time of the murders or at the time of trial. Walls submitted a report by Dr. Peter Breggin, a psychiatrist with special expertise on the effects of encephalitis on the brain and behavior and on the use of stimulants in the treatment of hyperactivity. Dr. Breggin concluded that Walls' long-term ingestion of Ritalin for hyperactivity would have compounded his recovery from meningoencephalitis at age twelve and would have made him vulnerable to paranoia and violence. While acknowledging that Dr.Breggin wasqualified as an expert in this area, the trial court noted that Dr. Breggin did not disagree with the diagnosis and findings presented by the three defense experts who testified at trial.[FN3] Thus, the trial court concluded, Dr. Breggin's testimony was cumulative to that presented at trial and Walls was not entitled to relief because he could not show that he suffered any prejudice from counsel's failure in this regard. We agree with the trial court and affirm the summary denial of postconviction relief on this claim.

> FN3. The experts included psychologist Dr. Edward Chandler, psychiatrist Dr. Eugene Valentine, and neuropsychologist Dr. Karen Hagerott.

Walls also contends that trial counsel was ineffective for failing to obtain further medical testing to confirm that he suffered from brain damage. In order to support this claim, Walls filed a motion to conduct a PET scan. This motion was discussed at the outset of the postconviction evidentiary hearing and the court decided to hold the motion under advisement until the end of the evidentiary hearing. During the evidentiary hearing, trial counsel Loveless testified that he was aware of the PET scan and its uses at the time of trial, but did not have the test conducted because the

defense experts indicated that the scan would not show anything that their testing had not already shown. Trial counsel Sewell testified that neuropsychologist Dr. Karen Hagerott informed him that her test results were sufficiently conclusive on the issue of Walls' neurological deficits and that further testing was unnecessary. At the close of the evidentiary hearing, the trial court denied Walls' request for a PET scan. The court found that the evidence presented in the guilt and penalty phases informed the jury that Walls suffers from a brain disorder and a mental disorder, that the defense experts had advised trial counsel that the scan was not necessary, and that a PET scan would not reveal anything that the experts' tests had not already shown. Thus, the trial court concluded, the jury had received the evidence that a PET scan could have revealed and the jury had considered those findings in their sentencing decision.

A trial court's decision to deny a defendant's motion for a PET scan will not be disturbed absent an abuse of discretion. *See Rogers v. State,* 783 So.2d 980, 998 (Fla.2001). In evaluating whether the trial court abused its discretion, this Court generally looks at two factors. First, before the trial court will provide a defendant with the necessary funds for a PET scan, the defendant must establish a particularized need for the test, that is, that the test is necessary for experts to make a more definitive determination as to whether the defendant's brain is functioning properly and to provide their opinions about the extent of the defendant's brain damage. *Id.* at 999. Second, this Court must consider whether the defendant was prejudiced by the trial court's denial of the motion requesting a PET scan. *Id.* In *Robinson v. State,* 761 So.2d 269, 275-76 (Fla.1999), this Court concluded that the trial court did not err in denying the defendant's motion for a Single Photon Emission Computed Tomography (SPECT) scan because the results of the scan would only have "confirmed the doctors' already established opinions, which were substantially accepted by the trial court." In the instant case, Walls did not show a particularized need for the PET scan, nor could he establish prejudice from the trial court's denial of his motion. Thus, we find that the trial court did not abuse its discretion in denying Walls' postconviction motion for a PET scan.

Walls also claims that his trial counsel was ineffective for failing to conduct a PET scan at the time of trial in order to support the mitigating factor of brain damage. However, both of Walls' trial counsel testified that the defense mental health experts advised them that this test was not necessary. Further, any results that the PET scan might have revealed were already presented to the jury by the defense experts. Psychiatrist Dr. Eugene Valentine testified that Walls suffered from bipolar disorder and the conduct disorder of socialized aggression. Dr. Valentine also testified

that he had performed a Computerized Axial Tomography scan and two electroencephalograms on Walls in 1985. Psychologist Dr. Edward Chandler testified that his testing was suggestive of mild cerebral dysfunction or brain damage. Neuropsychologist Dr. Hagerott testified that Walls has significant neuropsychological deficits, organic brain damage, and an organic personality disorder. In Walls' sentencing order, the trial court found as nonstatutory mitigating evidence that Walls suffers from apparent brain dysfunction and brain damage, has a low IQ, and was classified as emotionally handicapped. *Walls,* 641 So.2d at 386. Thus, Walls failed to show either deficient performance or prejudice on this claim and is not entitled to relief.

The trial court also denied an evidentiary hearing on Walls' claim that trial counsel was ineffective for failing to present testimony from a pharmacologist regarding the effects of Walls' drug and alcohol abuse. The trial court concluded that the record refuted this claim since defense witness Dr. Hagerott testified about Walls extensive drug and alcohol use during the penalty phase of Walls' trial. Dr. Hagerott testified that her interview of Walls revealed

> [a] very strong history of drug use that included speed, acid, cocaine, heroin, hash, marijuana, alcohol. His use of speed and acid were the heaviest drugs he used, and his alcohol use by his late teens was in my opinion quite severe. He was drinking daily. He told me that he would drink a whole case of beer or a whole bottle of liquor at one time, so there was real severe drug and alcohol abuse in this individual.

Thus, trial counsel did present this mitigating evidence to the jury and any testimony by a pharmacologist would have been cumulative. Accordingly, Walls has shown neither deficient performance nor prejudice from this alleged failure by counsel, as required under *Strickland*.

Walls claims that counsel provided ineffective assistance by failing to present lay mitigation testimony about his life. The trial court concluded that this allegation was conclusively rebutted by the record, noting that evidence of Walls' life history was presented to the jury during the penalty phase of the trial. Walls contends that the jury did not hear evidence relating to his early life, sexual abuse,[FN4] use of legal and illegal drugs, alcohol problems, or the full story of the afflictions and illnesses he suffered from, including several high fevers, viral meningitis, migraines, hyperactivity, and emotional and behavioral problems.

> FN4. Although Walls alleges that there is mitigating evidence

of sexual abuse that his trial counsel did not present at trial, he never explains this further. In fact, Walls' second amended postconviction motion contained no allegation of sexual abuse.

While an attorney has a duty to conduct a reasonable investigation for possible mitigating evidence, the record on direct appeal in this case demonstrates that Walls' trial counsel fulfilled that duty and refutes this postconviction claim. Counsel presented a great deal of mitigating evidence during the penalty phase, including testimony from three mental health experts who recounted a life history of mental, emotional, and medical problems. These experts testified that Walls: was a "blue baby" at birth, indicating decreased oxygen which could have damaged his brain; had been diagnosed with attention deficit hyperactivity disorder in first grade and placed on Ritalin which he took until he was thirteen years old; had been placed in an emotionally handicapped class in elementary school based on his explosive violent behavior and mood swings; had attended a residential program for children with emotional and behavioral problems for one year; functions at a low level academically and had a delay in his early language skills; contracted viral meningitis at age twelve and suffered from severe headaches thereafter; had mild cerebral dysfunction or organic brain damage, significant paranoid thinking, impulsive acting out, pronounced emotional and social insecurity, low self-esteem, and mild psychosis under stress; suffers from bipolar disorder and socialized, aggressive conduct disorder; had a history of stealing, destroying property, and threatening others; and had a significant history of drug and alcohol use. Various family friends testified that Walls had been hyperactive and easily distracted since he was a toddler. Walls' parents confirmed his history of hyperactivity, violent rages, and emotional and medical problems. Based on this testimony and evidence, the trial court found a number of nonstatutory mitigating circumstances to be applicable to Walls, including being emotionally handicapped, having brain dysfunction caused by slight brain damage, experiencing a decrease in his IQ from average at school age to low normal at the time of trial, being extremely immature with the behavioral control of a middle or late elementary school child, and functioning intellectually at the age of twelve or thirteen.

Thus, all of the life history alleged in Walls' postconviction motion was presented to the jury during the penalty phase. This record conclusively shows that Walls was not entitled to an evidentiary hearing on this claim and the trial court properly denied relief.

Walls also claims that trial counsel should have moved for a life sentence on retrial based on an alleged double jeopardy violation and should have called the doctors who testified favorably for him at his first trial. In Walls' initial direct appeal, this Court held that the State's improper use of subterfuge to obtain psychiatric information from Walls while he was incarcerated prior to trial precluded the use of this information at trial and required reversal of Walls' convictions and sentence. *Walls v. State,* 580 So.2d 131, 135 (Fla.1991). Furthermore, we ruled that any psychiatric testing or evaluations on retrial could not rely directly or indirectly on the information obtained by the officer. Thus, "to eliminate the taint, any such evaluations shall not be conducted by the experts who previously received the information taken as a result of the police subterfuge." Id. at 135. Walls argues that the State's misconduct prevented him from using the doctors of his choice on retrial and that his trial counsel should have objected, proffered the testimony of his experts from the first trial, and preserved the issue for appeal. He also contends that counsel should have moved for imposition of a life sentence because the remand was caused solely by the prosecution's improper conduct.

The State's improper conduct occurred in the first trial and resulted in a new trial on all of the issues. *Id.* On retrial, Walls was not eligible for the death penalty for the murder of Alger because the first jury had recommended life. *Walls,* 641 So.2d at 386 n. 1 ("Because of the prior trial result, double jeopardy precluded the possibility of a death penalty for the murder of Alger on retrial."). Thus, double jeopardy did preclude the death penalty for this crime since Walls had received a life sentence from the fact-finder. *See Bullington v. Missouri,* 451 U.S. 430, 446, 101 S. Ct. 1852, 68 L. Ed. 2d 270 (1981) ("Because the sentencing proceeding at petitioner's first trial was like the trial on the question of guilt or innocence, the protection afforded by the Double Jeopardy Clause to one acquitted by a jury also is available to him, with respect to the death penalty, at his retrial."). However, the first jury had recommended a sentence of death for Peterson's murder, a recommendation which the judge followed and imposed. Because no fact-finder had acquitted Walls of the death penalty for Peterson's murder, double jeopardy did not bar imposition of the death penalty on retrial. *See Sattazahn v. Pennsylvania,* 537 U.S. 101, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003) (finding no double jeopardy bar to new penalty phase after the first jury failed to reach a verdict on the penalty and the judge imposed a life sentence pursuant to a state statute because there were no factual findings in favor of "acquittal of the death penalty" by either the jury or the judge; explaining that an "acquittal" at a trial-like sentencing phase, rather than the mere imposition of a life sentence, is

required to give rise to double jeopardy protections). Thus, trial counsel was not deficient for failing to raise this nonmeritorious claim and an evidentiary hearing was not warranted. Walls is not entitled to relief on this claim.

*Walls III*, 926 So.2d at 1169-73. (some internal citations omitted).

2.    Clearly Established Supreme Court Law

In *Williams v. Taylor*, the Supreme Court addressed the "clearly established law" requirement of § 2254(d)(1) before turning to the "contrary to, or an unreasonable application of," requirement.  529 U.S. 362 at 379.  The *Williams* Court highlighted the importance of the clause immediately following the "clearly established law" requirement, "limiting the area of relevant law to that 'determined by the Supreme Court of the United States.'"  *Id.* at 381 (quoting 28 U.S.C. § 2254(d)(1)).  The Court then held that "[i]f this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."  *Id.*  In *Lockyer v. Andrade, supra*, the Supreme Court subsequently held that the "clearly established law" requirement "refers to holdings, as opposed to dicta, of [the] . . . Court's decisions as of the time of the relevant state-court decision."  538 U.S. at 71 (quoting *Williams*, 529 U.S. at 412).

The Eleventh Circuit has held that the "clearly established law" requirement of § 2254(d)(1) does not include the law of the lower federal courts.  *See Dombrowski v. Mingo*, 543 F.3d 1270, 1274 (11th Cir. 2008) (citing *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001)).  Moreover, when no Supreme Court precedent is on point, the Eleventh Circuit has held that a state court's conclusion cannot be "contrary to clearly established Federal law as determined by the U.S. Supreme Court."  *Id.* (quoting *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003)).  In *Dombrowski*, the habeas petitioner claimed that the Florida state sentencing court violated his Fifth Amendment right against self-incrimination by failing to advise him of this right before soliciting his admission to prior convictions for sentencing enhancement purposes.  *Id.* at 1273.

Dombrowski argued that the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was clearly established federal law guaranteeing his Fifth Amendment right not to testify at his sentencing hearing about his prior convictions. *Id.* at 1274. Although the district court agreed that *Miranda* afforded Dombrowski such a right, the Eleventh Circuit was not persuaded and concluded that there is no clearly established federal law requiring sentencing courts to either determine that a defendant knows and understands the consequences of his admission to prior convictions for sentence enhancement purposes or to advise a defendant of his Fifth Amendment rights before hearing such an admission. *Id.* at 1276. Thus, the court adhered to its previous decisions in *Washington v. Crosby*, 324 F.3d 1303 (11th Cir. 2003) and *Isaacs v. Head*, 300 F.3d 1232, 1252 (11th Cir. 2002), in which the court held that "where no Supreme Court precedent is on point, we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court."[15] *Id.* (citing *Isaacs*, 300 F.3d at 1252; *Washington*, 324 F.3d at 1265). There is no Supreme Court law requiring a state court to grant an evidentiary hearing on any postconviction claim.

### 3. Federal Review of Claim

Based on the foregoing, the Florida Supreme Court's denial of this claim cannot be contrary to or an unreasonable application of federal law. Furthermore, the Eleventh Circuit has held that a state court's failure to hold an evidentiary hearing on a petitioner's Rule 3.850 motion is not a basis for habeas relief. *Spradley v. Dugger*, 825

---

[15]In so deciding, the Eleventh Circuit stated that it was "mindful of the Supreme Court's reminder that 'rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule.'" *Dombrowski,* 543 F.3d at 1276 (citing *Williams*, 529 U.S. at 382). However, the court was convinced that Dombrowski's Fifth Amendment argument did not rise to the level of a generalized standard, let alone a bright-line rule. *Id.* The court noted the wide disparity in opinion among its sister circuits on this issue and the lack of Supreme Court precedent directly on point. *Id.* The court also noted the Supreme Court's explanation in *Williams* that "[w]here the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Id.* (quoting *Williams*, 529 U.S. at 382) (internal quotation and citation omitted). The Eleventh Circuit was satisfied, however, that *Dombrowski* was not such a case. *Id.*

F.2d 1566, 1568 (11th Cir. 1987); *Anderson v. Sec'y for Dept. of Corr.*, 462 F. 1319, 1330-31 (11th Cir. 2006); *Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th 2004) ("while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."). This claim is also rejected.

Ground III:  Trial Court Erred in Denying Cause Challenge

Petitioner alleges that one juror's beliefs in favor of the imposition of the death penalty created a reasonable doubt about whether she was prevented or substantially impaired in her ability to fairly consider a life recommendation. Petitioner contends that although Juror Walker answered that she could set aside her own views and follow the law, she also continued to voice her strongly held views in favor of the death penalty. Doc. 1 at 87.  Petitioner cites as error the trial court's refusal to grant his cause challenge as to Juror Walker or to grant him an additional peremptory challenge.

1.     State Court Proceedings

Petitioner raised this claim in the direct appeal of his conviction and sentences, and the Florida Supreme Court denied the claim.  The court held as follows:

> As his first issue, Walls appears to raise alternative arguments that a potential juror should have been excused for cause during voir dire, or that the trial court should have granted an additional peremptory challenge to the defense to excuse the juror.  By that point in the trial the defense had exhausted all its peremptories.  The juror in question had stated that she favored the death penalty but, on further questioning, also stated that she could follow the judge's instructions regarding the law.  That being the case, we find no error on this point. (Citation omitted).  There clearly was no sufficient reason to excuse the juror for cause, and the trial court did not abuse its discretion in declining to grant another peremptory.

*Walls II*, 641 So.2d at 386.

2.     Clearly Established Supreme Court Law

The Sixth Amendment to the United States Constitution guarantees a defendant the right to a trial by impartial jurors.  In *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968),  the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding

veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." The Court later clarified this standard in *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), and held that the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526, 65 L. Ed. 2d 581 (1980)).

The Court in *Witt* addressed this issue in the context of federal habeas review and held that the findings of the trial judge are presumed correct unless one of the enumerated reasons for avoiding the presumption are present. *See* § 2254(d). The trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Witt*, 469 U.S. at 429. Therefore, because assessments of demeanor and credibility are "peculiarly within a trial judge's province," his or her determination on this issue is a factual finding which deserves deference on habeas review. *Id.*, 469 U.S. at 428. In a recent case, the Court reviewed *Witherspoon, Witt* and other relevant decisions and elaborated as follows:

> These precedents establish at least four principles of relevance here. First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law provides. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.
>
> Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications

of potential jurors.

(internal citations omitted).   *Uttecht v. Brown*, 551 U.S. 1, 8, 127 S. Ct. 2218, 2224,167 L. Ed. 2d 1014 (2007).

    3.    Federal Review of Claim

    During voir dire, the following exchange took place between the prosecutor, Mr. Williams, and prospective juror, Sarah Walker:

Q.    Miss Walker, how do you feel about the death penalty?

A.    Well, it's rough, but, you know, if he is guilty–if you find a person guilty of the crime, I feel he deserves the same thing.

Q.    In other words, you kind of go along with an eye for an eye and a tooth for a tooth?

A.    That's right.

Q.    Well, even if you feel that way, suppose the judge gave you directions about what you should think about, what you should consider before you vote.  Would you do what the judge told you, or would you always vote eye for an eye and tooth for a tooth?

A.    Well, I would–I mean, if he would tell me to do those things, you know, I'm supposed to do it, then I probably would, but then I would like to explain my own feelings.

Q.    All right, go ahead.

A.    Well, I know the Bible says thou shalt not kill, but as you know, there's a lot of killings going on, and truly, I have some kids, and if someone takes my life, my child's life just to be doing it because they can do it, I feel like they deserve the same thing that they give him.

Q.    I don't have any other questions.

A.    I feel like everybody loves their life, and if you take a life, I feel like you deserve one too.

Q.    I certainly appreciate that.

T. II at 287-88.  On examination of Ms. Walker by Mr. Loveless, the following exchange occurred:

> Q.     Miss Walker, you'd indicated in answer to Mr. Williams' questions that you feel if a person is convicted of murder that they ought to pay with their life.  Is that what you're saying, is that what you believe?
>
> A.     That's the way I feel about it.
>
> Q.     If the judge were to instruct you that the law is different from that, are you going to follow your own beliefs?
>
> A.     If I have to follow his instructions, that's what I do, but then I say my beliefs.
>
> Q.     Yeah, I want you to understand.  I'm not quarreling with your beliefs.  Your belief, for example, is different from Mr. Tanner's.  I'm not going to quarrel with anybody's belief.  All we want you to do is to express that belief to us, because in order to understand you and how you might react as a juror, we've got to know what those beliefs are, and I appreciate it, really. . . . Miss Walker, I'll direct this to you, and I don't mean to be picking on you.  It's just that you were the one I was questioning before.  Do you understand that if a person is convicted of first degree murder, regardless of which kind, and the State is requesting the death penalty, first the State must prove beyond any reasonable doubt at least one aggravating circumstance?  If they don't prove one aggravating circumstance, the jury is supposed to recommend to the judge a life sentence.  Does everyone understand that?  Do all of you agree that you would follow that?  Could you follow that, Miss Walker?  If that's what the judge told you that the law was, could you do that?
>
> A.     Yes, sir.

*Id*. at 294-95.  Defense counsel Sewell also asked the prospective jurors if they could form their own decision regarding guilt and sentence and maintain that decision once it was made, and Ms. Walker responded that she could.  *Id*. at 301.  Nonetheless, "in an abundance of caution" Mr. Loveless challenged Ms. Walker for cause.  *Id*. at 303.  The

court denied the challenge, stating "Court feels that when the procedure was adequately explained to her, she did indicate time and again that she could follow the law and the Court's instructions in the penalty phase." *Id.* The defense then asked for four additional peremptory strikes and renewed their challenge for cause as to Ms. Walker. *Id.* at 305. The trial court granted the defense an additional peremptory challenge, but denied two more requests to remove Ms. Walker for cause and denied a request for a second peremptory challenge to remove Ms. Walker. *Id.* at 305-07.

The court cannot conclude from the record that Ms. Walker was prevented or substantially impaired in the performance of her duties as a juror or inalterably favored the death penalty. She indicated that while she believed in the concept of "an eye for an eye", she would be able to follow the court's instructions. The trial court, who was in the best position to judge the jurors' demeanor, believed Ms. Walker would follow the law and the court's instructions. On this record, the court defers to the trial court on this issue. *See Witt*, 469 U.S. at 428; *Uttecht*, 551 U.S. at 8.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground IV: <u>Batson</u> Challenge

Petitioner alleges that two black prospective jurors, Ms. Kelly and Mr. Garvin, were removed from the jury by the State's use of peremptory challenges based solely on their race in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Petitioner contends that neither prospective juror expressed the inability

to impose death as a sanction nor did they express discomfort with the death penalty in general.

1.      **State Court Proceeding**

Petitioner raised this issue on the direct appeal of his conviction and sentences. The Florida Supreme Court denied the claim, holding:

> Second, Walls argues that two black jurors were excused by the State in violation of *State v. Neil*, 457 So.2d 481 (Fla. 1984), and *State v. Slappy*, 522 So.2d 18 (Fla.), *cert. denied*, 487 U.S. 1219, 108 S. Ct. 2873, 101 L. Ed. 2d 909 (1988). Fn2  Both of these jurors, however, had expressed discomfort with the death penalty. This is a sufficient race-neutral reason for the State to exercise it's peremptory.  *Atwater v. State*, 626 So.2d 1325, 1327 (Fla. 1993),  *cert. denied*, 511 U.S. 1046, 114 S. Ct. 1578, 128 L. Ed. 2d 221 (1994).
>
> Fn2  The final jury consisted of four blacks and eight whites.
> Of the twelve, eight were women and four were men.

*Walls II*, 641 So.2d at 386.

2.      **Clearly Established Supreme Court Precedent**

When the government's choice of jurors is tainted with racial bias, that "overt wrong casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial . . . ." *Powers v. Ohio,* 499 U.S. 400, 412, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).  So, "[f]or more than a century, this Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El v. Dretke*, 545 U.S. 231, 238, 125 S. Ct. 2317, 2323 - 2324, 162 L. Ed. 2d 196 (2005) (quoting *Georgia v. McCollum,* 505 U.S. 42, 44, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992)); *see Strauder v. West Virginia,* 100 U.S. 303, 308, 310, 25 L. Ed. 664 (1880); *Norris v. Alabama,* 294 U.S. 587, 596, 55 S. Ct. 579, 79 L. Ed. 1074 (1935); *Powers,* 499 U.S. at 404, 111 S. Ct. 1364.

In  *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Court established the test to be used in determining whether either party engaged in race-based exclusions of potential jurors through peremptory challenges.  Race based exclusions are unconstitutional regardless of whether the defendant and the excluded juror(s) share the same race.  *See  Powers,* 499 U.S. at 402.  The *Batson* test involves

a three-step inquiry:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." 476 U.S., at 93-94, 106 S. Ct. 1712 (citing *Washington v. Davis,* 426 U.S. 229, 239-242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)) (footnote omitted). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U.S., at 94, 106 S. Ct. 1712; *see also Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem,* 514 U.S. 765, 767, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (*per curiam*).

*Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, 162 L. Ed. 2d 129 (2005).

Under AEDPA, in order to grant relief on a *Baston* claim a federal habeas court must find the state court conclusion was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, a federal habeas court can grant habeas relief only if it was unreasonable to credit the prosecutor's race-neutral explanations for the juror challenge. State court factual findings are presumed correct, which means the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." § 2254(e)(1). *See Miller-El v. Dretke,* 545 U.S. at 240; *Rice v. Collins*, 546 U.S. 333, 338-339, 126 S. Ct. 969, 974, 163 L. Ed. 2d 824 (2006).

In *McNair v. Campbell*, 416 F.3d 1291, 1310 (11th Cir. 2005), the Eleventh Circuit explained:

> If both sides carry their burdens, it is left to the court to determine whether the defendant has proven purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S. Ct. at 1724. At this point, "the decisive question will be whether counsel's race-neutral explanation ... should be believed." *Hernandez v. New York,* 500 U.S. 352, 365, 111 S. Ct. 1859, 1869, 114 L. Ed. 2d 395 (1991) (plurality opinion). This is "a pure issue of fact, subject to review under a deferential standard ... [and] peculiarly within a trial judge's province." *Id.* at 364-65, 111 S. Ct. at 1869 (internal quotation omitted).

3.   Federal Review of Claim

During voir dire, the prosecutor asked the panel if they could vote for the

imposition of the death penalty or if they were against it.  The following exchange occurred between the prosecutor and prospective juror Kelly:

KELLY:      I'm not against it, but I really hadn't thought about it.

WILLIAMS:   You're not against it?

KELLY:      No.

WILLIAMS:   How do you know you're not against it?

KELLY:      Because if he did something that is wrong, I think he should be punished.

WILLIAMS:   Now, punishment is one thing, and I'm sure you're going to hear this if you sit on this jury, that life in prison is a very serious sentence. There's no parole for twenty-five years, but are there cases in which you say that's not enough of a punishment?  If there isn't, that's fine, and if that's the way you feel, I'm not going to disagree with you.  I just need to know how you feel.

KELLY:      I'm not sure.

WILLIAMS:   You're not sure.  You could go either way on it then?

KELLY:      Yes.

WILLIAMS:   If you were chosen to sit on the jury, and the judge instructed you like I explained about aggravation and mitigation, those words don't mean a thing right now, but it's a way of deciding how serious this crime was in your mind, and whether this person deserves the death penalty, and if it isn't that, then it probably isn't worth anything, but it is that, and it's the law.  Could you do that, could you weigh those things?

KELLY:      I believe so.

WILLIAMS: Could you vote for the death penalty?

KELLY: Yes.

WILLIAMS: I'm not asking you right now because you don't know the facts and circumstances. Let's say I prove my case, and you believe it was first degree murder, and you believe there was more aggravation than mitigation. In other words, you thought the death penalty was appropriate. Would you vote that way?

KELLY: Yes.

T. II at 282-83. The following occurred with prospective juror Garvin:

WILLIAMS: . . . . Could you base your decision on what you hear as aggravation and mitigation, or do you have some feelings about the death penalty that make you reluctant to vote for the death penalty?

GARVIN: No, I can't just walk in here and say kill him until I hear the evidence.

WILLIAMS: Well, nobody would ask you to do that, and that's not going to be the way it works. What we really want to know is, based on who you are and the family you were raised in and where you went to school and what you've seen on television, do you have a feeling about the death penalty that makes you wonder whether it's the right thing to do or not?

GARVIN: Sometimes.

WILLIAMS: Sometimes. What makes you wonder about it?

GARVIN: Just whether they were really guilty or not.

WILLIAMS: So, your main concern is it's final, and you want to make sure the person's guilty or not.

GARVIN: Right.

**WILLIAMS:** Let's suppose for argument that you're convinced of guilt beyond a reasonable doubt, and then you go to the penalty phase. Would you be reluctant to vote for the death penalty then if the aggravation outweighed the mitigation? If it was worse than it was not so bad, would you vote for the death penalty?

**GARVIN:** Yes.

**WILLIAMS:** Do you believe there's a place for the death penalty in our society?

**GARVIN:** Yes.

**WILLIAMS:** If we had a chance to do away with it, and we had a referendum, would you vote for it or against it?

**GARVIN:** I'd vote against it if there was another way around it.

**WILLIAMS:** You'd vote against it. You'd rather we didn't have a death penalty then.

**GARVIN:** It depends on, like I said, if I felt he was really guilty.

**COURT:** I don't know if he understood what you meant by a referendum. I think if you'll go over that once again.

**WILLIAMS:** Instead of letting the Legislature decide for us whether we were going to have a death penalty or not, suppose we let the people decide. Based upon what you know and what you've heard, where you've been and everybody you've ever talked to about it and read about it in the newspapers, and you had a chance to vote whether this country or state should have a death penalty, would you be more likely to vote for or against it?

GARVIN:     Probably vote for it, I'm not sure.

WILLIAMS:   That's all I have, Your Honor.

LOVELESS:   Mr. Garvin, I understood you to say that you would vote against it if there was a way around it, is that what you said?

GARVIN:     Yes, sir.

LOVELESS:   But not seeing a way around it, you would be compelled to vote for it.

GARVIN:     Yes.

COURT:      Mr. Loveless, I don't think he understood what he was talking about at that point was referendum.  I think he meant he was talking about a trial.

LOVELESS:   Is that what you thought, Mr. Garvin?

GARVIN:     Before he explained it again, that's what I thought.

*Id*. at  243-46.

When Mr. Loveless complained that the State might be excluding jurors on the basis of their race, the court asked the prosecutor to explain the State's reasons for its use of peremptory challenges with these two prospective jurors.  *Id*. at 332.  As to prospective juror Kelly, Mr. Williams elaborated:

> On Peggy Ann Kelly, I struck her because she was very reluctant in her belief in the death penalty, although she said she could vote for it, her reluctance—I didn't seat anyone on a jury, white or black, who was as reluctant as she was to go along with the death penalty, and that's a perfectly race-neutral reason.  It has nothing to do with her race.

*Id*. at 332.  With regard to Mr. Garvin, Mr. Williams explained:

> Mr. Garvin is twenty-four years old, and he is not the same age as the defendant, but that's a consideration.  I have struck a number, including Mr. Hussey and Mr. Shores, who are approximately the same age as the defendant.  The reason I'm doing that is because, obviously, and they're

white, but they might identify with this defendant merely because of his age, and I think that's a perfectly proper peremptory challenge, and it is race neutral. In addition to that, when questioning Mr. Garvin concerning what he thought about the death penalty, his first answer was to the effect that if there was another way out of it, he would not vote for the death penalty. Later on he later said that he could vote for the death penalty, but that first answer, combined with his age, and I'll tell the Court another thing. I personally sensed some hostility in that person. I may be dead wrong, but it wouldn't matter if he was black or white, I didn't want somebody on the jury that I sensed that kind of hostility from.

*Id.* at 333. After further discussion, the court found as follows:

The Court sees no pattern whatsoever, Mr. Loveless, in the defense allegation that Mr. Williams' strikes have in any way been race related or race motivated and have not been race neutral. The Court feels that the jury we now have contains several blacks, and I don't know how many, because I didn't actually keep up with them by color, but I do know that we do have blacks on this jury. As far as I know, the defense struck some blacks. I don't know that, but I assume that you did, I didn't keep up with it, but I don't see anything that has occurred in this courtroom today that would give rise to any charge of racial prejudice in this case.

*Id.* at 334-35. The court also pointed out that the defendant (petitioner) was white as were both victims. *See id.* at 331.

Petitioner has not made a prima facie showing sufficient to support a *Batson* challenge. The "totality of relevant facts" does not give rise to an inference that the prosecution used its peremptory strikes on these two prospective jurors for discriminatory reasons. *See Batson*, 476 U.S. at 93-94. Mr. Williams stated that he challenged Ms. Kelly because she seemed reluctant in her support of the death penalty. The transcript reveals that when asked about whether she supported the death penalty, Ms. Kelly answered that she was "not sure" and could go either way on it. T. II at 282-283. When asked whether she could weigh the aggravating and mitigating factors, she responded that she "believed so." *Id.* at 283. When asked again whether she could vote for the death penalty if she thought it was appropriate, she twice answered, yes. *Id.*

While demeanor cannot be adequately judged on a cold record, the record reflects some reluctance by Ms. Kelly in her support of the death penalty in general.

Also, the trial court was in the best position to judge Ms. Kelly's demeanor and this court sees no reason to question that judgment here, much less a clear and convincing one.

Regarding prospective juror Garvin, the prosecutor stated he exercised a peremptory challenge on Garvin because of his youth and age relative to the defendant's age; his equivocation with respect to the death penalty; and a certain hostility the prosecutor sensed in him. Youth is a reasonable race neutral factor. *See Rice*, 546 U.S. at 975. Additionally, Mr. Williams stated he rejected two other white jurors on the basis of youth, and the defense did not correct this statement. *See* T. II at 333. Therefore, it is reasonable to conclude that the prosecution used peremptory challenges against similarly situated white prospective jurors.

Also, the record reflects some hesitancy by Mr. Garvin toward the death penalty. When asked if he would vote for it if given a chance, Mr. Garvin responded that he would "[p]robably vote for it, I'm not sure" and that he had some concerns about it in general because he questioned "whether [those sentenced] were really guilty or not." *Id*. at 244. He also responded that if there were a referendum on the issue, he "would vote against it if there was another way around it," then stated that he would "probably vote for it, I'm not sure." *Id*. at 244-45. On being questioned by Mr. Loveless, Mr. Garvin again stated that he would vote against the death penalty if there was a way around it, but would vote for it if compelled to do so. As the trial court pointed out, there may be some confusion as to whether Mr. Garvin was speaking about a referendum on the death penalty in general or in a specific case. In any case, his reluctance is supported by the record.

Finally, while the record before the Court does not evidence hostility on the part of Mr. Garvin toward the prosecution, hostility without more is not inherently discriminatory. "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices.'" *Rice v.*

*Collins*, 546 U.S. at 338 *(*quoting *Purkett v. Elem,* 514 U.S. at 767-768). Hostility, particularly when it is subtle, is a question of demeanor and thus is within the trial court's province to evaluate. Because there is support in the record for the trial court's finding that the prosecution expressed a race-neutral reason for Mr. Garvin's challenge and because Petitioner has not demonstrated by clear and convincing evidence that this finding is incorrect, no habeas relief is warranted.

Furthermore, while the record does not reflect the racial composition of the venire panel, Respondents assert that Jackson County, Florida, where Petitioner's retrial was conducted in 1992, was approximately 26% black in 2000. Doc. 23 at 68. The racial composition of the jury was 33% black, as four blacks ultimately served on the jury. These statistics, coupled with the entire voir dire testimony, cast the prosecution's articulated race-neutral reasons for the use of its peremptory challenges in a plausible light. *See also U.S. v. Allison*, 908 F.2d 1531, 1537 (11th Cir. 1990)("the unchallenged presence of three blacks on the jury undercuts any inference of impermissible discrimination that might arise simply by the striking of other blacks. We recognize that the seating of some blacks on the jury does not necessarily bar a finding of racial discrimination, but it is a significant fact."); *U.S. v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995)("This claim is meritless. Puentes's jury contained four African-Americans. Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."). Finally, Petitioner has not shown that similarly situated whites were not the subject of peremptory strikes for the same articulated reasons.

Petitioner has failed to establish that prospective jurors were removed from the jury by peremptory challenges based solely on their race. The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous

facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground V:    The Trial Court Erred in Requiring the Jury to Work Extended Hours**

Petitioner alleges that the jury was required to work extended hours which resulted in a denial of his right to a fair trial and due process of law. He alleges that at least one juror fell asleep during testimony in the guilt phase, and further that the jury may have been pressured by the court to make a hasty decision regarding his guilt. Doc. 1 at 103. Respondents assert that no Supreme Court decision has recognized a Sixth Amendment violation based on a jury having to work long or extended hours.

**1.    State Court Proceedings**

Petitioner raised this issue in the direct appeal of his conviction and sentences. The Florida Supreme Court denied relief, as follows:

> As his third argument, Walls contends that jurors during his trial were kept in session for overtaxing hours. It is true that jurors worked into some evenings, and that the trial court noticed one juror beginning to nod her head. However, jurors in homicide trials throughout the state often work into the evening; and the trial court clearly intervened when he noticed the juror's head nod, before she actually fell asleep. We also find no error in the fact that this same juror expressed some reluctance at being sequestered in a motel room. This reluctance appeared to stem from her erroneous belief she would not be able to retrieve clothing and medicine from her home. The trial court assigned a deputy to assist her in retrieving these articles, which resolved the problem.

*Walls II*, 641 So.2d at 386.

**2.    Clearly Established Supreme Court Law**

The law regarding "clearly established [Supreme Court] law" is set forth *supra.*

**3.    Federal Review of Claim**

Petitioner has cited no Supreme Court precedent holding that having a jury work extended hours in and of itself violates the Sixth Amendment right to a fair trial or the due process clause.[16] Because there is no Supreme Court law on this issue, the Florida Supreme Court's rejection of Petitioner's claim is not contrary to, and does not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See Washington v. Crosby*, *supra*, 324 F.3d at 1265.

Moreover, the state court decision was not based on an unreasonable determination of the facts. Petitioner has not pointed to anything in the record that supports his argument that the verdict and/or sentencing recommendation was the product of judicial coercion or juror fatigue. The record reflects that the jury received the guilt phase case for deliberation at 5:53 p.m. T. VI at 760. Just prior to giving the case to the jury, the trial court explained:

> I'm going to go let you deliberate a little while to see what's going to happen. Before it gets too late, I'll probably–I'll send a bailiff in to see if you want to order some sandwiches out. We'll order sandwiches for you, and of course, we'll pay for whatever you order to eat. I'll probably do that at about seven o'clock or so if you run that late. We'll let you eat a sandwich and hope to continue to deliberate. If you're able to reach a verdict tonight, that's fine. If you're not, if it appears–it starts getting 8:30 or 9:00 and it appears that you've not reached a verdict and you're not likely to, then we'll start making some arrangements to see that you have some things to keep you overnight. I'll be checking with you through the bailiff as to how things are going.

*Id*. at 759. At 10:00 p.m., the court reconvened without the jury having reached a verdict, so the court adjourned for the evening and sequestered the jury. Deliberations

---

[16]Petitioner cited *U.S. v. McLain*, 823 F.2d 1457, 1460 (11th Cir. 1987), in which the court stated "[w]ith respect to the case at bar, the trial judge's efforts to speed up the pace not only rushed the attorneys, but also allowed the proceedings to get out of hand, seriously impeding appellants' rights to a fair trial." *McLain*, however, is not a decision of the United States Supreme Court.

continued at 9:00 a.m. the next morning, and the jury reached their verdict shortly thereafter at 11:10 a.m.  *Id*. at 760 & 776.  The record does not reflect any pressure by the court on the jury to reach a verdict.  Finally, while there was one occasion in which a juror, Ms. Walker, appeared to nod off during the medical examiner's testimony, she was questioned by the court and stated unequivocally that she had heard the testimony and had gotten a good night's sleep and felt rested.  *Id*. at 570-71.  The court stressed to her that if she felt she needed a break, she should feel free to request one.  *Id*. at 572-73.  Nothing in the record reflects that this juror, or any other juror, nodded off again during the trial.

Federal courts have regularly rejected the claim that long hours alone violate the right to a fair trial.  *See, e.g., U.S. v. Mitchell*, 104 Fed.Appx 544, 548-49 (6th Cir. 2004)(jury verdict which was returned at 1:30 a.m. was not result of judicial coercion; there was no indication that jury was tired or unable to continue); *U.S. v. Tubbs*, 461 F.2d 43, 47 (7th Cir. 1972)(jury verdict which was returned at 4:30 a.m. upheld because no evidence to suggest verdict was the product of juror exhaustion or fatigue)*; U.S. v. Caracci*, 446 F.2d 173, 178 (5th Cir. 1971)(the length of time of jury deliberation is a matter of trial court discretion and without more cannot constitute coercion)*; DeGrandis v. Fay*, 335 F.2d 173, 175-76 (2nd Cir. 1964)(verdict returned after twenty-eight consecutive hours of duty and deliberation; court held that  the mere fact that a jury has been without sleep will not vitiate its verdict if its agreement was deliberate and voluntary and not due to fatigue and exhaustion).  Petitioner is not entitled to habeas relief on this ground.

**Ground VI:  Trial Court Erred in Its Jury Instructions on Aggravating and Mitigating Circumstances**

Petitioner alleges the trial court gave unconstitutionally vague jury instructions regarding the heinous, atrocious, or cruel ("HAC") aggravator and the cold, calculated and premeditated ("CCP") aggravator.  He also alleges the trial court erred in failing to give jury instructions regarding mitigating circumstances, as requested by defense counsel, thereby limiting the jury's consideration of non-statutory mitigation evidence.

A.    Heinous, Atrocious, or Cruel Instruction

Petitioner alleges that the standard HAC jury instruction given during the penalty phase of his trial was unconstitutionally vague in violation of *Espinosa v. Florida*, 505 U.S. 112, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992), *Maynard v. Cartwright*, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988), and *Shell v. Mississippi*, 498 U.S. 1, 111 S. Ct. 323, 112 L. Ed. 2d 1 (1990).

1.    State Court Proceedings

Petitioner raised this issue in the direct appeal of his conviction and sentences. The Florida Supreme Court denied relief, holding as follows:

> As Walls concedes, the instruction on the first of these was the one upheld by this Court in *Hall v. State*, 614 So.2d 473 (Fla.), *cert. denied*, 510 U.S. 834, 114 S. Ct. 109, 126 L. Ed. 2d 74 (1993).  Moreover, the evidence here clearly supports the existence of  heinous, atrocious, or cruel beyond a reasonable doubt.  There thus is no merit to the challenge to this instruction.

*Walls II*, 641 So.2d at 387.

2.    Clearly Established Supreme Court Law

The Supreme Court has held that in a state like Florida where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment.  *See Sochor v. Florida,* 504 U.S. 527, 532, 112 S. Ct. 2114, 2119, 119 L. Ed. 2d 326 (1992); *Stringer v. Black,* 503 U.S. 222, 232, 112 S. Ct. 1130, 1140, 117 L. Ed. 2d 367 (1992); *Parker v. Dugger,* 498 U.S. 308, 319-321, 111 S. Ct. 731, 738-740, 112 L. Ed. 2d 812 (1991); *Clemons v. Mississippi,* 494 U.S. 738, 752, 110 S. Ct. 1441, 1450, 108 L. Ed. 2d 725 (1990).  An aggravating circumstance is invalid if its description is so vague as to leave the sentencer without sufficient guidance for determining its presence or absence.  *See Stringer,* 503 U.S. at 235.  In *Espinosa v. Florida, supra*, the Court determined that Florida's then-standard HAC jury instruction was unconstitutionally vague because the instruction listed as an aggravating circumstance conduct that was "especially wicked, evil, atrocious or cruel,"

without defining any of those terms. After *Espinosa*, the Florida Supreme Court declared the following HAC instruction constitutional because its terms were sufficiently defined:

> [T]he crime for which the defendant is to be sentenced is especially heinous, atrocious, or cruel. Heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked or vile. Cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. The kind of crime to be included as heinous, atrocious, or cruel is one accompanied by additional acts to show that the crime was conscienceless or pitiless and was unnecessarily tortuous to the victim.

*See Hall v. State*, 614 So.2d 473, 478 (Fla. 1993). This same instruction was the one given in Petitioner's case. *See* Section 921.141(5)(h), Florida Statutes; T. VI at 1011-12.

Even if an aggravator is found to be unconstitutionally vague, the Supreme Court has held that a death sentence that is based in part on an invalid or improperly defined aggravating circumstance may be upheld despite the sentencer's consideration of the invalidated aggravating factor if the state appellate court either (1) reweighs the aggravating and mitigating evidence or (2) conducts a harmless-error review. As explained by the Supreme Court in *Clemons v. Mississippi*:

> Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would be infringed where an appellate court invalidates one of two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that the one or more valid remaining aggravating factors outweigh the mitigating evidence.

*Clemons v. Mississippi, supra*, 494 U.S. at 745. *See also Stringer v. Black, supra*. In conducting a harmless error analysis, "an [state] appellate court may choose to consider whether absent an invalid factor, the jury would have reached the same verdict or it may choose instead to consider whether the result would have been the same had the invalid aggravating factor been precisely defined." *Jones v. United States*, 527 U.S. 373, 402, 119 S. Ct. 2090, 2109, 144 L. Ed. 2d 370 (1999). *See Lambrix v. Singletary*, 520

U.S. 518, 537 n. 6, 117 S. Ct. 1517, 1526, 137 L. Ed. 2d 771 (1997)(wherein the Court noted that "*Walton [v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), overruled on other grounds, *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002)] indicated that our precedents provided two distinct and permissible routes to satisfy the Eighth Amendment where the sentencer considered a vague aggravator: a court's finding of the aggravator under a proper limiting construction, *or* independent reweighing of the circumstances."); *See also Godfrey v. Georgia, supra*; *Maynard v. Cartwright, supra; Lewis v. Jeffers*, 497 U.S. 764, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990); and *Bell v. Cone*, 543 U.S. 447, 125 S. Ct. 847, 160 L. Ed. 2d 881 (2005)(per curiam)(wherein the Court reversed a decision of the Sixth Circuit that the Tennessee Supreme Court did not apply a narrowing construction of the HAC aggravator because the state court did not specifically cite to the case in which it had adopted a narrowing construction of that aggravator). In *Bell* the Court citing *Walton* as the law governing vagueness challenges to statutory aggravating circumstances, noted that if the aggravator is found to be too vague to provide guidance to the sentencer, "then the federal court must attempt to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide *some* guidance to the sentencer." *Bell*, 543 U.S. at 453 (quoting *Walton*, 497 U.S. at 654)(emphasis in original). Finally, the Court in *Lewis v. Jeffers*, noted that:

> Because federal habeas corpus relief does not lie for errors of state law, federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.

*Lewis v. Jeffers*, 497 U.S. at 780 (internal citations omitted).

3. **Federal Review of Claim**

In *Proffitt v. Florida*, 428 U.S. 242, 255, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), the Supreme Court upheld an HAC jury instruction similar to the one given in Petitioner's

case "on the express ground that a narrowing construction had been adopted by that State's Supreme Court." *Bell*, 543 U.S. at 453. In Petitioner's case the Florida Supreme Court held that "the evidence clearly supports the existence of heinous, atrocious, or cruel beyond a reasonable doubt." *Walls II*, 641 So.2d 387. While the state court did not elaborate further, it routinely applies a narrowing construction to the HAC aggravator and has upheld its construction in cases similar to this one. [17] The Florida Supreme Court has held that "fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel." *James v. State,* 695 So.2d 1229, 1235 (Fla.1997). The court has also held that "the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." *Brown v. State,* 721 So.2d 274, 277 (Fla.1998). *See Swafford v. State,* 533 So.2d 270, 277 (Fla.1988) ("the victim's mental state may be evaluated for purposes of such [HAC] determination in accordance with a common-sense inference from the circumstances."); *Lynch v. State,* 841 So.2d 362, 369 (Fla. 2003) ("[T]he focus should be upon the victim's perception of the circumstances...."); *Preston v. State,* 444 So.2d 939, 946 (Fla.1984) ("victim must have felt terror and fear as these events unfolded"); *Buzia v. State,* 926 So.2d 1203, 1214 (Fla. 2006)("Whether this state of consciousness lasted minutes or seconds, he was 'acutely aware' of his 'impending death[ ].' We have upheld the HAC aggravator where the victim was conscious for merely seconds." *See Rolling v. State*, 695 So.2d 278, 296 (Fla. 1997)").

Because the state court has applied a narrowing construction to the HAC aggravator numerous times, this Court must presume that it did so here. As the Supreme Court stated in *Bell, supra,* "[w]e do not think that a federal court can presume so lightly that a state court failed to apply its own law." *Bell*, 543 U.S. at 853. *See also*

---

[17]In this case, Ms. Peterson was awakened from sleep; bound, gagged and left alone to hear the fight between Petitioner and her boyfriend, including the subsequent gunshots. When she asked if Mr. Alger was okay, Petitioner answered that he was dead. Petitioner and she then struggled, her clothing was ripped off, and she was shot once before receiving a second fatal shot.

*Jennings v. McDonough*, 490 F.3d 1230, 1250-51 (Florida Supreme Court conducted proper harmless error review of HAC aggravator). The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**B.      Cold, Calculated and Premeditated Instruction**

Petitioner alleges that the jury was given an unconstitutionally vague instruction as to the cold, calculated and premeditated ("CCP") aggravator in his case. He contends that even though the Florida Supreme Court found the aggravator vague and conducted a harmless error analysis, the court's reasoning was fatally flawed and it failed to apply its *Jackson, infra*, test reasonably. *See* Doc. 1 at 122.

**1.      State Court Proceedings**

The jury was given the following standard instruction with regard to the CCP aggravating circumstance in this case: "the crime for which the defendant is to be sentenced was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." T. VI at 1012. The Florida Supreme Court found this instruction unconstitutionally vague in *Jackson v. State*, 648 So.2d 85 (Fla. 1994).[18]

_____

[18]In *Jackson v. State*, 648 So.2d 85 (Fla. 1994), the Florida Supreme Court determined that the state's standard CCP instruction "suffers the same constitutional infirmity as the HAC-type instructions which the United States Supreme Court found lacking in *Espinosa [v. Florida*, 505 U.S. 1079, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992)], *Maynard [v. Cartwright*, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988)], and *Godfrey [v. Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980)]–the description of the CCP aggravator is 'so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor.'" *Jackson*, 648 So.2d at 90 (quoting *Espinosa*, 505 U.S. at 1081). The *Jackson* court then clarified the CCP aggravator as follows:

Petitioner's defense counsel properly preserved the issue for appeal, and the Florida Supreme Court held that "there is no doubt" that the instruction given violated the requirements established in *Jackson.  Walls II*, 641 So.2d at 387.  Notwithstanding, the court denied the claim after conducting a harmless error review as follows:

> We believe that, under *Jackson*, harmlessness does exist if the State can demonstrate beyond a reasonable doubt that the murder could only have been cold, calculated, and premeditated without any pretense of moral or legal justification even if the proper instruction had been given.  *See State v. DiGuilio*, 491 So.2d 1129 (Fla. 1986).
>
> On this issue, we must consider the nature of the murder in this case.  The victim here, Peterson, was asleep when Walls intentionally woke her and her boyfriend up.  She was forced to tie up her boyfriend, then was taken to another room and was bound and gagged.  She had to listen to her boyfriend's struggle with their attacker, followed by the sound of shots, at which point Walls returned to her.  She asked whether Alger was alive, but Walls said, "No."  Walls confessed that Peterson was crying and "curled up" at one point during the fatal encounter.  He admitted "wrestling" with Peterson, ripping off her clothes, shooting her non-fatally, listening to her "doing all kinds of screaming,"and then shooting her in the head.
>
> Under *Jackson*, there are four elements that must exist to establish cold calculated premeditation.  The first is that "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic or a fit of rage."  *Jackson*, [ 648 So.2d at 89].  Here, the calm and deliberate nature of Walls' actions against Peterson establish this element beyond any reasonable doubt.
>
> We recognize that Walls himself claimed a loss of emotional control.  However, judge and jury were within their discretion to reject this statement of opinion as self-serving or inconsistent with the facts, based on the present record.  The "cold" element generally has been found wanting only for "heated" murders of passion, in which the loss of emotional control is evident from the facts though perhaps also supported

---

[T]he jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), *and* that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated) *and* that the defendant exhibited heightened premeditation (premeditated) *and* that the defendant had no pretense of moral or legal justification.

*Jackson*, 648 So.2d at 89 (citations omitted).

by expert opinion. *E.g., Santos v. State*, 591 So.2d 160 (Fla. 1991). Such was not the case here. Walls' actions against Peterson fall within the category of a protracted execution-style slaying, which by its very nature is a "cold" crime. Coldness exists beyond any reasonable doubt.

Second, *Jackson* requires that the murder be the product of "a careful plan or prearranged design to commit murder before the fatal incident." *Jackson*, [ 648 So.2d at 89](citation omitted). Once again, the facts of the murder itself show that this element exists beyond a reasonable doubt. Here, Walls left his first victim, weapon in hand, then returned to the place where he had left Peterson bound and gagged, then taunted and abused her before shooting her to death. At the point where Walls left Alger's body, he obviously had formed a "prearranged design" to kill Peterson, a conclusion only reinforced by the time it took him to kill her and Walls' confession.

Third, *Jackson* requires "heightened premeditation," which is to say, premeditation over and above what is required for unaggravated first-degree murder. Again, the facts clearly show this element to be present. The acts by Walls not only were calm and careful, but they exhibited a degree of deliberate ruthlessness, as shown by the way he toyed with Peterson prior to her death. This was not merely a murder resulting from the specific and preexisting intent to kill; it was a murder in which Walls told Peterson that he was going to "hurt" her because of what her boyfriend had done, and in which he saw that the killing was a drawn-out affair. Heightened premeditation exists beyond any reasonable doubt.

Finally, *Jackson* states that the murder must have "no pretense of moral or legal justification." *Jackson*, [ 648 So.2d at 89](quotation omitted). Our cases on this point generally establish that a pretense of moral or legal justification is any colorable (fn 4) claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide. (Citation omitted).

> fn 4. "Colorable" means "that which is in appearance only, . . . having the appearance of truth." *Black's Law Dictionary* 265 (6th ed. 1991). "Appearance" means there must be at least some basis in fact to support the defendant's belief that the killing would be excusable, justifiable, or subject to a legal defense. Of course, we are not dealing here with delusional defendants, as in *Santos*, whose internal distortion of reality more properly is relevant to the "coldness" element.

Thus, we have repeatedly rejected claims that the purely subjective beliefs of the defendant, without more, could establish a pretense of moral or legal justification. *E.g., Arbelaez v. State*, 626 So.2d 169 (Fla. 1993), *cert. denied*, 511 U.S. 1115, 114 S. Ct. 2123, 128 L. Ed. 2d 678 (1994); *Banda [v. State*, 536 So.2d 221 (Fla. 1998); *see Dougan v. State*, 595 So.2d 1 (Fla.), *cert. denied*, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). However, we have found such justification where some factual evidence or testimony supported a colorable though incomplete claim of self-defense, typically because the victim had threatened violence against the defendant at some recent point in the past. *Christian [v. State*], 550 So.2d 450 (Fla. 1989). This has been true even where the only evidence to this effect was uncontroverted factual testimony of the defendant himself that nevertheless was consistent with the facts surrounding the murder. *Cannady v. State*, 427 So.2d 723 (Fla. 1983).

In the present case, we see absolutely no evidence, much less a colorable claim, establishing a pretense of moral or legal justification. As to Peterson, there is no construction of the facts that would support even a fragmentary claim of excuse or justification, or of a defense to homicide, because the victim here was prostrate and helpless when Walls returned to kill her. Beyond any reasonable doubt, the fourth element exists here. Accordingly, the error in instructing the jury as to cold, calculated premeditation is harmless, because all four elements of this aggravator would exist under any definition. *See DiGuilo*.

*Id*. at 387-389.

2.      Clearly Established Supreme Court Law

There is no United States Supreme Court case holding that a CCP instruction like the one given in Petitioner's resentencing trial is constitutionally flawed. However, in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the Supreme Court cautioned that a sentence of death may not be imposed under sentencing procedures that create a substantial risk the punishment will be inflicted in an arbitrary and capricious manner. An aggravating factor must provide "a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Godfrey v. Georgia*, 466 U.S. at 427 (quoting *Furman v. Georgia*, 408 U.S. at 313). An aggravating factor "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe

sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 2742, 77 L. Ed. 2d 235 (1983). Accordingly, the application of a vague aggravator is a violation of the Eighth Amendment because it "creates the risk that the jury will treat the defendant as more deserving than he otherwise might be by relying on the existence of an illusory circumstance." *Stringer v. Black*, 503 U.S. at 235.

    3.    Federal Review of Claim

    The analysis here is similar to the analysis with regard to the HAC aggravator, discussed *supra.* The first consideration is whether the state appellate court has further defined the vague terms and, if so, whether those definitions are constitutionally sufficient. *See Walton v. Arizona, supra* and *Bell v. Cone*, 543 U.S. at 453. The Florida Supreme Court emphasized in *Jackson* the need to provide adequate guidance to a sentencing jury that the CCP aggravator requires more than what is required for premeditated first-degree murder:

> This court has found it necessary to explain that the CCP statutory aggravator applies to 'murders more cold-blooded, more ruthless, and more plotting that the ordinarily reprehensible crime or premeditated first-degree murder,' and where the killing involves 'calm and cool reflection.' The Court has adopted the phrase 'heightened premeditation' to distinguish this aggravating circumstance from the premeditation element of first-degree murder. The Court has also explained that 'calculation' constitutes a careful plan or a prearranged design. These explications by the Court make it clear that CCP encompasses more than first-degree murder.

*Jackson*, 648 So.2d at 88-89 (internal citations omitted). The court also stated that:

> It would also be reasonable for the general public to consider premeditated first-degree murder as 'cold-blooded murder.' Without legal guidance that the coldness element is only present when the killing involves 'calm and cool reflection,' or when the murder is 'more cold-blooded, more ruthless, and more plotting than the ordinarily reprehensible crime of premeditated first-degree murder,' the average juror may automatically characterize all premeditated murders as CCP. This Court has also explained that calculation must involve a 'careful plan or prearranged design.' Yet [under the standard CCP aggravator instruction], the jury receives no instruction to illuminate the meaning of the terms 'cold,' 'calculated,' or

'premeditated.' Moreover, the meaning of each of these terms is particularly important because the CCP factor is not applicable unless the crime was 'cold, calculated, <u>and</u> premeditated.' . . . Certainly these requirements call for more expansive instructions to give content to the CCP statutory factor.

*Id.* at 89. (internal citations omitted). The *Jackson* court then set forth a narrower instruction to be used until a new jury instruction could be adopted:

The crime for which the defendant is to be sentenced was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. In order for you to consider this aggravating factor, you must find the murder was cold, and calculated, and premeditated, and that there was no pretense of moral or legal justification. 'Cold' means the murder was the product of calm and cool reflection. 'Calculated' means the defendant had a careful plan or prearranged design to commit the murder. 'Premeditated' means the defendant exhibited a higher degree of premeditation than that which is normally required in a premeditated murder. A 'pretense of moral or legal justification' is any claim of justification or excuse that, though insufficient to reduce the degree of homicide, nevertheless rebuts the otherwise cold and calculating nature of the homicide.

*Id.* at 89 n.8.

The better defined instruction for the CCP aggravator set forth by the Florida Supreme Court in *Jackson* is constitutionally sufficient. In fashioning this instruction, the state court set forth the applicable Supreme Court precedent governing vagueness challenges to aggravating factors and addressed the concerns raised in those cases. *See Jackson*, 648 So.2d at 90. The narrowed construction of the CCP aggravator adopted in *Jackson* comports with Supreme Court precedent concerning constitutionally vague aggravators and provides some guidance to the sentencer.[19]

---

[19]While the United States Supreme Court has not directly addressed the constitutional sufficiency of this narrowed instruction, it is notable that the Eleventh Circuit Court of Appeals rejected a vagueness challenge to Florida's former standard CCP instruction, which was the one given in Petitioner's case. *Harich v. Wainwright*, 813 F.2d 1082, 1102 (11th Cir. 1987):

While most capital murders require premeditation, the Florida courts have construed § 921.141(5)(i) to require a greater degree of premeditation and cold-bloodedness than is required to obtain a first degree murder conviction. *See Brown v. State,* 473 So.2d 1260, 1268 (Fla. 1985) ("[cold, calculated] factor places a limitation on the use of premeditation as an aggravating circumstance in the absence of some quality setting the crime apart from mere ordinarily premeditated murder"), *cert. denied,* 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). Given this limiting construction,

The Florida Supreme Court applied the narrowed construction of the CCP aggravator set forth in *Jackson* to the facts of Petitioner's case. The court found that the error in instructing the jury as to the CCP aggravator was harmless because "all four elements of this aggravator would exist under any definition." *Walls II*, 648 So.2d at 389. In its harmless error analysis the court unambiguously found that Petitioner would have been sentenced to death even if the proper instruction had been given. Upon review of the record, the state court's adjudication of this issue is not objectively unreasonable. The court cited *Jackson* and found that the facts supported each element necessary to support the existence of the CCP aggravator.

Petitioner has failed to rebut, by clear and convincing evidence, the factual determinations made by the state court. The state court's factual findings are supported by the record and owed deference by this court. Given these considerations, this Court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Significantly, Petitioner does not allege that the state court failed to engage in harmless-error review as required by Clemons nor does he demonstrate how the state court's analysis is an unreasonable application of established Supreme Court law. Therefore, this court is satisfied that Petitioner's death sentence was not imposed in an arbitrary or capricious manner and that any Eighth Amendment violation was cured by the state appellate court's harmless-error analysis. The CCP instruction as more precisely defined and applied by the Florida Supreme Court provided a meaningful basis for distinguishing Petitioner's case from those in which a death sentence is not appropriate, and thus genuinely narrowed the class of persons eligible for the death penalty. *See Furman v. Georgia, Zant v. Stephens* and *Stringer v. Black, supra.* Furthermore, the state court's findings were not so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation (*see Lewis v. Jeffers*, 497 U.S. at 780). Therefore, Petitioner is not

§ 921.141(5)(i) is a facially valid aggravating circumstance because it genuinely narrows the class of persons eligible for the death penalty).

entitled to relief on this ground.

C.    Mitigation Instructions

Petitioner contends the trial court erred in failing to instruct the jury on the mitigating circumstances of mental impairment , as requested by defense counsel.  He also asserts that the catchall instruction, informing the jury it can consider "any other aspect of the defendant's character or record," fails to inform the jury that mental impairments which may not rise to the level of statutory mitigating circumstance may still be considered.  Doc. 1 at 123.

1.    State Court Proceedings

Petitioner raised this issue in the direct appeal of his conviction and sentences. The Florida Supreme Court denied the claim, explaining:

> As to mental disturbance, Walls contends that the use of adjectives such as 'extreme' or 'substantial' may lead jurors to believe that less serious mental mitigation is precluded.  This is true, Walls believes even though the instructions tell jurors they may consider in mitigation any other aspect of the defendant's character or record.
>
> Our law does establish that all evidence of mental disturbance or impairment is relevant if it may have some bearing on the crime or the defendant's character.  *Cheshire v. State*, 568 So.2d 908 (Fla. 1990). Nevertheless, we do not find any error in denying the more detailed instruction Walls urges.  The instruction on mitigating factors has been repeatedly upheld both in this Court and in the federal courts, and we reaffirm its validity today.  Jurors clearly are told they may consider anything relevant.

*Walls II*, 641 So. 2d at 389.

2.    Clearly Established Supreme Court Law

In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2965, 57 L. Ed. 2d 973 (1978)(plurality opinion), the Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The Court emphasized that an "individualized decision" is essential in

capital cases. *Id.*, 438 U.S. at 605. The sentencing body must consider the "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976). In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), a majority of the Court reaffirmed that a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death.

> Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 479 U.S. 538, 545, 107 S. Ct. 837, 841, 93 L. Ed. 2d 934 (1987) (O'CONNOR, J., concurring). Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock v. Dugger,* [481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987)]. Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that death is the appropriate sentence. *Woodson,* 428 U.S., at 304, 305, 96 S. Ct., at 2991, 2992. "Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California v. Brown, supra,* 479 U.S., at 545, 107 S. Ct., at 841 (O'CONNOR, J., concurring) (emphasis in original).

*Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 2947, 106 L. Ed. 2d 256 (1989).

*See also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007).

### 3.    Federal Review of Claim

Petitioner's sentencing jury was instructed as follows with respect to mitigating circumstances:

> Among the mitigating circumstances you may consider, if established

**by the evidence, are: 1. Frank Walls has no significant history of prior criminal activity; 2. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law were substantially impaired; 3. The crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance; 4. The age of the defendant at the time of the crime; 5. Any other aspect of the defendant's character or record, and any other circumstances of the offense.**

T. VI at 1012. The Florida Supreme Court, citing *Lockett*, has stated that "the jury is not limited, in its evaluation of the question of sentencing, to consideration of the statutory mitigating circumstances. It is allowed to draw on any considerations reasonably relevant to the question of mitigation of punishment." *Lewis v. State*, 398 So.2d 432, 439 (Fla. 1981). *See Hardwick v. Crosby*, 320 F.3d 1127, 1167 n. 151 (11th 2003)("The Florida Supreme Court has been explicit that "[ a]ll evidence of mitigating circumstances may be considered by the judge or jury."(quoting *State v. Dixon*, 283 So.2d 1, 9 (Fla. 1973)).

Petitioner contends that his death sentence violates the constitution because the standard instructions regarding mitigation did not sufficiently apprise the jury that it could consider his mental state, even if this mental state did not rise to the level of a statutory mitigating circumstance. He cites *Penry v. Lynaugh, supra*, as support for his argument. In *Penry*, however, under the Texas death penalty scheme, the jury was not advised to consider mitigating circumstances; the jury was instructed to answer three special questions: 1) did Penry act deliberately when he murdered Pamela Carpenter? 2) is there a probability that he will be dangerous in the future? and 3) did he act unreasonably in response to provocation? *Penry*, 492 U.S. at 320. As the Supreme Court noted, "the jury was never instructed that it could consider the evidence offered by Penry as *mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence." *Id*. Under the principles established in *Lockett* and *Eddings*, the case was remanded for a new sentencing proceeding in order that an individualized assessment of the defendant's background and character, including his claims of mental retardation and abusive background,

be considered by the jury.

Petitioner's case is distinguishable from *Penry* because the jury in his case was given an instruction that it could consider all aspects of his background and character in mitigation of the sentence. The standard "catchall" mitigating circumstance instruction given comports with *Lockett* and *Eddings*. Petitioner has not demonstrated that his jury did not consider all of the mitigation evidence presented, nor has he cited a Supreme Court case which requires a more specific instruction be given with regard to non-statutory emotional disturbance.

Petitioner has not demonstrated that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

D.    Mitigation Instruction Regarding Extreme Duress

Petitioner contends that the trial court erred in not giving the jury the standard instruction provided in Fla. Stat. Section 921.141(6)(e) regarding extreme duress (that the defendant acted under extreme duress or under the substantial domination of another person). He alleges that his "mental impairments rendered him unusually sensitive to impulsive rage reactions when provoked" and that Mr. Alger's reaction to him was the provocation which caused his violent rage and the resulting murders. Doc. 1 at 127.

1.    State Court Proceedings

Petitioner raised this issue in the direct appeal of his conviction and sentences. The Florida Supreme Court denied the claim, holding that it "also find[s] no error in failing to instruct the jury as to the factor of extreme duress. The facts of the murder, as detailed in Walls' own confession and the other evidence, are inconsistent with any such claim." *Walls II*, 641 So.2d at 389.

**2.      Clearly Established Supreme Court Law**

The law regarding mitigating circumstances is set forth *supra*.

**3.      Federal Review of Claim**

Petitioner contends that there was sufficient evidence in the record to support the statutory mitigating circumstance of extreme duress.   During a charge conference, defense counsel requested that a portion of the statutory mitigation instruction be given (that at the time of the commission of the crime the defendant was under extreme duress), but excluding the portion dealing with the defendant being under the substantial domination of some person.  Defense counsel based his request on expert testimony that due to Petitioner's "mental impairments, his organic brain deficits, that any time under issues of stress, periods of stress, that he would not be able to act as other persons could act."  T. VI at 958.  The trial court questioned why this testimony would not be covered under the statutory mitigating circumstance of extreme mental or emotional disturbance.  Defense counsel argued that this testimony would fall under both statutory circumstances.  *Id*. at 959.  The State argued that there was no evidence of duress in the record and that this testimony could fall within the catchall mitigation instruction.  *Id*. at 960.  The trial court initially agreed to give the requested instruction.  *Id*. at 961.

The State then asked whether the term "duress" would be defined for the jury. The following exchange took place:

COURT:      Do you have a definition?

LOVELESS: Your honor, I have a requested instruction on
                        mental impairment.

WILLIAMS:  That's totally different though.  Duress means
                        some outside force required him, forced him.
                        It's not justified by the record.

LOVELESS: Duress means pressure, your Honor, and
                        stress is pressure.  I have just provided to the
                        court–

**COURT:** This is on mental impairment. That doesn't say anything about duress.

**LOVELESS:** Well, your Honor, I think it goes to a number of these particular circumstances, and it goes to allow them to better judge the testimony of doctors and how it relates to these mitigating circumstances.

**WILLIAMS:** Mental capacity, mental problems, mental defects are covered in number 5. You can argue that he was under some kind of duress if you think the record supports it in the catch all that allows you to then define any other mitigating circumstance, but the record simply does not establish medically or any other way from a witness that he was acting under duress. He was not acting under outside forces.

**LOVELESS:** That's the state's definition of the word duress, which I believe is incorrect, your Honor.

**COURT:** Well, that's just it, gentlemen, I don't have a definition of extreme duress.

**LOVELESS:** I don't think there is one.

**COURT:** Gentlemen–Mr. Loveless, to be just very truthful with you, I think that the facts of this case, the evidence in the case, even the defendant's taped statement–it's covered under number 2 that it was committed while he was under the influence of extreme mental or emotional disturbance, that that covers it, and I've already agreed to give that one.

**LOVELESS:** Well, you Honor, I think the court's required to give that based on the evidence that was presented. I do not agree with the court that–

**COURT:** All right. I'm going to retract my previous

> ruling. I don't see any reason in giving the
> extreme duress instruction. I simply don't
> think that the evidence justifies the giving of
> that instruction.

*Id.* at 961-63.

Petitioner is not claiming that the trial court refused to allow the presentation of relevant mitigating evidence, or that the court refused to allow his defense counsel to argue emotional duress to the jury. A review of the record shows that Petitioner's sentencing jury was not precluded from considering all the relevant facets of his character and record. Thus, he demonstrates no constitutional violation. *See Lockett* and *Eddings, supra. See also Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S. Ct. 1669, 1673, 90 L. Ed. 2d 1 (1986)(the exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender).

The state cases cited by Petitioner in his petition do not dictate a different conclusion and can be distinguished on their facts. Petitioner cites *Toole v. State*, 479 So.2d 731, 734 (Fla. 1985), in which the Florida Supreme Court upheld the inapplicability of the emotional duress mitigating circumstance in a case involving a defendant diagnosed as a pyromaniac and stated, "'[d]uress'" is often used in the vernacular to denote internal pressure, but it actually refers to external provocation such as imprisonment or the use of force or threats." (Citation omitted). *Fead v. State,* 512 So.2d 176, 179 (Fla. 1987), was a case involving a jury override involving what the court referred to as a "lovers' quarrel" and the possibility that the defendant may have been acting under emotional disturbance and duress at the time of the crime due to his relationship with the victim.

The state court's factual findings are supported by the record and must be given deference by this Court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to

established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this Court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground VII: Trial Court Erred in Answering Jury Questions**

Petitioner contends that the trial court erred when answering two questions posed by the jury concerning the emotional disturbance mitigating circumstance. He contends that the trial court's failure to further define "emotional disturbance" confused the jury and led it to limit its consideration of mental health mitigation in an unconstitutional manner in violation of Petitioner's due process rights. Doc. 1 at 131. Respondents assert that this claim was not fairly presented as a federal constitutional claim in state court and thus is procedurally barred from federal habeas review.

**1.      State Court Proceedings**

Petitioner raised this issue in the direct appeal of his conviction and sentences. The Florida Supreme Court denied relief and held:

> As his fifth issue, Walls assigns error to the trial court's refusal to provide a more detailed interpretation of emotional disturbance as a mitigating factor. During deliberations, the jury sent written questions to the judge asking what "emotional disturbance" means, and whether the emotional disturbance may be present or preexisting. All parties agreed that "emotional disturbance" could not be further defined, so this question was left essentially unanswered. In response to the second question, the trial court simply reread the previously given instruction on the factor. We find no error in this response. The jury's question in effect asked for an interpretation of the law above and beyond what previously has been found acceptable in jury instructions; and there was no error in the instruction that would have required any modification.

*Walls II*, 641 So. 2d at 389.

**2.      Clearly Established Supreme Court Law**

The law regarding fair presentation and procedural bar is set forth *supra* in

**Ground One, Section 5 b.**

      **3.     Federal Review of Claim**

      In his initial brief appealing his conviction and sentences on retrial, Petitioner raised this claim, citing three Florida state cases.  He cited the federal constitution, Amendments V, VI, VIII and XIV, as well as the Florida constitution for support that his death sentence was imposed in an unconstitutional manner.  *See* Initial Brief ("IB") at 66-67.  He did not, however, cite any Supreme Court law or other federal cases addressing his claims and relied solely on state cases.

      Petitioner did not fairly present this claim in state court, and it is therefore, procedurally barred from federal habeas review.  A mere citation to the federal constitution, without more, is insufficient.  *See  Anderson v. Harless*, 459 U.S. at 7.  "'[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.' *McNair v. Campbell*, 416 F.3d at 1303 (quoting *Kelley v. Sec.'y for Dep't of Corr.*, 377 F.3d at 1345).  The Eleventh Circuit noted in *McNair*:

> McNair never cited any United States Supreme Court or federal appellate court case dealing with extraneous evidence, nor did he mention the presumption of prejudice that arises under federal law when jurors consider such evidence. Instead, he relied on state law opinions to argue a state law claim under a state law standard, citing a lone federal district court opinion (which itself did not mention the federal presumption of prejudice) only as part of a string citation illustrating various courts' holdings with respect to extraneous evidence in the jury room. A careful review of the record makes it clear that McNair did not fairly present his federal constitutional claim to the state court. He therefore failed to exhaust his state court remedies and is procedurally barred from raising his non-exhausted federal claim in his federal habeas petition.

*McNair*, 416 F.3d at 1304.

      Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review.  *See Coleman v. Thompson, supra*.  Additionally, Petitioner has made none of the requisite showing to excuse his default.  Furthermore, Petitioner is now

precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848.

Even if this claim had been fairly presented, Petitioner would not be entitled to relief. While Petitioner cites two federal cases in his federal petition, *Hitchcock v. Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987), and *Lockett v. Ohio*, *supra*, in support of this claim (*see* Doc. 1 at 131), these cases do not address a requirement that the term "emotional disturbance" be further defined for the jury, but require that all relevant mitigating circumstances be considered by the sentencer. Moreover, the trial court's failure to further define emotional disturbance is not a <u>Hitchcock</u> error (wherein the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence) and *Lockett* and its progeny do not require further definition of the term.[20] Absent a Supreme Court case requiring a trial court to further define emotional disturbance, the state court's decision cannot be contrary to nor an unreasonable application of federal law. *See Dombrowski*, 543 F. 3d at 1274. Petitioner is not entitled to habeas relief on this claim.

**Ground VIII:      Trial Court Erred in Sentencing Petitioner to Death Because it Considered Improper Aggravating Circumstances**

**A.      <u>Trial Court Improperly Found HAC Aggravator</u>**

Petitioner contends that the murder of Ann Peterson does not meet the definition of a heinous, atrocious, or cruel murder under Florida law. He alleges that the two gunshots which caused her death were nearly instantaneous and that there is no evidence of intentional infliction of mental suffering prior to Ms. Peterson's death. Doc. 1 at 137. Respondents assert that this claim was not fairly presented as a federal constitutional claim in state court and thus is procedurally barred from federal habeas review.

---

[20]The trial court in fact found several non-statutory mitigating circumstances. *See Walls II*, 641 So.2d at 386.

### 1.  State Court Proceedings

Petitioner raised this claim in the direct appeal of his conviction and sentences. The Florida Supreme Court found that "[t]he murder of Peterson in this instance was protracted, tortuous, and the product of a calculated design, coldly conceived through heightened premeditation, and executed without pretense of any justification." *Walls II*, 641 So.2d at 389.

### 2.  Clearly Established Supreme Court Precedent

The law regarding fair presentation and procedural bar is set forth *supra*.

### 3.  Federal Review of Claim

Petitioner made no reference to federal law on this issue in his initial brief in the direct appeal of his conviction and sentences. *See* IB at 68-72. He relied solely on state cases. Petitioner failed to fairly present this claim in state court as a federal claim. *See McNair v. Campbell*, 416 F.3d at 1304. Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review. *See Coleman v. Thompson*, *supra*. Additionally, Petitioner has made none of the requisite showing to excuse his default. Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848. Petitioner has not demonstrated cause or actual prejudice to excuse for his failure to exhaust, and no fundamental miscarriage of justice will result from his default.

Moreover, even if this claim had been fairly presented, Petitioner cites no federal case in his habeas petition in support of this claim. Therefore, he cannot demonstrate that the state court's determination is contrary to or an unreasonable application of federal law. *See Dombrowski*, 543 F. 3d at 1274.

Finally, the facts as found by the trial court are supported by the record in this case. The trial court supported its finding of the HAC aggravator as follows:

While sleeping in the security of her own home with her boyfriend, [Ann Peterson] was intentionally awakened by the defendant, a gun and knife-wielding stranger. She was forced at gunpoint to tie up her boyfriend, Edward, with curtain cord provided by the defendant. Ann was then taken by the defendant to the living room where she was bound and gagged . She was left to hear the violent life and death struggle between the defendant and her boyfriend. She was also there to hear the three gun shots and realize that it was the intruder who had returned to her and not Edward. Ann begged the defendant to tell her if Edward was alright; the defendant told her "No." The defendant has confessed that at that point he was verbally taunting and terrifying her. The defendant and Ann Peterson wrestled and struggled and he ripped off her only clothing, a night shirt, leaving her completely naked. He then took her to the front bedroom where he untied her. The defendant has confessed that he intended to leave no witnesses. We will never know the full extent of the taunting, cruel teasing, and mental suffering inflicted upon and suffered by Ann Peterson. Instead of a swift, efficient, and "painless" killing, the defendant fired one shot into Ann Peterson's cheek and as she lay there screaming in fear and pain, and while she was curled up crying on the floor, the defendant ended her life by firing a second shot point blank into her head.

To Ann Peterson, the knowledge of her own certain impending death, at the hands of this wicked intruder into the night, knowing that he had already taken the life of Edward Alger, must have brought a level of terror, panic, and utter hopelessness beyond comprehension.

T. VII at 1165-66 (Order on Aggravating and Mitigating Circumstances Considered by the Court Upon Imposition of the Death Penalty). Therefore, Petitioner has not demonstrated that a fundamental miscarriage of justice exists as to the finding of the HAC aggravating circumstance in this case. Petitioner is entitled to no habeas relief on this claim.

**B.     Trial Court Improperly Found CCP Aggravator**

Petitioner contends that the trial court erred in finding the CCP aggravating circumstance applied to the murder of Ms. Peterson. He argues that the evidence does not support the definition of CCP as found in Florida case law because there was no calculated plan to kill and no heightened premeditation proven. Doc. 1 at 139-42. Respondents assert that this claim was not fairly presented as a federal

constitutional claim in state court and thus is procedurally barred from federal habeas review.

### 1. State Court Proceedings

Petitioner raised this issue in the direct appeal of his conviction and sentences. The Florida Supreme Court held that the CCP factor was proven beyond a reasonable doubt. *Walls II*, 641 So.2d at 389. In a footnote, the court noted:

> While the trial court may have unduly emphasized Walls' preparation for the burglary in finding cold calculated premeditation, the judge's findings nevertheless also note the facts showing Walls' preparations for killing Peterson. The latter sufficiently support the trial court's findings.

Id. at 389 n.5.

### 2. Clearly Established Supreme Court Precedent

The law regarding fair presentation and procedural bar is set forth *supra*.

### 3. Federal Review of Claim

Petitioner made no reference to federal law in his initial brief in the direct appeal of his conviction and sentence. *See* IB at 73-77. He relied solely on state cases. Petitioner failed to fairly present this claim in state court as a federal claim. *See McNair v. Campbell*, 416 F.3d at 1304. Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review. *See Coleman v. Thompson, supra*. Additionally, Petitioner has made none of the requisite showing to excuse his default. Petitioner has not demonstrated cause or actual prejudice to excuse for his failure to exhaust, and no fundamental miscarriage of justice will result from his default. Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848.

Finally, the facts as found by the trial court are adequately supported by the

record in this case. The trial court supported its finding of the CCP aggravator as follows:

> The defendant burglarized a used car lot and took an automobile at approximately 8-8:30 p.m. on the night before the murders. He went to two bars and one "strip joint" after committing the burglary of the used car lot. As a result of the burglary the defendant had accumulated assorted stolen property which he took back to and stored at his own trailer. Between approximately 1:45 a.m. and 2:25 a.m. the defendant forcibly entered (using an ice pick-like instrument) the Alger/Peterson mobile home. Parked in front of the home were a minimum of two vehicles giving the clear impression that the home was at that very time occupied. He cut curtain cord immediately upon entering. He proceeded directly to the back bedroom and intentionally awakened both victims. He made no effort to conceal his identity. The property that he ultimately took was taken from the living room area, and the taking of that property did not necessitate waking and confronting the victims. He bound both victims and gagged one. He separated the victims. After killing Edward he then returned to Ann, informed her of what he had done to Edward and then proceeded to kill Ann.
>
> After the murders the defendant checked to make sure "everything was alright," i.e., making sure he left nothing to connect him with the crime. He fled in the stolen automobile which he had parked near the murder scene. He took the victim's property to his trailer. He showered and changed clothes. Then he removed Alger's personal papers from the wallet and put his own in. The wallet contents of the victim were then tossed in a garbage dumpster behind a local high school. The defendant proceeded (now approximately 3:00 a.m.) to the same "strip joint/topless bar" where he freely spent the victim's money on drinks and dancers.
>
> The totality of the defendant's conduct before, during and after the murders elevates his premeditation to the heightened level needed to constitute an aggravating factor.

T. VII at 1166-68 (Order on Aggravating and Mitigating Circumstances Considered by the Court Upon Imposition of the Death Penalty). Petitioner has not demonstrated that a fundamental miscarriage of justice exists as to the finding of the CCP aggravating circumstance in this case. Therefore, Petitioner is entitled to no habeas relief on this claim.

**C.** **Trial Court Improperly Found Homicide During Kidnaping Aggravator**

Petitioner contends that the trial court erred in finding the existence of this aggravator because the State never argued kidnaping in aggravation, and the jury was never instructed that a kidnaping could establish the aggravating circumstance in violation of his due process rights. Doc. 1 at 143. *See* Fla. Stat. § 921.141(5)(d)(1994)(the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, sexual battery, arson, burglary, kidnaping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb).

1.    **State Court Proceedings**

Petitioner raised this claim in the direct appeal of his conviction and sentences. He claimed that because the jury was not instructed on kidnaping that this factor could only rest on the commission of a burglary factor which impermissibly doubled the factor that the murder was committed for pecuniary gain, which would be subsumed with the burglary aggravator. The Florida Supreme Court held that:

> Were we to accept Walls' initial premise, we agree that improper doubling would exist. However, we find that there was sufficient evidence of a kidnaping here: Walls was convicted of two counts of kidnaping because he forcibly confined Peterson against her will, without lawful authority, for the purpose of inflicting bodily harm and terrorizing his victim. *See* section 787.01 Fla. Stat. (1991). Moreover, the confinement here met the "asportation or confinement" requirement announced in *Faison v. State*, 426 So.2d 963, 965-66 (Fla. 1983), because: (a) the confinement here was not slight, inconsequential, or merely incidental to the other crime; (b) it was not inherent in the nature of the other crime; and (c) it made the other crime substantially easier to commit or lessened the risk of detection. *Id.* at 965. There is no error in the fact that the penalty-phase jury was not instructed on kidnaping. *See Ruffin v. State*, 397 So.2d 277 (Fla.), *cert. denied,* 454 U.S. 882, 102 S. Ct. 368, 70 L. Ed. 2d 194 (1981). Fn 6
>
> Fn 6. We do not agree with Walls' assertion that *Ruffin* has been undermined by *Espinosa v. Florida*, 505 U.S. 1079, 112

> S. Ct. 2926, 120 L. Ed. 2d 854 (1992). The latter dealt with jury instructions that were constitutionally invalid, not with minor differences between constitutionally valid instructions and the trial court's findings.

*Walls II*, 641 So.2d at 389-90.

2.      **Clearly Established Supreme Court Law**

While the Supreme Court has not explicitly held that the "double counting" of aggravating circumstances renders them constitutionally invalid,[21] the Court has held that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor. *See Stringer v. Black*, 503 U.S. at 232 ("when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale"). Because of the uniqueness of the death penalty, "*Furman [v. Georgia*] held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. at 188. Therefore, "statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty," (*Zant v. Stephens, supra*, 462 U.S. at 878) and provide a " 'meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not,' " *Gregg v. Georgia*, 428 U.S. at 188 (quoting *Furman v. Georgia*, 408 U.S. at 313 (WHITE, J., concurring)). Given these constitutional concerns, the doubling of aggravators could create a strong presumption in favor of death which creates a substantial risk that death will be inflicted in an arbitrary and capricious manner.

The Florida Supreme Court, however, has invalidated double-counting (the use of the same factual predicate to find two aggravators) of aggravating circumstances.

---

[21] *See Jones v. United States*, 527 U.S. at 398 (the Court has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory advanced by the Tenth Circuit in *U.S. v. McCullah*, 76 F.3d 1087, 1112 (10th Cir. 1996)).

*See Provence v. State*, 337 So.2d 783, 786 (Fla. 1976), which addressed the aggravating circumstances which Petitioner complains of here.  The court explained:

> The State argues the existence of two aggravating circumstances, that the murder occurred in the commission of the robbery (subsection (d)) and that the crime was committed for pecuniary gain (subsection (f)).
>
> While we would agree that in some cases, such as where a larceny is committed in the course of a rape-murder, subsections (d) and (f) refer to separate analytical concepts and can validly be considered to constitute two circumstances, here, as in all robbery-murders, both subsections refer to the Same aspect of the defendant's crime. Consequently, one who commits a capital crime in the course of a robbery will always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged. Mindful that our decision in death penalty cases must result from more than a simple summing of aggravating and mitigating circumstances, State v. Dixon, 283 So.2d 1, 10 (Fla.1973), we believe that Provence's pecuniary motive at the time of the murder constitutes only one factor which we must consider in this case.

*Id.*

### 3.    Federal Review of Claim

Petitioner did exhaust this claim in state court, citing both *Espinosa, supra*, and *Sochor v. Florida*, 504 U.S. 527, 112 S. Ct. 2114, 119 L. Ed. 2d 326 (1992), and asserting that *Ruffin v. State, supra,*[22] was unconstitutional in light of *Espinosa* and

---

[22]    In *Ruffin v. State*, 397 So.2d 277, 282 (Fla. 1981), the court held that:

[A] defendant has no right to a statement of particulars as to the aggravating circumstances upon which the State will rely to support its request for the death penalty. *Clark v. State*, 379 So.2d 97 (Fla.1979). His second contention is also without merit. It was not necessary that Ruffin be charged and convicted of the robbery and the kidnaping that led to the murder of Mrs. Hurst. The State proved beyond a reasonable doubt that concomitant with the murder Ruffin also committed the robbery and the kidnaping. The State has clearly met its burden, and the court properly found and applied this aggravating circumstance.

*Sochor* to the extent that it allows the trial judge to find aggravating circumstances which were not presented to the jury for consideration via proper instructions or arguments. *See* IB at 78-79. Petitioner does not make this argument in his federal petition and cites no federal law in support of his claim other than a string cite to the federal Constitution.

The Florida Supreme Court properly determined that *Espinosa* and *Sochor* dealt with Eighth Amendment violations when the sentencer considered invalid aggravating factors, and thus are inapplicable to this claim. *See Walls II*, 641 So.2d at 390. Furthermore, Respondents contend that the State's sentencing memorandum did argue the aggravator that the murder was committed while the defendant was engaged in the commission of a kidnaping, to wit:

> The crime of kidnaping was accomplished when Ann, at gunpoint, was forced from her bed, taken to the living room, bound and gagged. Subsequently, Ann was moved to yet another room. Ann was murdered shortly after she was moved to the second room (and after Edward was murdered). After her murder Edward's wallet, money, and a fan were taken from their mobile home.

T. Vol. VII at 1035. The trial court's finding on this aggravator mirror the State's argument. *See id.* at 1164 (Order on Aggravating and Mitigating Circumstances Considered by the Court Upon Imposition of the Death Penalty). Because the facts support evidence of a kidnaping, Petitioner can demonstrate no due process violation here. Moreover, the trial court found five other aggravating circumstances applicable to the crime, so any error in applying this aggravator is harmless under the *Brecht* standard.

Finally, because Petitioner cites no federal case in his habeas petition in support of this claim, he cannot demonstrate that the state court's determination is contrary to or an unreasonable application of federal law. *See Dombrowski*, 543 F. 3d at 1274. The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C.

───────────────────────

§ 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this Court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**D.    Trial Court Erred in Finding Homicide Committed to Avoid Arrest Aggravator**

Petitioner contends that the avoid arrest aggravator is not applicable in his case because it only applies when the evidence proves that the only or dominant motive for the killing is to eliminate a witness, unless the victim is a police officer. Doc. 1 at 144. Petitioner asserts that the dominant reason for the murder of Ms. Peterson was his mental illness and that he suffered an uncontrollable rage reaction when Mr. Alger fought him during the burglary and when Ms. Peterson later struggled with him. Id. at 145. Respondents assert that this claim was not fairly presented as a federal constitutional claim in state court and thus is procedurally barred from federal habeas review.

**1.    State Court Proceedings**

Petitioner raised this issue in the direct appeal of his conviction and sentences, and the Florida Supreme Court denied the claim, holding:

> [The avoid arrest] factor properly exists if the dominant motive of the murder was to eliminate a witness. *See Knowles v. State*, 632 So.2d 62 (Fla. 1993). Here, Walls' own confession stated that he killed Peterson because he wanted no witnesses. A confession is direct evidence in Florida. *Hardwick v. State*, 521 So.2d 1071 (Fla.), *cert. denied*, 488 U.S. 871, 109 S. Ct. 185, 102 L. Ed. 2d 154 (1988); *Michael v. State*, 437 So.2d 138 (Fla. 1983), *cert. denied*, 465 U.S. 1013, 104 S. Ct. 1017, 79 L. Ed. 2d 246 (1984). Therefore, this argument is without merit because it is directly refuted by the record and Walls' own words. For much the same reason, we also do not agree that Walls' "motive" was based on some mental derangement, not witness elimination. The facts of the killing as well as Walls' confession indicate otherwise, and the expert opinion

testimony on this point is equivocal at best.  Fn 7

> **Fn 7.  It is perhaps true that some aspects of psychological science today treat criminal predisposition or criminal intent as a mental derangement.  The law, however, is more exacting.  "Mens rea" (or guilty mind) is the keystone of the law on homicide, because it is the measure of social blameworthiness.  In the penalty phase of a capital trial, we have held that mental derangement may be relevant if it lessens or eliminates the weight of one of the heightened intent aggravators, which themselves gauge a kind of "heightened mens rea."  *Santos v. State*, 591 So.2d 160, 163 (Fla. 1991).  However, the purported "derangement" is irrelevant if it consists of nothing more than the aggravating factor itself.  Any other holding would create an exception that completely swallows the rule.  The evidence in this case establishes beyond a reasonable doubt that Walls possessed the heightened mens rea necessary for intent aggravators.  The expert testimony to the contrary is too tenuous and too poorly supported by the facts to detract from the judge and jury's decision to impose death.**

*Walls II*, 641 So.2d at 390.


### 2.      Clearly Established Supreme Court Precedent

The law regarding fair presentation and procedural bar is set forth *supra*.

### 3.      Federal Review of Claim

Petitioner made no reference to federal law in his initial brief in the direct appeal of his conviction and sentence.  *See* IB at 79-81.  He relied solely on state cases.  Petitioner failed to fairly present this claim in state court as a federal claim.  *See  McNair v. Campbell*, 416 F.3d at 1304.  Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review.  *See Coleman v. Thompson, supra*.  Additionally, Petitioner has made none of the requisite showing to excuse his default.  He has not demonstrated cause or actual prejudice to excuse for his failure to exhaust, and no fundamental miscarriage of justice will result from his default.

Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848.

Moreover, even if this claim had been fairly presented, Petitioner cites no federal case in his habeas petition in support of this claim. Therefore, he cannot demonstrate that the state court's determination is contrary to or an unreasonable application of federal law. *See Dombrowski*, 543 F. 3d at 1274.

Finally, the facts as found by the trial court are adequately supported by the record in this case. The trial court supported its finding of the avoid arrest aggravator as follows:

> The defendant, by his own admission, fully intended to eliminate Ann Peterson as a witness to the murder of Edward Alger and other crimes. The defendant confessed that Ann Peterson asked if Edward was "O.K." and he told her "No." He further stated that she knew what he had done to Edward. The defendant made no attempt to conceal his identity, yet took elaborate steps to avoid detection. The defendant stated, "I don't want. . . no witnesses." *Kokal v. State*, 492 So.2d 1317 (1986).

T. VII at 1164 (Order on Aggravating and Mitigating Circumstances Considered by the Court Upon Imposition of the Death Penalty). Therefore, Petitioner has not demonstrated that a fundamental miscarriage of justice exists as to the finding of the avoid arrest aggravating circumstance in this case. Petitioner is entitled to no habeas relief on this claim.

E.     Trial Court Impermissibly Doubled the Homicide Occurred During a Burglary and Homicide Committed for Pecuniary Gain Aggravators

Petitioner contends that the trial court erred when it found both that the homicide was committed during a burglary or kidnaping aggravator (Fla. Stat. § 921.141(5)(d)) and that the homicide was committed for pecuniary gain (Fla. Stat. § 921.141(5)(f)). Respondents assert that this claim was not fairly presented as a federal constitutional claim in state court and thus is procedurally barred from federal

habeas review.

1.    **State Court Proceedings**

Petitioner raised this claim in the direct appeal of his conviction and sentences. The Florida Supreme Court found that there was no improper doubling of aggravating factors because a kidnaping also provided support for the aggravating circumstance provided in Section 921.141(5)(d).  *See Walls II*, 641 So.2d at 389-90.  Respondents contend that Petitioner failed to fairly present this federal claim in state court.

2.    **Clearly Established Supreme Court Precedent**

The law regarding fair presentation and procedural bar is set forth *supra*.

3.    **Federal Review of Claim**

Petitioner made no reference to federal law in his initial brief in the direct appeal of his conviction and sentence.  *See IB at 82-83.* He relied solely on state cases.  Petitioner failed to fairly present this claim in state court as a federal claim. *See McNair v. Campbell*, 416 F.3d at 1304.  Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review.  *See Coleman v. Thompson, supra*. Additionally, Petitioner has made none of the requisite showing to excuse his default. Petitioner has not demonstrated cause or actual prejudice to excuse for his failure to exhaust, and no fundamental miscarriage of justice will result from his default. Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal.  As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  *See O'Sullivan*, 526 U.S. at 839-40, 848.

Moreover, even if this claim had been fairly presented, Petitioner cites no federal case in his habeas petition in support of this claim.   Therefore, he cannot demonstrate that the state court's determination is contrary to or an unreasonable application of federal law.   *See Dombrowski*, 543 F. 3d at 1274.

Even if this claim had been fairly presented, Petitioner's claim would be denied.

In Petitioner's case, the trial court supported its finding of the pecuniary gain aggravator as follows:

> The Court is aware of the prohibition against the doubling of aggravated factors (i.e., considering both the burglary and pecuniary gain). Even though burglary was the underlying felony for the first degree felony murder conviction, the murder was also committed during the commission of a kidnaping and F.S. 921.141(5)(d) could stand on burglary *or* a kidnaping. Upon consideration of the total circumstances, the fact that a burglary also occurred does not prevent the Court from considering the pecuniary gain aspect of the crime.

> Evidence of pecuniary gain was clear by recovery of Edward's wallet and Edward and Ann's fan from the trailer occupied by the defendant. It was further established by the defendant's statement that he went there to get some things and had in fact taken between $200-$300 from the trailer.

T. V II at 1164-65 (Order on Aggravating and Mitigating Circumstances Considered by the Court Upon Imposition of the Death Penalty). In Petitioner's case, each aggravator was supported by different factual predicates. The kidnaping necessarily relied on facts discrete from the facts relating to the burglary of the victims' home. The state courts recited facts in the record which supported both the kidnaping and the pecuniary gain aggravators. Accordingly, there was no improper doubling of the aggravating circumstances here and no concern that Petitioner's sentence was skewed by the consideration of an invalid aggravator. Therefore, Petitioner has not demonstrated that a fundamental miscarriage of justice exists as in this case. Petitioner is entitled to no habeas relief on this claim.

**Ground IX:  Trial Court Used Incorrect Legal Standard in Finding Mitigating Circumstances**

Petitioner contends that while the trial court judge properly instructed the jury as to the burden of proof necessary to establish mitigating circumstances ("if you are reasonably convinced that a mitigating circumstance exists, you may consider it as established"), he erroneously applied a preponderance of the evidence standard in his sentencing order. *See* T. VI at 1013 & T. VII at 1168. Petitioner alleges that the trial court may have rejected mitigating circumstances which were supported by the

evidence in violation of his due process rights. Doc. 1 at 149-50. Respondents assert that this claim was not fairly presented as a federal constitutional claim in state court and thus is procedurally barred from federal habeas review.

### 1. State Court Proceedings

Petitioner raised this claim in the direct appeal of his conviction and sentences. The Florida Supreme Court denied the claim as meritless, stating:

> Walls cites to language in opinions such as *Nibert v. State*, 574 So.2d 1059 (Fla. 1990), that mitigating factors must be found if they are "reasonably established" in the record. *Nibert* and other cases, however, add the condition that the factors must be "reasonably established *by the greater weight of the evidence.*" *Id.* at 1061. "Greater weight" is the equivalent of "preponderance," because both simply mean "that which is more probable."

*Walls II*, 641 So.2d at 390 (internal citations omitted).

### 2. Clearly Established Supreme Court Precedent

The law regarding fair presentation and procedural bar is set forth *supra*.

### 3. Federal Review of Claim

The only reference to federal law in Petitioner's initial brief in the direct appeal of his conviction and sentences is a string citation to the federal constitution, Amendments V, VI, VIII and XIV. *See* IB at 84-86. Petitioner failed to fairly present this claim in state court as a federal claim. *See McNair v. Campbell*, 416 F.3d at 1304. Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review. *See Coleman v. Thompson, supra*. Additionally, Petitioner has made none of the requisite showing to excuse his default. He has not demonstrated cause or actual prejudice to excuse for his failure to exhaust, and no fundamental miscarriage of justice will result from his default. Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848.

Furthermore, this issue is not a federal constitutional issue. A violation of state law is not a ground for federal habeas relief. *See Hendrix v. Secretary, Fla. Dept. of Corr.*, 527 F.3d 1149, 1153 (11th Cir. 2008)("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). *See Lewis v. Jeffers,* 497 U.S. at 780 ("[F]ederal habeas corpus relief does not lie for errors of state law ...."); *Pulley v. Harris,* 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Finally, the Supreme Court has approved of the preponderance standard to prove mitigating circumstances in capital cases. The Court in *Walton v. Arizona*, 497 U.S. at 649-650, stated as follows in rejecting a claim that the preponderance standard to prove mitigating circumstances was unconstitutional:

> It does not follow from *Lockett* and its progeny that a State is precluded from specifying how mitigating circumstances are to be proved. Indeed, in *Lockett* itself, we expressly reserved opinion on whether "it violates the Constitution to require defendants to bear the risk of nonpersuasion as to the existence of mitigating circumstances in capital cases." [*Lockett*, 438 U.S.] at 609, and n. 16 (plurality opinion).

The Court in *Walton* also stated that "so long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Id.,* 497 U.S. at 650. *See also Kennedy v. Dugger*, 933 F.2d 905, 915 (11th Cir. 1991). For the foregoing reasons, Petitioner is entitled to no habeas relief on this claim.

**Ground X:**     **Trial Court Erred in Failing to Find Extreme Emotional Disturbance and Substantially Impaired Mental Capacity Mitigating Circumstances**

Petitioner contends that the trial court erred in not finding two statutory mitigating circumstances because the court applied the incorrect burden of proof, the medical opinion supporting the mitigators was not refuted by the testimony of other medical expert witnesses, and the trial court's reliance on Petitioner's demeanor

during the trial was irrelevant. Doc. 1 at 152. Respondents assert that this claim was not fairly presented as a federal constitutional claim in state court and thus is procedurally barred from federal habeas review.

1.      State Court Proceedings

Petitioner raised this claim in the direct appeal of his conviction and sentences. The Florida Supreme Court denied the claim, explaining as follows:

> In Florida as in many states, a distinction exists between factual evidence or testimony, and opinion testimony. As a general rule, uncontroverted factual evidence cannot simply be rejected unless it is contrary to law, improbable, untrustworthy, unreasonable, or contradictory. *E.g., Brannen v. State*, 94 Fla. 656, 114 So. 429 (1927). This rule applies equally to the penalty phase of a capital trial. *Hardwick*, 521 So.2d at 1076.
>
> Opinion testimony, on the other hand, is not subject to the same rule. *Brannen.* Certain kinds of opinion testimony clearly are admissible–and especially qualified expert opinion testimony–but they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking. A debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve. *See Hardwick*, 521 So.2d at 1076. We cannot conclude that the evidence here was anything more than debatable. Fn8. Accordingly, this Court may not revisit the judge and jury's determinations on appeal.
>
>> Fn8. Reasonable persons could conclude that the facts of the murder are inconsistent with the presence of the two mental mitigators. Moreover, all the experts hedged their statements, gave equivocal responses, or responded to questions that themselves were equivocal. The psychiatrist said he could not testify as to Walls' state of mind at the time of the murder. One psychologist responded yes to a question that essentially only asked whether Walls was suffering *any* impairment at the time of the murder. The facts may be consistent with some degree of emotional impairment, which the trial court surely recognized in finding emotional handicap and brain dysfunction as nonstatutory mitigators. Nevertheless, the expert testimony does not address the true problem here:

> the relative weight of mitigators versus aggravators. On the whole, the facts are consistent with the conclusion that any impairment Walls suffered was nonstatutory in nature and, in any event, was of far slighter weight than the aggravating factors found to exist.

*Walls II*, 641 So.2d at 390-91.

### 2.    Clearly Established Supreme Court Precedent

The law regarding fair presentation and procedural bar is set forth <u>supra</u>.

### 3.    Federal Review of Claim

The only reference to federal law in Petitioner's initial brief in the direct appeal of his conviction and sentence is a string citation to the federal constitution, Amendments V, VIII and XIV. *See* IB at 87-90. He relied solely on state law cases. Petitioner failed to fairly present this claim in state court as a federal claim. *See McNair v. Campbell*, 416 F.3d at 1304. Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review. *See Coleman v. Thompson, supra*. Additionally, Petitioner has made none of the requisite showing to excuse his default. He has not demonstrated cause or actual prejudice to excuse for his failure to exhaust, and no fundamental miscarriage of justice will result from his default. Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848.

Furthermore, this is not a federal constitutional issue. In his federal petition, Petitioner contends that the trial court did not adhere to the requirements set forth in *Campbell v. State*, 571 So.2d 415, 419 (Fla. 1990), which among other things requires that the trial court make specific findings concerning each proposed mitigating circumstance, including the weight to be accorded each circumstance. The requirements of *Campbell* are matters of state law. A violation of state law is not

a ground for federal habeas relief. *See Lewis v. Jeffers,* 497 U.S. at 780 ("[F]ederal habeas corpus relief does not lie for errors of state law ...."); *Pulley v. Harris,* 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.").

While Petitioner cites *Penry v. Lynaugh, Eddings v. Oklahoma*, and *Lockett v. Ohio* in his federal petition, as support for his claim, these cases address the restriction of the sentencer's consideration of mitigating circumstances. They do not require the sentencer to give effect to all of the mitigation presented by the defense. So long as the defense was allowed to present all relevant mitigating evidence and the jury was given the opportunity to consider and give it effect, there is no constitutional violation. *See Penry*, 492 U.S. at 328. There is no federal requirement that a fact finder credit expert testimony whether it is rebutted or not. The Court has summarized the Court's death penalty jurisprudence as follows:

> In sum, our decisions since *Furman* have identified a constitutionally permissible range of discretion in imposing the death penalty. First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.

*Blystone v. Pennsylvania*, 494 U.S. 299, 308-309, 110 S. Ct. 1078, 1084, 108 L. Ed. 2d 255 (1990)(quoting *McCleskey v. Kemp*, 481 U.S. 279, 305-06, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)).

Finally, the trial court in its sentencing order made the following findings with regard to mental health mitigators:

Although there was some testimony from one psychologist (Dr.

Hagerott) that the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (F.S. 921.141(6)(b)), the Court does not believe that this mitigating factor was proved by a preponderance of the evidence. Dr. Hagerott's evaluation consisted of approximately a four hour examination conducted five years after the event. Neither the other defense psychologist nor the defense psychiatrist who each examined the defendant and/or treated him prior to the murders and at a point in time much closer to the murders would testify that the defendant was under the influence of extreme mental or emotional disturbance. To the contrary, they testified that the defendant in fact had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law.

Furthermore, Dr. Valentine, defense psychiatrist, testified that the defendant had previously been diagnosed and treated for manic depression, but testified further that the defendant was no longer being treated for that diagnosis and was, to Dr. Valentine's knowledge, under no medication for any emotional disturbance either at the time of the murders or at the time of trial.

The Court also observed that during the course of the week long trial the defendant, who at the time was taking no medication and was on trial for his life, exhibited absolutely no symptoms of emotional stress or disturbance, and appeared to remain calm and lucid at all times and participated actively with his counsel during the jury selection process and the trial of the case.

T. VII at 1168-69 (Order on Aggravating and Mitigating Circumstances Considered by the Court Upon Imposition of the Death Penalty). For the foregoing reasons, Petitioner is entitled to no habeas relief on this claim.

**Ground XI: Petitioner's Sentence is Disproportionate to the Crimes Committed**

Petitioner contends that his death sentence is improper when compared to other similar cases. He argues that he suffered from a mental disorder which rendered him temporarily out of control and that other mitigating factors render his death sentence disproportionate to his crimes, and thus unconstitutional. Doc. 1 at 160-64. Respondents assert that this claim was not fairly presented as a federal constitutional claim in state court and thus is procedurally barred from federal

habeas review.

1.    **State Court Proceedings**

Petitioner raised this issue in the direct appeal of his conviction and sentences. The Florida Supreme Court denied the claim, holding:

> Our review of this Court's case law, however, shows no comparability between the present case and others in which the death penalty has been found disproportionate.  *Fitzpatrick [v.State*, 527 So.2d 809 (Fla. 1988)], for example, involved a bizarre robbery scheme by an immature and emotionally disturbed young man who impulsively fired his weapon when surprised by a police officer.
>
> The present case, on the other hand, is little better than the execution-style slaying of a helpless woman who already had been bound and gagged, who had been terrorized by hearing her boyfriend's murder, who was helpless and in tears, and who obviously posed no threat whatsoever to Walls.  The case for mitigation here unmistakably is of far lesser weight than that of aggravation, and we believe it would be so under any reasonable construction of the case for mitigation.
>
> Accordingly, death is proportionate here.  We say so having reviewed the entire record for any other possible errors.  Having found none, the judgment and sentences are affirmed.

*Walls II*, 641 So.2d at 391.

2.    **Clearly Established Supreme Court Precedent**

The law regarding fair presentation and procedural bar is set forth *supra*.

3.    **Federal Review of Claim**

Petitioner made no reference to federal law in his initial brief in the direct appeal of his conviction and sentence.   *See* IB at 91-94. Petitioner failed to fairly present this claim in state court as a federal claim. *See  McNair v. Campbell*, 416 F.3d at 1304.  Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review.  *See Coleman v. Thompson, supra*.  Additionally, Petitioner has made none

of the requisite showing to excuse his default. He has not demonstrated cause or actual prejudice to excuse for his failure to exhaust, and no fundamental miscarriage of justice will result from his default. Furthermore, Petitioner is now precluded under state law from re-arguing the issue on appeal. As discussed *supra*, an issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. *See O'Sullivan*, 526 U.S. at 839-40, 848.

Even if this claim had been fairly presented, there is no constitutional requirement of proportionality review. *See Pulley v. Harris*, 465 U.S. at 50 (proportionality review by state courts is not required by federal Constitution); *McCleskey v. Kemp*, 481 U.S. at 307("'Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.'" (quoting *Gregg v. Georgia*, 428 U.S. at 199)); *Lewis v. Jeffers*, 497 U.S. at 779 (proportionality review is not constitutionally required). Fore the foregoing reasons, Petitioner is not entitled to habeas relief on this claim.

Ground XII: Ineffective Assistance of Appellate Counsel

A.    Prosecutorial Misconduct

Petitioner references various comments made by the prosecutor which were not objected to by defense counsel which he characterizes as constituting prosecutorial misconduct.[23]    Doc. 1 at 165-167.    Petitioner argues that these

---

[23]Petitioner alleges that the following prosecutorial comments constitute misconduct: (1) the prosecutor introduced evidence of an uncharged sexual battery which his predecessor had agreed should not be part of the trial; (2) the prosecutor argued to the jury that Petitioner would have killed witness Amy Touchton had she known he was there; (3) the prosecutor commented on Petitioner's lack of remorse; (4) the prosecutor argued at the penalty phase closing that Petitioner would have be a future danger to society; (5) the defense did not prove that Petitioner went to church; (6) the prosecutor argued that because this was a

comments rendered his trial fundamentally unfair, and his appellate counsel's failure to raise the issue on appeal constitutes ineffective assistance of counsel.

### 1. State Court Proceedings

Petitioner raised this issue in his state habeas proceeding. The Florida Supreme Court dealt with the claim in conjunction with its decision in Petitioner's postconviction proceeding. The court denied the claim:

> Walls' claims of ineffective assistance of appellate counsel involve prosecutorial comments that were not preserved by proper objection at trial. As a general rule, this Court has determined that failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error.
>
> In order for an error to be fundamental and justify reversal in the absence of a timely objection, "the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." In order for improper comments made in the closing arguments of a penalty phase to constitute fundamental error, they must be so prejudicial as to taint the jury's recommended sentence.
>
> The prosecutorial comments that Walls claims as fundamental error are the same ones raised in his rule 3.850 claims of ineffective assistance of trial counsel. As explained above, trial counsel did not object to some of these comments and some of the comments were not objectionable. Appellate counsel cannot be deemed ineffective for failing to raise as an issue on appeal these unpreserved improper comments. Nor do we find that the comments in question constitute fundamental error. *See e.g., Crump v. State*, 622 So.2d 963, 971-72 (Fla. 1993)(rejecting defendant's assertion that the prosecutor's improper comments in both the guilt and penalty phases of the trial constituted fundamental error that could be raised on appeal without proper

---

double murder, the jury would have to find that the prior violent felony aggravator should apply; (7) the prosecutor mislead the jury that Petitioner's bipolar disorder was not a genuine psychiatric disorder;(8) the prosecutor argued that Petitioner should be executed because he lacked the will to be a good person. Doc. 1 at 165-67.

**objection at trial; comments at issue included a narrative that gained sympathy for the victim, characterization of the defense as an "octopus" that was clouding the water in order to "slither away," and two statements during the penalty phase asking the jury to return a death sentence in order to send a message to the community). Additionally, as noted above, Walls cannot prove prejudice from the comments in question because the comments either were not improper or were harmless. In one instance, trial counsel did object to the prosecutor's comments regarding the jury's obligation as to aggravating factors and the comment was corrected. Appellate counsel cannot be faulted for not raising this meritless claim on appeal. Walls is not entitled to habeas relief on this claim.**

*Walls III*, 926 So.2d at 1176 (internal citations omitted).

2.      **Clearly Established Supreme Court Law**

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is that enunciated in *Strickland. See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed.2d 746 (2000). The Supreme Court has held that counsel need not raise every nonfrivolous claim on appeal. *See Jones v. Barnes*, 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed.2d 987 (1983). The Court in *Jones* emphasized the importance of winnowing out weaker arguments in favor of stronger ones. The Court stated:

> 'Most cases present only one, two, or three significant questions . . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weaker arguments will be to dilute the force of the stronger ones.' (Citing R. Stern, Appellate Practice in the United States 266 (1981)).

*Id.*, 463 U.S. at 752. The Court has also stated that while it is possible to bring a *Strickland* claim based on appellate counsel's failure to raise a particular claim in a merits brief, it will be difficult to demonstrate incompetence. *See Robbins*, 528 U.S. at 288. "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'"

*Id.* (citation omitted).  To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal.  *See id.,* 528 U.S. at 285.

   3.      Federal Review of Claim

   The Florida Supreme Court cited *Strickland* as the legal standard for analyzing claims of ineffective assistance of appellate counsel and applied those standards to the facts of Petitioner's claims.  *Walls III*, 926 So.2d at 1175.  Therefore, the court applied the correct legal rule based on Supreme Court precedent.  The remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

   The Florida Supreme Court first concluded that some of the comments raised by Petitioner were not objected to and, therefore, were not properly preserved for appeal.  Where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  *Atkins v. Singletary*, 965 F.2d 952, 957 (11th Cir. 1992), *cert. denied*, 515 U.S. 1165, 115 S. Ct. 2624, 132 L. Ed. 2d 865 (1995); *Francois v. Wainwright*, 741 F.2d 1275, 1285-86 (11th Cir. 1984).

   The court also found that the comments did not constitute fundamental error to overcome a procedural bar because they were not so prejudicial as to taint the jury's recommended sentence.  Petitioner raised an ineffective assistance of trial counsel claim in his postconviction proceeding regarding most of the comments he complains of, and the state court denied relief.  *See Walls III*, 926 So.2d at 1166-69. Therefore, this claim is without merit to the extent that the issue was dealt with on appeal. Finally, Petitioner has not demonstrated that there is a reasonable probability that, but for these comments the  outcome of the proceeding would have been different, so he cannot establish either prong of the *Strickland* standard.

   The state court's factual findings are supported by the record and must be

given deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.   Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Given these considerations, this Court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law.  Therefore, Petitioner is not entitled to habeas relief on this ground.

B.    **Petitioner Could Not Present Certain Expert Witness Testimony in Violation of *Ake v. Oklahoma***

Petitioner contends that the State's improper use of subterfuge which led to the reversal of his first conviction and subsequent retrial had the effect of depriving him of the aid of the experts who considered him incompetent because they could not testify at the retrial.   He alleges ineffective assistance of appellate counsel because his attorney failed to raise this issue on appeal.  Doc. 1 at 169.

1.    State Court Proceedings

Petitioner raised this issue in his state habeas proceeding.   The Florida Supreme Court addressed the claim in conjunction with its decision in Petitioner's postconviction proceeding.  The court denied the claim, holding:

> Walls claims that he was denied due process by the prosecution's misconduct in giving psychiatric information to its psychiatrists through subterfuge prior to his first trial.  He argues that he was denied the opportunity of presenting testimony from his own experts who had testified at his first trial.  He further contends that appellate counsel should have raised this issue on appeal and argued that double jeopardy precluded the imposition of the death penalty on retrial because retrial was due to the State's misconduct.
>
> As explained above, this improper conduct by the State was raised in Walls' initial direct appeal, and this Court remanded for a new trial on all issues because of the misconduct.  *Walls*, 580 So.2d at 135.  On retrial,

Walls was not eligible for the death penalty for Alger's murder because he had been "acquitted of death" by the first jury. However, he had not been "acquitted of death" for Peterson's murder and double jeopardy did not bar the death penalty on retrial. *See Sattazahn v. Pennsylvania*. Walls' present double jeopardy claim has no merit.

Walls also contends that he was denied due process on retrial because he was denied the opportunity to present testimony from the experts who had testified at his first trial. This Court ruled that any psychiatric testing and evaluations presented at the retrial could not rely directly or indirectly on the information that was unlawfully obtained by the officer. "[T]o eliminate the taint, any such evaluations shall not be conducted by the experts who previously received the information taken as a result of the police subterfuge." *Walls*, 580 So.2d at 135. This ruling did not result in Walls being denied a mental health evaluation at his retrial. In fact, he was evaluated by a neuropsychologist before retrial, and this neuropsychologist, along with a psychologist and a psychiatrist who had treated and evaluated Walls before the crime, testified on his behalf at retrial.

*Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), requires that a defendant have access to a "competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Walls does not argue that he was denied access to mental health professionals or that these professionals failed to conduct the appropriate examinations. In fact, Dr. Hagerott testified that she conducted an extensive evaluation of Walls prior to trial. Instead, Walls argues that he was denied the testimony of the experts who had testified at his first trial. While *Ake* held that failure to provide a mental health evaluation violates due process, it did not establish a right to have a *specific* expert conduct that examination. *See Ake*, 470 U.S. at 83, 105 S. Ct. 1087 (pointing out that an indigent defendant has no "constitutional right to choose a psychiatrist of his [or her] personal liking"). Nor did *Ake* establish a claim of ineffective assistance of mental health expert. *See, e.g., Wilson v. Greene*, 155 F. 3d 396, 401 (4th Cir. 1998)("The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness."); *Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir. 1990)(indicating that valid *Ake* claim cannot be basis for court to conduct a "psychiatric medical malpractice review"); *Silagy v. Peters*, 905 F.2d 986, 1013 (7th Cir. 1990)(same). Thus, Walls has failed to establish a violation of *Ake* and is not entitled to habeas relief on this

**claim. *Cf. Hodges v. State*, 885 So.2d 338, 353 (Fla. 2004)(refusing to consider ineffective assistance of counsel claim recast as an *Ake* claim).**

*Walls III*, 926 So.2d at 1177.

**2.      Clearly Established Supreme Court Precedent**

**The law regarding ineffective assistance of appellate counsel is set forth *supra*.**

**3.      Federal Review of Claim**

**In *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S. Ct. 1087, 1096, 84 L. Ed. 2d 53 (1985), the Court held that:**

> **When a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.**

As the Florida Supreme Court correctly determined, *Ake* does not state that Petitioner has a right to be examined by a *specific* mental health expert.  Petitioner was evaluated by three mental health experts, Drs. Chandler, Valentine and Hagerott, all of whom testified on his behalf during the penalty phase of his retrial.  *See* T. VI at 787-878.  Petitioner cannot, therefore, establish an *Ake* violation.  *See Provenzano v. Singletary*, 148 F.3d 1327, 1333 -1334 (11th Cir. 1998) noting that the Circuit's leading decision on *Ake, Clisby v. Jones*, 960 F.2d 925, 930 (11th Cir.1992) (en banc), requires the petitioner to show that he requested from the trial court something in the way of mental health assistance that the trial court refused to give him.

Petitioner has made no claim that the trial court denied any request he made in the way of expert witnesses on mental health issues.  Because Petitioner's

appellate counsel is not ineffective for failing to raise a meritless claim, Petitioner has failed to establish either prong of the *Strickland* analysis as to ineffective assistance of counsel. It is not constitutionally defective performance for appellate counsel to abandon a meritless argument on direct appeal. *See Diaz v. Secretary for Dep't of Corrections*, 402 F.3d 1136, 1144- 45 (11th Cir.2005) ("Appellate counsel would not have prevailed on this argument, and nonmeritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel."); *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir.2001) (declaring that defendant's appellate counsel was not ineffective for failing to raise a nonmeritorious issue); *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir.2000) ("Appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit.").

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**C.** **Trial Court Erred in Failing to Independently Weigh Aggravating and Mitigating Circumstances**

Petitioner contends that the trial court simply adopted the proposed findings supplied to it by the State in its sentencing memorandum without making its own findings. Petitioner alleges that had his appellate attorney raised this issue on direct appeal, he would have received a life sentence. Doc. 1 at 170.

**1.** **State Court Proceedings**

Petitioner raised this issue in his state habeas proceeding. The Florida Supreme Court addressed the claim in conjunction with its decision in Petitioner's postconviction proceeding. The court denied the claim:

Walls contends that the sentencing court read the State's sentencing memo into the record, adopting it as its own sentencing order. Walls also contends that the sentencing findings in his 1992 sentencing order are identical to those made at his first trial in 1988. Thus, he argues, the sentencing court had predetermined to impose the death penalty for Peterson's murder on retrial. Walls contends that had appellate counsel raised this issue on appeal, he would have received a life sentence.

As a threshold matter, Walls' substantive claim that the trial court failed to independently weigh the aggravating and mitigating circumstances is procedurally barred, since it could have and should have been raised on direct appeal. *See Harvey v. Dugger,* 656 So.2d 1253, 1256 (Fla.1995); *Roberts v. State,* 568 So.2d 1255, 1258 (Fla.1990). To succeed on the ineffective assistance of appellate counsel portion of the claim, Walls must establish that counsel's failure to raise the claim on appeal is of "such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." *Floyd v. State,* 808 So.2d 175, 183 (Fla. 2002) (quoting *Pope v. Wainwright,* 496 So.2d 798, 800 (Fla. 1986)). However, appellate counsel's failure to raise a meritless issue does not constitute ineffective assistance of counsel. *See Valle v. Moore,* 837 So.2d 905, 908 (Fla. 2002); *Chandler v. Dugger,* 634 So.2d 1066, 1068 (Fla.1994).

The record of Walls' sentencing proceedings on retrial shows that trial counsel voiced his objection to the sentencing order. Counsel argued that the trial court had failed to make an independent assessment of the aggravating and mitigating circumstances, had simply adopted the State's sentencing recommendation, and had made a decision to impose a death sentence prior to trial. The trial judge responded that the facts of the case did not change on retrial and that much of the same evidence was presented at both trials. The judge also stated that he had made an independent assessment of the propriety of the death penalty for Peterson's murder. Despite trial counsel's objection to the sentencing order, appellate counsel did not raise this issue on appeal. Walls claims that appellate counsel rendered ineffective assistance for

failing to do so.

While the sentencing order on retrial repeats the factual findings and much of the aggravating circumstances contained in the sentencing order from the first trial, there are substantial differences in the mitigating circumstances found in the sentencing order on retrial. The sentencing order on retrial also finds a sixth aggravating factor (prior violent felony) that was not included in the sentencing order from the first trial. Further, the sentencing order on retrial accurately recounts the mitigating evidence and the witnesses who testified at the retrial, which was very different from what was presented at the first trial. From this record, we conclude that the sentencing court conducted its own evaluation and independently weighed the aggravating and mitigating circumstances in imposing the death sentence. *See Blackwelder v. State,* 851 So.2d 650, 652-53 (Fla. 2003) (concluding that differences between State's sentencing memo and sentencing order established that trial court did not simply rubber-stamp the State's sentencing memorandum, but independently weighed the aggravating and mitigating factors and personally evaluated the case). Additionally, any similarities between the sentencing order from the first trial and the sentencing order on retrial would not have necessarily entitled Walls to relief on this issue had appellate counsel raised it on appeal. *See Morton v. State,* 789 So.2d 324, 334 (Fla. 2001) (concluding that reversal was not necessary even though resentencing judge copied verbatim substantial portions of the prior sentencing order because it was evident from the record that the resentencing judge performed an independent weighing and personal evaluation of the case in light of several significant difference between the orders).   Because Walls cannot show that he would have been entitled to relief on appeal had this claim been raised, he cannot make the required showing of prejudice and is not entitled to habeas relief.

*Walls III*, 926 So.2d at 1178-79.

2.      Clearly Established Supreme Court Precedent

The law regarding ineffective assistance of appellate counsel is set forth *supra*.

3.      Federal Review of Claim

The trial court held the sentencing hearing in Petitioner's case on June 29, 1992.  T. VII at 1219-1242.  After the court recited its findings, defense counsel Loveless requested that the sentencing proceedings from the original trial in 1987 be

included in the transcript on appeal because "that transcript will show the virtual identity of these proceedings to that, indicating that the Court had made no–that the Court had made up its mind prior to the trial in this particular case prior to sentencing" as to the sentence to be imposed. *Id.* at 1238-39. Mr. Loveless also stated that "the Court has read verbatim the State's recommendation into the record" and "has made no independent findings of its own." *Id.* at 1239. The trial court responded that there was a substantial difference in the mitigating factors between the first and second trials, but that the facts set forth in both proceedings were "essentially the same." *Id.* The court elaborated further:

> During the course of the second trial of this case I saw no basic differences in the facts as they were presented in the first trial. I also–the only difference that I really saw in the two trials was in the presentation of mitigating factors. Those were addressed in the sentence that has been imposed this morning. While I would certainly agree–in fact, I will note for the record that in reading the State's letter to me this morning– . . . I noticed that it tracked my previous order. But I can't see any real problem with that.
>
> I would like to state for the record that in all instances, both instances, I went over the record with a fine-tooth comb in trying to set forth every possible fact situation that I could set forth that was supported by the evidence. As I indicate, I felt the evidence tracked very closely in both the first and second trial. The Court felt at the conclusion of the first trial that Mr. Walls was entitled to the imposition of the death penalty and I feel at the conclusion of this trial, after hearing a second presentation of the facts before a second jury, that he's still entitled to the death penalty.

*Id.* at 1240-41.

The Florida Supreme Court held that based on its precedent, Petitioner could not show that he would have been entitled to relief on appeal, thus he could not demonstrate the prejudice necessary to prevail on an ineffective assistance of appellate counsel claim. *See Blackwelder v. State*, 851 So.2d 650, 652-53 (Fla. 2003); *Morton v. State,* 789 So.2d 324, 334 (Fla. 2001). Because Petitioner's appellate counsel is not ineffective for failing to raise an issue which would not have prevailed on appeal, Petitioner has failed to establish prejudice under *Strickland. See Diaz,*

**402 F.3d at 1144 -1145;** *United States v. Nyhuis,* **211 F.3d at 1344.**

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**D.    Trial Court Admitted/ Considered Inadmissible Victim Impact Evidence**

Petitioner alleges that the trial court had before it letters from the victims' families that were forwarded by the State Attorney's Office which contained inadmissible victim impact evidence in violation of *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), because they contained comments on his future dangerousness and recommended the death penalty as punishment. *See* T. VII at 1039-44. Petitioner alleges that his appellate counsel was ineffective for failing to challenge "this prosecutorial conduct, the court's procedure, and the reliance on inadmissible documents and sentencing considerations." Doc. 1 at 171.

**1.    State Court Proceedings**

Petitioner raised this issue in his state habeas proceeding. The Florida Supreme Court addressed the claim in conjunction with its decision in Petitioner's postconviction proceeding. The court denied the claim, holding:

> In *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), the United States Supreme Court held that the Eighth Amendment to the United States Constitution did not prevent the State from presenting evidence about the victim, evidence of the impact of the murder on the victim's family, and prosecutorial argument on these subjects, if permitted to do so by state law. Subsequently, the Florida Legislature enacted section 921.141(7), Florida Statutes (2005), which

permits the prosecution to introduce and argue victim impact evidence. See ch. 92-81, § 1, Laws of Fla. Even though victim impact evidence is admissible in a death case, it is limited to evidence "designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." § 921.141(7), Fla. Stat. (2005). "Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence." *Id.; see also Payne*, 501 U.S. at 830 n. 2, 111 S. Ct. 2597.

In this case, the letters from the victims' family members exceeded the proper bounds of victim impact evidence as provided in both the statute and *Payne* because they commented on the defendant and the crime and provided an opinion as to the proper punishment to be imposed. However, any error in this regard would not be fundamental error because the jury never saw the letters and were never exposed to this evidence. The judge alone saw this improper victim impact evidence. *See Card v. State,* 803 So.2d 613, 628 (Fla.2001) (finding no fundamental error where improper victim impact evidence was introduced during the *Spencer* hearing, outside the presence of the jury). Thus, Walls would not have prevailed on this issue even had appellate counsel raised it on direct appeal. Accordingly, Walls is not entitled to habeas relief on this claim.

*Walls III*, 926 So.2d at 1179.

　　2.　　**Clearly Established Supreme Court Precedent**

The law regarding ineffective assistance of appellate counsel is set forth *supra.*

　　3.　　**Federal Review of Claim**

While the state court determined that some comments in the letters written by family members violated the bounds of Fla. Stat. 921.141(7) and *Payne v. Tennessee*, it held that there was no fundamental error because only the judge, not the jury, was exposed to this evidence. *Payne* provides that "in the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. *Payne*, 501 U.S. at 825 (citing *Darden v. Wainwright,* 477 U.S. 168, 179-183, 106 S. Ct. 2464, 2470-2472, 91 L. Ed. 2d 144 (1986)). The concerns about allowing a

sentencer to hear victim impact evidence (that evidence relating to a particular victim or harm caused to the victim's family does not reflect on the defendant's "blameworthiness" for the crime and thus is irrelevant to the sentencing decision) do not apply in the same manner when the evidence is heard by the trial court alone, as opposed to a jury.  Trial courts are routinely tasked with addressing and/or setting aside inflammatory and prejudicial evidence in order to reach a reasoned decision.  Petitioner has not demonstrated that *Payne* applies when the evidence is before the court alone.

Because the court held that Petitioner would not have prevailed on appeal, his appellate counsel was not ineffective for failing to raise this issue on appeal.  Petitioner has failed to establish prejudice under *Strickland.  See Diaz*,  402 F.3d at 1144 -1145; *United States v. Nyhuis,* 211 F.3d at 1344.

The state court's factual findings are supported by the record and must be given deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.    Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law.  Therefore, Petitioner is not entitled to habeas relief on this ground.

E.    <u>Appellate Counsel Failed to Raise Unconstitutional Jury Instructions On Appeal</u>

Petitioner alleges that his jury was not properly instructed on the following aggravating circumstances: prior violent felony, engaged in the commission of a burglary or kidnaping, and avoid lawful arrest.  He alleges that his trial counsel failed to preserve this issue for appeal and the failure of his appellate counsel to raise the issue constituted ineffective assistance of counsel.  Doc. 1 at 171-72.

1.    **State Court Proceedings**

Petitioner raised this issue in his state habeas proceeding.  The Florida Supreme Court addressed the claim in conjunction with its decision in Petitioner's postconviction proceeding.  The court denied the claim, holding:

> Counsel also requested a special instruction on the avoid arrest aggravating circumstance. The trial court granted this request and gave Walls' special instruction to the jury. Counsel did not object to the prior violent felony or committed during the course of a felony instructions.

> Jury instructions "are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred." *State v. Delva,* 575 So.2d 643, 644 (Fla.1991). "To justify not imposing the contemporaneous objection rule, 'the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.' " *Id.* at 644-45 (quoting *Brown v. State,* 124 So.2d 481, 484 (Fla.1960)). "In other words, 'fundamental error occurs only when the omission is pertinent or material to what the jury must consider in order to convict.' " *Delva,* 575 So.2d at 645 (quoting *Stewart v. State,* 420 So.2d 862, 863 (Fla.1982)). In order for an error to be deemed fundamental and thus cognizable on appeal without being preserved below, the error must be basic to the judicial decision under review and equivalent to a denial of due process. *See State v. Johnson,* 616 So.2d 1, 3 (Fla.1993).

> Even if appellate counsel had raised claims relating to the prior violent felony and the committed during the course of a felony instructions as fundamental error on direct appeal, Walls would not have prevailed because these instructions have withstood similar challenges. *See Blanco v. State,* 706 So.2d 7, 11 (Fla.1997) (finding that instruction on aggravating circumstance of murder in the course of a felony does not constitute an automatic aggravator); *Whitton v. State,* 649 So.2d 861, 867 n. 10 (Fla.1994) (concluding that standard jury instruction for avoid arrest aggravator was not vague and did not require a limiting instruction in order to make the aggravator constitutionally sound); *Gorby v. State,* 819 So.2d 664, 686 (Fla.2002) (declining to determine that the jury instruction for the "prior violent felony" aggravator is invalid). Appellate counsel's failure to appeal these unpreserved and meritless issues is not deficient performance.

Finally, even if there were some infirmity in the instructions given on these aggravating circumstances, Walls still could not prevail because the record clearly supports the existence of the prior violent felony, committed during the course of a felony, and avoid arrest aggravators. Walls was convicted of the contemporaneous murder of Alger, which clearly supported the "prior violent felony" aggravating circumstance. *See Zeigler v. State,* 580 So.2d 127, 129 (Fla.1991) (explaining that prior violent felony aggravating factor is properly applied where the contemporaneous crime is committed upon a separate victim). Additionally, "there was sufficient evidence of a kidnapping here" because Walls "forcibly confined Peterson against her will, without lawful authority, for the purpose of inflicting bodily harm and terrorizing her." *Walls,* 641 So.2d at 389. Finally, "Walls' own confession stated that he killed Peterson because he wanted no witnesses," which is direct evidence that Walls' dominant motive for killing Peterson was to eliminate a witness. *Id.* at 390.

Thus, Walls has not established ineffective assistance of appellate counsel relating to instructional error and is not entitled to habeas relief on this claim.

*Walls III*, 1179-81.

2. **Clearly Established Supreme Court Precedent**

The law regarding ineffective assistance of appellate counsel is set forth <u>supra</u>.

3. **Federal Review of Claim**

First, Petitioner raised on direct appeal that the trial court erred in finding the avoid arrest aggravating circumstance. *Walls II*, 641 So.2d at 390. While he contends that this instruction failed to inform the jury that the State was required to prove each element beyond a reasonable doubt, the Florida Supreme Court found that the facts supported the existence of this aggravator.

As to the jury instructions regarding the prior violent felony and engaged in the commission of a burglary or kidnaping aggravators, because defense counsel failed to object to the jury instruction, the issue was not preserved for appeal, and thus was procedurally barred from review. *See Francois v. Wainwright*, 741 F.2d at 1285. Even

if it had been preserved, Petitioner's appellate counsel was not ineffective for failing to raise an issue which would not have prevailed on appeal. *See Diaz*, 402 F.3d at 1144 -1145; *United States v. Nyhuis,* 211 F.3d at 1344. Finally, because the state court found the record supported the existence of the aggravators, Petitioner cannot establish the prejudice prong of *Strickland*. Therefore, Petitioner is entitled to no habeas relief on this claim.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

### F. *Ring v. Arizona*

Petitioner contends that Florida's death penalty scheme is unconstitutional because it requires the judge, without aid of the jury, to make other findings necessary for the imposition of his death sentence in violation of *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). He also contends that his death sentence must be vacated because elements of the offense necessary to establish capital murder were not charged in the indictment. Finally, Petitioner asserts that the failure of his appellate counsel to raise these claims on direct appeal constitutes ineffective assistance of counsel. Doc. 1 at 173-192.

#### 1. State Court Proceedings

Petitioner raised two claims regarding *Ring v. Arizona, supra*, in his state

habeas petition.  The Florida Supreme Court addressed the claims in conjunction with its decision in Petitioner's postconviction proceeding.  The court denied the claims:

> Walls raises two habeas claims based on the United States Supreme Court's decision in *Ring.* First, he claims that Florida's capital sentencing statute violates his constitutional rights under *Ring* and thus his death sentence must be vacated. Second, he claims that his death sentence is invalid because the aggravating factors were not charged in his indictment. We find no merit to either claim.

> The United States Supreme Court's recent decision in *Schriro v. Summerlin,* 542 U.S. 348, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004), held that the decision in *Ring* is not retroactive. A majority of this Court has also concluded that *Ring* does not apply retroactively in Florida to cases that are final, under the test of *Witt v. State,* 387 So.2d 922 (Fla.1980). *See Johnson v. State,* 904 So.2d 400, 412 (Fla.2005). Accordingly, Wall's *Ring* claims are procedurally barred in these postconviction proceedings.

> However, even if the claims were not barred, they would be without merit. This Court has recognized that a defendant is not entitled to relief under the "prior-conviction exception" to *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), [Fn5] where the aggravating circumstances include a prior violent felony conviction. *See, e.g., Duest v. State,* 855 So.2d 33, 49 (Fla.2003) (noting rejection of *Ring* claims in a number of cases involving a prior-conviction aggravator), *cert. denied,* 541 U.S. 993, 124 S. Ct. 2023, 158 L. Ed. 2d 500 (2004); *Grim v. State,* 841 So.2d 455, 465 (Fla.) (explaining that defendant was not entitled to relief under *Ring* where aggravating circumstances of multiple convictions for prior violent felonies and contemporaneous felony of sexual battery were unanimously found by jury), *cert. denied,* 540 U.S. 892, 124 S. Ct. 230, 157 L. Ed. 2d 166 (2003).

>> FN5. In *Apprendi,* the Supreme Court held that "*[o]ther than the fact of a prior conviction,* any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S. Ct. 2348 (emphasis added).

> In the instant case, the trial court found the aggravating circumstances

of a prior violent felony conviction, based on the contemporaneous murder of Alger, and that the murder was committed during the course of a burglary and a kidnapping. *Walls,* 641 So.2d at 386. A unanimous jury found Walls guilty beyond a reasonable doubt of these offenses, thereby satisfying the mandates of the United States and Florida Constitutions. *See Kimbrough v. State,* 886 So.2d 965, 984 (Fla.2004); *Doorbal v. State,* 837 So.2d 940, 963 (Fla.), *cert. denied,* 539 U.S. 962, 123 S. Ct. 2647, 156 L. Ed. 2d 663 (2003). Further, this Court has rejected similar claims that *Ring* requires aggravating circumstances be alleged in the indictment or to be individually found by a unanimous jury verdict. *See Blackwelder v. State,* 851 So.2d 650, 654 (Fla.2003); *Porter v. Crosby,* 840 So.2d 981, 986 (Fla.2003). Thus, Walls is not entitled to postconviction relief on his *Ring* claims.

*Walls III*, 926 So.2d at 1174-75.

2.     Clearly Established Supreme Court Law

In *Ring v. Arizona, supra*, the Supreme Court held that a sentencing judge, sitting without a jury, may not find an aggravating circumstance necessary for the imposition of the death penalty, and that the Sixth Amendment requires those circumstances to be found by a jury. The Court has expressly held that *Ring* does not apply retroactively on collateral review. *Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519, 2526, 159 L. Ed. 2d 442 (2004).

3.     Federal Review of Claim

To the extent that Petitioner is alleging a straight *Ring* claim, his claim is precluded by *Schriro v. Summerlin*. Furthermore, Florida's capital sentencing procedures do not implicate the Sixth Amendment concern identified in *Ring*, which was that Arizona's death penalty system, committed *both* capital sentencing factfinding and the ultimate sentencing decision entirely to the trial judge. Florida, on the other hand, has a hybrid system in which the jury renders an advisory verdict, but the trial judge makes the ultimate sentencing determination. *See* Fla. Stat. 921.141; *Ring, supra*, 536 U. S. at 608, n. 6. A Florida defendant is eligible for the death penalty upon the conviction of first degree murder. Because *Ring* holds that any fact which increases the penalty beyond the statutory maximum must be found

by the jury, and because death is the statutory maximum for first degree murder in Florida, *Ring* does not establish Sixth Amendment error under Florida's statutory scheme. *See also Hildwin v. Florida*, 490 U. S. 638, 109 S. Ct. 2055, 104 L. Ed. 2d 728 (1989) (*per curium*) (finding no Sixth Amendment violation with Florida's death penalty scheme that permits judge to find aggravating circumstance authorizing death sentence). In addition, Petitioner's death sentence was supported by a recommendation of death by a unanimous jury. Thus, any possible requirement that the jury find Petitioner eligible for the death penalty was satisfied in this case.

To the extent that Petitioner is making an ineffective assistance of appellate counsel claim because his appellate counsel failed to raise a Sixth Amendment right to a jury trial claim, the claim has not been fairly presented to the state courts and is thus procedurally barred from federal habeas review. *See Coleman v. Thompson*, *supra.* Even if the claim had been fairly presented, appellate counsel was not ineffective for failing to raise the claim because the Supreme Court precedent was contrary to his position. *Spaziano v. Florida*, 468 U.S. 477, 464-65, 104 S. Ct. 3154, 3164-65, 83 L. Ed. 2d 340 (1984); *Hildwin v. Florida, supra.* *Ring* did not overrule *Walton* until 2002; Petitioner's case became final in 1995. Appellate counsel is not ineffective for failing to raise an issue under these circumstances. *See Funchess v. Wainwright*, 772 F.2d 683, 691 (11th Cir. 1985)(failure of trial counsel to anticipate Florida Supreme Court's "doubling" jurisprudence in capital cases not deficient for purposes of inquiry into counsel's ineffectiveness); *Pitts v. Cook*, 923 F.2d 1568, 1574 (11th Cir. 1991)(counsel's pre- *Batson* failure to raise a *Batson* -type claim does not fall below reasonable standards of professional competence, and thus does not render counsel's assistance constitutionally ineffective).

With regard to Petitioner's argument that his death sentence is invalid because his indictment did not reference the aggravating factors required for a death sentence, there is no federal constitutional requirement that the aggravators be included in the indictment. The Fifth Amendment right to grand jury indictments does not extend to state prosecutions. *Hurtado v. California*, 110 U.S. 516, 4 S. Ct. 111, 28 L. Ed. 232

(1884)(due process guarantee does not require an indictment by a grand jury in a state murder prosecution). *See Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 2356 n.3 (2000)("[The Fourteenth] Amendment has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' that was implicated in our recent decision in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998)").[24]

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

---

[24]Petitioner's reliance on *U.S. v. Allen*, 406 F.3d 940, 942 (8th Cir. 2005), a federal prosecution, is misplaced. In *Allen*, he Eighth Circuit held that *Ring* implies that the Fifth Amendment also requires capital aggravating factors to be found by the grand jury and included in the indictment; however the court acknowledged that *Ring* did not address the indictment issue because it involved a state prosecution, and the Fifth Amendment's grand jury requirement has not been construed to apply to the states. *Allen*, 406 F.3d at 942-43. *Allen* is not a Supreme Court case and, thus, does not change the controlling law on this issue.

## V. CONCLUSION

For the foregoing reasons, the petition for issuance of a writ of habeas corpus (doc. 1) is DENIED.

DONE and ORDERED this 30th  day of September, 2009.


*s/ M. Casey Rodgers*

**M. CASEY RODGERS**
**United States District Judge**